# IN THE SUPREME COURT OF IOWA

No. 17–0367

Filed June 28, 2019

**STATE OF IOWA,**

    Appellee,

vs.

**SCOTTIZE DANYELLE BROWN,**

    Appellant.

---

Appeal from the Iowa District Court for Black Hawk County, Nathan A. Callahan, District Associate Judge.

The defendant challenges her conviction for operating a motor vehicle while intoxicated under Iowa Code section 321J.2 (2017), arguing she was subjected to an impermissible pretextual stop. **AFFIRMED.**

Mark C. Smith (until withdrawal), State Appellate Defender, and Theresa R. Wilson, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Kelli Huser (until withdrawal), Kevin Cmelik, and Israel Kodiaga Assistant Attorneys General, Brian Williams, County Attorney, and Charity Sullivan, Assistant County Attorney, for appellee.

Rita Bettis of ACLU of Iowa Foundation, Des Moines; Russell E. Lovell II, Des Moines; David S. Walker, Windsor Heights; and Andrew B. Duffelmeyer (until withdrawal) of Glazebrook & Hurd, LLP, Des Moines, for

Amici Curiae American Civil Liberties Union of Iowa, the NAACP, League of United Latin American Citizens of Iowa, and 1000 Kids for Iowa.

Alan R. Ostergren, Muscatine, for amicus curiae Iowa County Attorneys Association.

**CHRISTENSEN, Justice.**

This case requires us to decide whether a motorist who breaks a traffic law may lawfully be stopped if the officer was motivated by investigative reasons for the stop. Around 12:25 a.m., a police officer observed the defendant making an improper turn and decided to follow the defendant. At a stoplight, the officer noticed the defendant's vehicle had an improperly functioning license plate light and ran the vehicle information for the vehicle's registered owner—who was not the defendant. The vehicle information revealed the registered owner's affiliation to gang activity. Subsequently, the officer pulled the defendant over, which led to his discovery of the defendant's open beer container in the center cupholder.

The State charged the defendant with operating while intoxicated in violation of Iowa Code section 321J.2 (2016). The defendant moved to suppress all evidence obtained after the stop, arguing the officer conducted it in violation of the Fourth Amendment of the United States Constitution and article I, section 8 of the Iowa Constitution because the officer's reasons for the stop were not the traffic violations themselves. The district court denied the motion to suppress and later convicted the defendant following a bench trial on the minutes. Consistent with precedent in Iowa and the vast bulk of authority elsewhere, we affirm the district court judgment because the subjective motivations of an individual officer for making a traffic stop are irrelevant as long as the officer has objectively reasonable cause to believe the motorist violated a traffic law.

## I. Background Facts and Proceedings.

On October 17, 2015, Officer Justin Brandt of the Waterloo Police Department observed a black Lincoln Navigator at around 12:25 a.m. in the City of Waterloo. Officer Brandt observed the driver accelerating at a

yellow light and passing to the left of a moving vehicle before veering across the centerline. The traffic light changed from yellow to red as the Lincoln Navigator passed through the intersection. Officer Brandt followed the driver to another intersection, where he also observed the driver's license plate light was not properly functioning. At the red light, he ran the vehicle information for the vehicle's registered owner—who was not the driver—and discovered the registered owner's association with local gang activity.

After realizing the registered vehicle owner's gang affiliation, Officer Brandt decided to stop the vehicle. He activated his emergency lights, but the driver continued. The driver eventually stopped the vehicle after Officer Brandt activated his audible siren. Officer Brandt approached the vehicle and immediately smelled an odor of alcohol coming from the driver; he also observed an open can of beer in the center cupholder. The driver denied ownership of the open container but admitted to drinking prior to driving. Officer Brandt obtained the driver's name and date of birth because the driver did not have a license with her. The driver was identified as Scottize Brown. Officer Brandt determined Brown was driving with a suspended license and transported her to the police station, where she failed several field sobriety tests and refused to submit to a breath test.

Brown was charged with a second offense of operating a motor vehicle while intoxicated, an aggravated misdemeanor, in violation of Iowa Code section 321J.2. She filed a motion to suppress on January 15, 2016, claiming she was unlawfully subjected to a pretextual stop in violation of both article I, section 8 of the Iowa Constitution and the Fourth Amendment of the United States Constitution. The district court held a hearing on the motion on February 3, and it denied Brown's motion on February 16, explaining, "Since there were traffic violations that were

objectively observed by Officer Brandt, any subjective reasons that may have gone into his decision to stop the vehicle do not matter."

Brown subsequently agreed to a trial on the minutes, and the district court found her guilty on June 21. She was sentenced to incarceration in Black Hawk County jail, "351 days suspended, 14 days imposed," and to probation for one to two years. The district court also ordered Brown to pay a $1875 fine with surcharge, a $10 DARE surcharge, court costs, and attorney fees. Brown appealed on March 7, 2017, requesting that we vacate her conviction and sentence and remand her case for dismissal because she was subjected to an impermissible pretextual stop. We retained Brown's appeal.

## II. Standard of Review.

"When a defendant challenges a district court's denial of a motion to suppress based upon the deprivation of a state or federal constitutional right, our standard of review is de novo." *State v. Brown*, 890 N.W.2d 315, 321 (Iowa 2017). We examine the entire record and "make an independent evaluation of the totality of the circumstances." *State v. Meyer*, 543 N.W.2d 876, 877 (Iowa 1996), *abrogated in part on other grounds by Knowles v. Iowa*, 525 U.S. 113, 115, 118–19, 119 S. Ct. 484, 487, 488 (1998). In doing so, we evaluate each case "in light of its unique circumstances." *State v. Kurth*, 813 N.W.2d 270, 272 (Iowa 2012) (quoting *State v. Krogmann*, 804 N.W.2d 518, 523 (Iowa 2011)).

Ineffective-assistance-of-counsel claims are based in the Sixth Amendment of the United States Constitution and article I, section 10 of the Iowa Constitution. *Strickland v. Washington*, 466 U.S. 668, 684–86, 104 S. Ct. 2052, 2063–64 (1984); *State v. Schlitter*, 881 N.W.2d. 380, 388 (Iowa 2016). We normally preserve ineffective-assistance-of-counsel claims for postconviction-relief proceedings. *State v. Harrison*, 914 N.W.2d

178, 206 (Iowa 2018). But, "we will address such claims on direct appeal when the record is sufficient to permit a ruling." *State v. Wills*, 696 N.W.2d 20, 22 (Iowa 2005). We review ineffective-assistance-of-counsel claims de novo. *Schlitter*, 881 N.W.2d at 388.

### III. Analysis.

The United States Supreme Court has established an objective test to evaluate the reasonableness of a traffic stop under the Fourth Amendment of the United States Constitution. In prior cases, we have applied this objective test when evaluating whether law enforcement violated a defendant's Fourth Amendment rights by making a pretextual traffic stop. *See State v. Predka*, 555 N.W.2d 202, 205 (Iowa 1996); *see also State v. Cline*, 617 N.W.2d 277, 280–81 (Iowa 2000) (en banc), *abrogated on other grounds by State v. Turner*, 630 N.W.2d 601, 606 n.2 (Iowa 2001). Brown now asks us to take a different approach under the Iowa Constitution. For the reasons explained below, we decline to do so. We first address Brown's constitutional claim, and then turn to her ineffective-assistance-of-counsel claim based on an argument not raised during her motion to suppress in the district court.

### A. Subjective Reasons to Stop Motorists.

1. *The Fourth Amendment.* The Fourth Amendment of the United States Constitution protects individuals from unreasonable searches and seizures. *Whren v. United States*, 517 U.S. 806, 809, 116 S. Ct. 1769, 1772 (1996); *see also* U.S. Const. amend. IV ("The right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ."). Under the Fourth Amendment, the temporary detention of a motorist during a traffic stop is a "seizure," which is "subject to the constitutional imperative that it not be 'unreasonable' under the

circumstances." *Whren,* 517 U.S. at 809–10, 116 S. Ct. at 1772. Generally, a traffic stop is reasonable when the police have probable cause or reasonable suspicion to believe that the motorist violated a traffic law. *Navarette v. California,* 572 U.S. 393, 401–02, 134 S. Ct. 1683, 1690 (2014); *Whren,* 517 U.S. at 809–10, 116 S. Ct. at 1772; *State v. Tague,* 676 N.W.2d 197, 204 (Iowa 2004).

In *Whren,* the United States Supreme Court unanimously held that an officer's "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." 517 U.S. at 813, 116 S. Ct. at 1774. In that case, police officers stopped a motorist and his passenger in a "high drug area" after observing the motorist turning without signaling then speed "off at an 'unreasonable speed.'" *Id.* at 808, 116 S. Ct. at 1772. Upon stopping the motorist, one of the officers observed drugs in the motorist's hands. *Id.* at 808–09, 116 S. Ct. at 1772. The officers arrested the motorist and his passenger and retrieved various illegal drugs from the vehicle. *Id.* at 809, 116 S. Ct. at 1772. Both the motorist and his passenger were convicted of violating numerous drug laws and sought to have their convictions reversed, arguing the district court should have granted their suppression motions since the traffic stop was pretextual. *Id.*

The petitioners in *Whren* asked the Supreme Court to adopt a different reasonableness test for traffic stops since the traffic code is so expansive that it provides officers with discretion to make pretextual stops based on factors such as race. *Id.* at 810, 116 S. Ct. at 1773. Specifically, the petitioners claimed the test for traffic stops should be "whether a police officer, acting reasonably, would have made the stop for the reason given." *Id.* In rejecting petitioners' test, the Supreme Court noted, "Not only have we never held, outside the context of inventory search or administrative

inspection . . . , that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment; but we have repeatedly held and asserted the contrary." *Id.* at 812, 116 S. Ct. at 1774. The Supreme Court "agree[d] with petitioners that the Constitution prohibits selective enforcement of the law based on considerations such as race." *Id.* at 813, 116 S. Ct. at 1774. However, it declared "the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment." *Id.*

The Supreme Court acknowledged the expansive nature of the traffic code and the potential for an "unsettling show of authority" that enforcing such an expansive code created. *Id.* at 817, 116 S. Ct. at 1776 (quoting *Delaware v. Prouse,* 440 U.S. 648, 657, 99 S. Ct. 1391, 1398 (1979)). Nevertheless, it was "aware of no principle that would allow [it] to decide at what point a code of law becomes so expansive and so commonly violated that infraction itself can no longer be the ordinary measure of the lawfulness of enforcement." *Id.* at 818, 116 S. Ct. at 1777. It concluded, "[F]or the run-of-the-mine case, which this surely is, we think there is no realistic alternative to the traditional common-law rule that probable cause justifies a search and seizure." *Id.* at 819, 116 S. Ct. at 1777.

On appeal, Brown concedes that the officer's subjective motivations are irrelevant under the Fourth Amendment to the United States Constitution so long as there is probable cause to support the stop. We therefore turn to the question whether the Iowa Constitution forbids stopping a motorist who violated the law if that was not the officer's real reason for the stop.

2. *Article I, section 8.* The question before us is whether, under the Iowa Constitution, a traffic stop for a traffic violation is "reasonable" even if the violation did not happen to be the officer's motivation for the stop.

To put it another way, we must decide whether a motorist who violates a traffic law has a justified expectation that she will be able to continue down the road without interruption unless that violation is the officer's motivation for the stop. As we will explain herein, we do not think article I, section 8 draws such fine lines. It is reasonable to stop a motorist based on reasonable suspicion that the motorist violated the law.

i. *Scope of article I, section 8.* Article I, section 8 of the Iowa Constitution protects persons against "unreasonable seizures." Iowa Const. art. I, § 8 ("The right of the people to be secure in their persons . . . against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause . . . ."). It should be noted that article I, section 8 and the Fourth Amendment have only minimal textual differences. Article I, section 8 employs a semicolon between the reasonableness and warrant clauses while the Fourth Amendment uses a comma between these two clauses.[1] *State v. Gaskins,* 866 N.W.2d 1, 6 (Iowa 2015).

Current members of our court have disagreed about the semicolon's significance. *Compare State v. Short,* 851 N.W.2d 474, 483 (Iowa 2014) ("This semicolon suggests the framers believed that there was a relationship between the reasonableness clause and the warrant clause . . . ."), *with id.* at 522 (Mansfield, J., dissenting) ("I do not think one can use this inconsequential punctuation difference to justify a different interpretation of article I, section 8."). "One expects that, if the semicolon in [a]rticle I, section 8 fundamentally altered the meaning of that provision, this argument [over differences in punctuation marks] would

---

[1]We also note a textual difference for order of appearance; the Iowa Constitution reverses the order of "searches and seizures."

have emerged at some point within the first 150 years . . . .” *Gaskins*, 866 N.W.2d at 52 n.27 (Waterman, J., dissenting).

There is also evidence in the 1857 debates over the Iowa Constitution that our framers wanted our bill of rights to provide similar protection to the Federal Bill of Rights when they adopted similar language. For example, George W. Ells proposed an amendment at the convention to include a counterpart to the Federal Due Process Clause in the Iowa Constitution, noting, “[T]he committee who have offered the amendment to this second section, did so from a *desire that the Bill of Rights in the Constitution of this State, should be as strong, in this respect, as the Constitution of the United States.*” 1 *The Debates of the Constitutional Convention of the State of Iowa* 101–02 (W. Blair Lord rep., 1857), https://www.statelibraryofiowa.org/services/collections/law-library/iaconst (emphasis added). Ellis noted his desire for his proposed due process amendment for the Iowa Constitution to be verbatim to the Federal Due Process Clause. *Id.* at 101. If the framers of the Iowa Constitution wanted to create greater search and seizure protections for Iowans, the nearly identical language of article I, section 8 to the Fourth Amendment does not reflect this desire.

We generally “interpret the scope and purpose of the Iowa Constitution’s search and seizure provisions to track with federal interpretations of the Fourth Amendment” because of their nearly identical language. *State v. Christopher*, 757 N.W.2d 247, 249 (Iowa 2008). Nevertheless, we acknowledge our duty to interpret article I, section 8 independently. *See Cline*, 617 N.W.2d at 292–93. “We jealously guard our right to construe a provision of our state constitution differently than its federal counterpart, though the two provisions may contain nearly identical language and have the same general scope, import, and purpose.”

*State v. Brooks*, 888 N.W.2d 406, 410–11 (Iowa 2016) (quoting *State v. Jackson*, 878 N.W.2d 422, 442 (Iowa 2016)).

However, as to article I, section 8, we are not writing on a blank slate. In *State v. Griffin*, 691 N.W.2d 734 (Iowa 2005), which was decided after *Cline*, we ruled unanimously as follows:

> We now hold that our pronouncement in *Meyer* was not only a correct application of federal law but also accurately described the validity of a pretextual arrest under article I, section 8 of the Iowa Constitution for purposes of sustaining a search incident to that arrest. If probable cause exists for an arrest to be made, the motive for making the arrest does not limit the right to conduct a search incident thereto.

*Id.* at 737. And in *State v. Kreps*, 650 N.W.2d 636 (Iowa 2002), also decided after *Cline*, we said,

> The motivation of the officer stopping the vehicle is not controlling in determining whether reasonable suspicion existed. The officer is therefore not bound by his real reasons for the stop.

*Id.* at 641 (citation omitted).[2] So, the question today is whether we should overturn our article I, section 8 precedent.

As already noted, we have similarly held under article I, section 8 that "the motive for making the arrest does not limit the right to conduct a search incident thereto" under the Iowa Constitution "[i]f probable cause exists for an arrest to be made." *Griffin*, 691 N.W.2d at 737. In *Griffin*, an officer stopped the defendant due to an improperly illuminated rear license plate and an excessively loud muffler. *Id.* at 736. The officer's "computer check indicated a recent prior conviction for failing to have proof of liability insurance for the vehicle he was driving and prior drug-related arrests." *Id.* The defendant informed the officer that he did not have liability

---

[2]In *State v. Harrison*, 846 N.W.2d 362 (Iowa 2014), we quoted this language from *Kreps* with approval. *Id.* at 366. However, in that case we also said, "The parties did not raise on appeal the issue of whether a pretextual traffic stop is valid. We therefore do not reach that issue." *Id.* at 364 n.1.

insurance, and the officer arrested the defendant for all three traffic violations he observed. *Id.* The officer's search of the vehicle incident to arrest revealed drugs, and the officer testified at the suppression hearing that he would not have arrested the defendant if he had not suspected the vehicle contained drugs based on the defendant's prior drug convictions. *Id.* We rejected the defendant's claim that the evidence obtained from the search should have been suppressed because it was obtained incident to a pretextual arrest in violation of article I, section 8 of the Iowa Constitution. *Id.* at 735–36.

Brown asks us to decline to follow our approach *Griffin* and *Kreps* in evaluating the constitutionality of pretextual traffic stops under the Iowa Constitution.

ii. *Brown's proposed burden-shifting framework.* Brown proposes that we interpret article I, section 8 more broadly than the Fourth Amendment and adopt a burden-shifting test for evaluating traffic stops. Under this burden-shifting test, a court would allow the State to provide an objective basis for the stop, allow the defendant to rebut that with evidence of subjective motivation, and then allow the State to come forward and show that the objective basis was the real reason for the stop. We find this test unworkable for a number of reasons.

First, Brown's proposed burden-shifting test is difficult to administer. While this test appears objective on its face, it is ultimately a subjective standard that focuses on the officer's state of mind at the time of the traffic stop. " '[O]bjective evidence' of . . . general police practice is simply an aggregation of the subjective intentions of officers in the regions." *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993). For example, in Iowa, police practices can range from county to county. The usual practice of police officers in Polk County may not represent the usual

practice of police officers in Shelby County, as the problems police officers must regularly confront in the course of their job duties quite possibly differ between rural and urban counties. Likewise, what may seem like a common and reasonable practice for a narcotics officer may seem unreasonable to the highway patrolman. Consequently, the reasonableness, and thus the validity, of the officer's traffic stop may turn on the county in which it is made or the detaining officer's law enforcement division. Yet, the search and seizure protections of article I, section 8 and the Fourth Amendment do not vary, nor "can [they] be made to turn upon such trivialities." *Whren*, 517 U.S. at 815, 116 S. Ct. at 1775.

Brown's burden-shifting test also fails to consider that there are often a number of factors influencing an officer's decision-making process. We have previously concluded that parking in a frequently burglarized area can lead to an officer's decision to stop a motorist. *State v. Richardson*, 501 N.W.2d 495, 497 (Iowa 1993) (per curiam). So, too, can pouring a can of beer out onto the pavement of a tavern parking lot at "a time notorious for drunken driving." *State v. Rosenstiel*, 473 N.W.2d 59, 62 (Iowa 1991), *overruled on other grounds by Cline*, 617 N.W.2d at 281. It is unclear under the proposed burden-shifting test when these situations become pretextual. Our search and seizure jurisprudence requires more certainty and uniformity than the burden-shifting test provides.

Second, Brown bases her request for a burden-shifting test on concerns of racial profiling. Brown does not argue that Officer Brandt knew she was African-American before initiating the traffic stop. Instead, the observed traffic violations precipitated Officer Brandt discovering the vehicle's registered owner's gang affiliation. A key element that often defines gangs or gang behavior is "violent or criminal behavior as a major

activity of group members." William B. Sanders, *Gangbangs and Drive-Bys* 10 (1994).

Though we acknowledge that police discretion can lead to racial profiling, we are not persuaded that Brown's approach would have any significant impact on eliminating racial profiling. Racial profiling concerns existed when we decided *Griffin*, and many of the racial profiling studies Brown cites predate *Griffin*. An officer who engages in racial profiling is also likely to be willing to lie about it. We are hopeful, though, that the spread of technology such as body cams, dash cams, and cell phone videos taken by private citizens will enable our society to better monitor and reduce racial profiling in the future.

Third, the burden-shifting test is also unnecessary to protect citizens from unlawful searches and seizures. "[T]he harsh reality [is] that we lack the ability to control all the variables leading to disparate enforcement. In few areas is this more observable than in our criminal justice system." Jeff D. May et al., *Pretext Searches and Seizures: In Search of Solid Ground*, 30 Alaska L. Rev. 151, 184–85 (2013) [hereinafter May et al.]. The criminal justice system is rife with "so many variables that influence who becomes subject to prosecution that it is difficult to isolate any one causal source of the disparate representation we see in our statistics." *Id.* at 185. Because of the numerous factors influencing law enforcement, especially regarding areas of the law as expansive as the traffic code, "[t]here is real doubt that we will ever eradicate the use of pretext motivations even if we were to prohibit them." *Id.*

Law enforcement officers "make judgments and mental shortcuts based on [their] past experiences and training." *Id.* It appears "somewhat easier to figure out the intent of an individual officer than to plumb the collective consciousness of law enforcement in order to determine whether

a 'reasonable officer' would have been moved to act upon the traffic violation." *Whren*, 517 U.S. at 815, 116 S. Ct. at 1775. Brown's approach of effectively prohibiting pretextual stops outright only risks "push[ing] its use further into the shadows." May et al., 30 Alaska L. Rev. at 185.

This case involves a relatively common scenario where a late-night traffic stop based on an observed violation of the traffic code leads to a determination that the driver was intoxicated and to an OWI conviction. Although it is our job to interpret the Iowa Constitution and not to set policy for the State of Iowa, we think most Iowans favor this policy outcome and would not want reduced enforcement of the drunk driving laws.

Iowa law already provides motorists with protections meant to curtail law enforcement's abuse of authority during traffic stops. Under article I, section 8 of the Iowa Constitution, the officer must allow a motorist to leave "when the reason for a traffic stop is resolved and there is no other basis for reasonable suspicion." *State v. Coleman*, 890 N.W.2d 284, 301 (Iowa 2017). Iowa also restricts the scope of the search-incident-to-arrest exception to the warrant requirement under the Iowa Constitution to limit law enforcement's ability to gather evidence incident to arrest. *See Gaskins*, 866 N.W.2d at 16–17. Thus, officers may not rely on the search-incident-to-arrest exception to search a motorist's vehicle on the grounds that the officers believe the vehicle contains evidence of the arresting offense. *Id.* at 13–14. We even analyze a motorist's consent to the search of a vehicle during a traffic stop more rigorously in Iowa. *See State v. Pals*, 805 N.W.2d 767, 782–83 (Iowa 2011) (applying a narrow version of the federal totality-of-the-circumstances test in determining consent was involuntary). These additional protections for motorists in Iowa help limit the potential for an abuse of authority that Brown is concerned with reducing.

All of this is not to say that the officer's subjective motivations are never relevant in determining the validity of a traffic stop. "The more evidence that a detention was motivated by police suspicions unrelated to the traffic offense, the less credible the officer's assertion that the traffic offense occurred." *State v. Lopez*, 873 P.2d 1127, 1138–39 (Utah 1994). The district court considers the officer's credibility in determining at the suppression hearing whether the facts justified the officer's traffic stop at its inception. If the district court doubts the officer's credibility and finds the motorist did not commit a traffic violation, then the stop is unconstitutional. In the event of an unconstitutional traffic stop based on a claim of selective enforcement, the Equal Protection Clause—not the State or Federal Search and Seizure Clause—is the proper claim to bring when seeking recourse. *Whren*, 517 U.S. at 813, 116 S. Ct. at 1774. To be certain, the Equal Protection Clause prohibits selective enforcement of the law based on racially discriminatory grounds. *See, e.g.*, *id. ("[T]he Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment.")*; *United States v. Coney*, 456 F.3d 850, 856 n.4 (8th Cir. 2006); *United States v. Frazier*, 408 F.3d 1102, 1108 (8th Cir. 2005); *Johnson v. Crooks*, 326 F.3d 995, 999–1000 (8th Cir. 2003); *Chavez v. Ill. State Police*, 251 F.3d 612, 635 (7th Cir. 2001); *Gardenhire v. Schubert*, 205 F.3d 303, 319–20 (6th Cir. 2000); *United States v. Bell*, 86 F.3d 820, 823 (8th Cir. 1996); *United States v. Benitez*, 613 F. Supp. 2d 1099, 1101–02 (S.D. Iowa 2009); *In re Prop. Seized from Kaster*, 454 N.W.2d 876, 880 (Iowa 1990) (en banc); *State v. Durrell*, 300 N.W.2d 134, 135–36 (Iowa 1981); *State v. Walker*, 236 N.W.2d 292, 295 (Iowa 1975).

Brown's request for a departure from *Griffin* and *Kreps* and adoption of a burden-shifting framework for evaluating traffic stops would create instability in the law, hinder law enforcement efforts, weaken the strength

of our adversarial system, and undermine public confidence in the legal system. This kind of burden-shifting may work well in employment discrimination law, where there will usually be a fairly detailed record to evaluate, but it would be a challenge to apply in the thousands of suppression hearings where the legality of split-second actions are at issue.

iii. *Other states' approaches.* Not only does our article I, section 8 precedent hold that traffic stops for traffic violations are reasonable regardless of the officer's subjective motivation, but the vast majority of other jurisdictions agree with us. In addition to Iowa, forty states and the District of Columbia follow the same objective standard we outlined in *Griffin* and *Kreps*.[3] Brown points to only three states that have adopted a

---

[3]*See, e.g.*, *State v. Ossana*, 18 P.3d 1258, 1260 (Ariz. Ct. App. 2001) (relying on *Whren* for a Fourth Amendment claim and holding "[t]he officers had the right to stop appellant's car if they reasonably believed he had committed a traffic violation"); *State v. Mancia-Sandoval*, 361 S.W.3d 835, 839–40 (Ark. 2010) ("As previously noted, a pretextual stop is not impermissible under either the federal or Arkansas Constitution and, thus, does not invalidate an otherwise lawful stop of the vehicle."); *People v. Miranda*, 21 Cal. Rptr. 2d 785, 789 (Ct. App. 1993) (determining under the Fourth Amendment, "the subjective motivation of an arresting officer is irrelevant in determining the propriety of a traffic stop"); *People v. Ingram*, 984 P.2d 597, 603 (Colo. 1999) (en banc) (concluding under the Fourth Amendment, "[a] reviewing court must base its analysis of whether reasonable suspicion exists on an objective analysis and not upon the subjective intent of the arresting officer"); *Karamychev v. District of Columbia*, 772 A.2d 806, 813 n.9 (D.C. Cir. 2001) (applying *Whren*, "if [the officer] had an adequate objective basis to stop (and then arrest) Karamychev, his subjective motivation was legally irrelevant"); *Holland v. State*, 696 So. 2d 757, 760 (Fla. 1997) (applying the objective standard established in *Whren* in state constitutional analysis and noting "the *Whren* Court made it clear that subjective viewpoints no longer factor into the analysis"); *State v. Bolosan*, 890 P.2d 673, 681 (Haw. 1995) ("This court has also disapproved of analyses of officers' subjective bases for conducting investigatory stops in favor of an objective standard, and we see no reason to depart from that position." (Citation omitted.)); *State v. Myers*, 798 P.2d 453, 455 (Idaho Ct. App. 1990) (concluding for a Fourth Amendment claim, that "any underlying motive of [the officer] in stopping Myers' vehicle as a pretext to search for drugs was irrelevant because the stop was justified by an objectively reasonable basis"); *People v. Rucker*, 689 N.E.2d 1203, 1208 (Ill. App. Ct. 1998) ("Regardless of [the officer's] subjective intention for stopping the vehicle, the key question is whether he had a reasonable, articulable suspicion of criminal activity such that he could lawfully stop the vehicle."); *Mitchell v. State*, 745 N.E.2d 775, 787 (Ind. 2001) (holding under the Indiana Constitution, there is "nothing unreasonable in permitting an officer, who may have knowledge or suspicion of

18

unrelated criminal activity by the motorist, to nevertheless respond to an observed traffic violation"); *State v. Jones*, 333 P.3d 886, 893 (Kan. 2014) (adopting the *Whren* objective standard); *Commonwealth v. Bucalo*, 422 S.W.3d 253, 258 (Ky. 2013) ("It has long been considered reasonable for an officer to conduct a traffic stop if he or she has probable cause to believe that a traffic violation has occurred."); *State v. Waters*, 780 So. 2d 1053, 1056 (La. 2001) (per curiam) (applying *Whren* and stating, that "[t]he standard [for assessing the reasonableness of a traffic stop] is a purely objective one that does not take into account the subjective beliefs or expectations of the detaining officer"); *State v. Sasso*, 143 A.3d 124, 128 (Me. 2016) ("The Supreme Court holding announced in *Whren* is consistent with Maine's standard for evaluating whether a traffic stop passes constitutional muster."); *Wilkes v. State*, 774 A.2d 420, 430–31 (Md. 2001) (referring to *Whren* in determining the constitutionality of a traffic stop under the Fourth Amendment); *Commonwealth v. Buckley*, 90 N.E.3d 767, 778 (Mass. 2018) ("Outside of the racial profiling context—as this case is—the reasonableness of a traffic stop does not depend upon the particular motivations underlying the stop. . . . [L]egal justification alone, such as an observed traffic violation, is sufficient."); *People v. Kazmierczak*, 605 N.W.2d 667, 672 n.8 (Mich. 2000) (relying on *Whren* in determining "[t]he traffic stop here was permissible because [the officer] observed a traffic violation"); *State v. George*, 557 N.W.2d 575, 578 (Minn. 1997) (en banc) ("Ordinarily, if an officer observes a violation of a traffic law, however insignificant, the officer has an objective basis for stopping the vehicle."); *Floyd v. City of Crystal Springs*, 749 So. 2d 110, 114–15 (Miss. 1999) (en banc) (referring to *Whren* after comparing the "almost identical language" of the Fourth Amendment to Mississippi's search and seizure provision); *State v. Brink*, 218 S.W.3d 440, 445 (Mo. Ct. App. 2006) ("Whether or not a traffic stop is reasonable and therefore lawful does not depend on the investigating officer's motive."); *State v. Farabee*, 22 P.3d 175, 180–81 (Mont. 2000) (declining to adopt the "would have" standard rejected in *Whren* to evaluate pretextual stops under the Montana Constitution, concluding "[that the court has] never held, however, that an otherwise objectively justifiable traffic stop is nonetheless unlawful because a law enforcement officer used the stop to investigate a hunch about other criminal activity"); *State v. Bartholomew*, 602 N.W.2d 510, 514 (Neb. 1999) ("If an officer has probable cause to stop a violator, the stop is objectively reasonable, and any ulterior motivation on the officer's part is irrelevant."); *Gama v. State*, 920 P.2d 1010, 1013 (Nev. 1996) (per curiam) (holding an officer's subjective motivation is irrelevant in analyzing the validity of a traffic stop "because we now conclude that the Nevada Constitution's search and seizure clause provides no greater protection than that afforded under its federal analogue, at least in the area of pretextual traffic stops"); *State v. McBreairty*, 697 A.2d 495, 497 (N.H. 1997) ("The ultimate test of the propriety of an investigatory stop under part I, article 19 is whether, viewing the circumstances objectively, an officer had a specific and articulable basis for concluding that an individual had committed, was committing, or was about to commit a crime."); *State v. Bacome*, 154 A.3d 1253, 1258 (N.J. 2017) ("The objective reasonableness of police officers' actions—not their subjective intentions—is the central focus of federal and New Jersey search-and-seizure jurisprudence."); *People v. Robinson*, 767 N.E.2d 638, 642 (N.Y. 2001) ("In making that determination of probable cause [for a traffic stop], neither the primary motivation of the officer nor a determination of what a reasonable traffic officer would have done under the circumstances is relevant."); *State v. McClendon*, 517 S.E.2d 128, 635 (N.C. 1999) (rejecting defendant's request to depart from the objective standard established in *Whren* under the North Carolina Constitution because "in general, police action related to probable cause should be judged in objective terms, not subjective terms"); *State v. Oliver*, 724 N.W.2d 114, 116 (N.D. 2006) (relying on *Whren* to determine "that [a] police officer's

different standard,[4] and only two of these states have adopted her proposed burden-shifting test.[5] Yet, these states have either subsequently disavowed their new standard or reached that new standard based on a state constitutional provision different from the Iowa Constitution.

---

subjective intentions in making a stop are not important as long as a traffic violation has occurred"); *City of Dayton v. Erickson*, 665 N.E.2d 1091, 1097–98 (Ohio 1996) ("[W]here an officer has an articulable reasonable suspicion or probable cause to stop a motorist for . . . a minor traffic violation, the stop is constitutionally valid regardless of the officer's underlying subjective intent or motivation for stopping the vehicle in question."); *Dufries v. State*, 133 P.3d 887, 889 (Okla. Crim. App. 2006) ("[W]here an officer has probable cause to believe a traffic violation has occurred, his subjective motivation for stopping the vehicle is irrelevant to the legality of the stop."); *State v. Carter*, 600 P.2d 873, 875 (Or. 1979) (en banc) ("The officer's motives for an otherwise justifiable traffic stop are, as we held in [*State v.*] *Tucker*, [595 P.2d 1364 (Or. 1979)] not relevant to the question of its validity."); *Commonwealth v. Chase*, 960 A.2d 108, 120–21 (Pa. 2008) (concluding that a state statute allowing police officers to initiate traffic stops based on reasonable suspicion of vehicle code violations did not offend the state constitution's search and seizure provision); *State v. Bjerke*, 697 A.2d 1069, 1073 (R.I. 1997) (declining to depart from *Whren* under the Rhode Island Constitution because it would be "unprincipled and unwarranted"); *State v. Vinson*, 734 S.E.2d 182, 184 (S.C. Ct. App. 2012) (referring to *Whren* and indicating an officer's subjective motivations play no role in search and seizure analysis); *State v. Vineyard*, 958 S.W.2d 730, 736 (Tenn. 1997) ("[W]e conclude that probable cause justifies a traffic stop under Article I, Section 7 of the Tennessee Constitution without regard to the subjective motivations of police officers."); *Crittenden v. State*, 899 S.W.2d 668, 673 (Tex. Crim. App. 1995) (en banc) ("Having adopted the objective approach under the Fourth Amendment, not because of binding precedent, but because it 'makes more sense' than the alternatives, we can hardly justify concluding otherwise for purposes of Article I, § 9."); *State v. Lopez*, 873 P.2d 1127, 1140 (Utah 1994) (holding an officer's subjective motivation for making a traffic stop is irrelevant so long as the traffic stop is based upon probable cause or reasonable suspicion); *State v. Tetreault*, 181 A.3d 505, 511 (Vt. 2017) (applying *Whren* and stating that "[a] traffic stop constitutes a seizure under either [United States or Vermont search and seizure provision] and must be supported by reasonable suspicion that a motor vehicle violation or other crime is taking place"); *Harris v. Commonwealth*, 668 S.E.2d 141, 146 (Va. 2008) (indicating for a claim pursuant to the Fourth Amendment, that "the Court's review of whether there was reasonable suspicion involves application of an objective rather than a subjective standard"); *Muscatell v. Cline*, 474 S.E.2d 518, 527 (W. Va. 1996) ("[I]f the trooper did indeed observe such a misdemeanor violation of the 'rules of the road', his stop would clearly be justified in any event."); *State v. Rutzinski*, 623 N.W.2d 516, 520–21 (Wis. 2001) (relying on the objective standard established in *Whren* under the Wisconsin Constitution).

[4]*See State v. Heath*, 929 A.2d 390, 405–06 (Del. Super. Ct. 2006); *State v. Ochoa*, 206 P.3d 143, 146 (N.M. Ct. App. 2008); *State v. Ladson*, 979 P.2d 833, 836 (Wash. 1999) (en banc).

[5]*Heath*, 929 A.2d at 402–03; *Ochoa*, 206 P.3d at 155–57.

For example, Brown's reliance on the Superior Court of Delaware's holding in *State v. Heath*, 929 A.2d 390 (Del. Super. Ct. 2006), overlooks the fact that subsequent Delaware decisions have declined to follow *Heath* because "[t]here are too many occasions where . . . there was a lawful basis to stop a motor vehicle for a traffic violation which led later to arrests for other kinds of offenses." *State v. Adams*, 13 A.3d 1162, 1166–67 (Del. Super. Ct. 2008). The Delaware Supreme Court has recognized that "*Heath* has not been followed in any other Superior Court decisions." *Turner v. State*, 25 A.3d 774, 777 (Del. 2011) (en banc).

Further, Brown's reliance on the Court of Appeals of New Mexico's holding in *State v. Ochoa*, 206 P.3d 143 (N.M. Ct. App. 2008), ignores the heightened expectation of privacy New Mexico courts have provided to motorists in an automobile that Iowa does not afford. The court of appeals in *Ochoa* specifically noted that this heightened privacy expectation " 'is a distinct characteristic of New Mexico constitutional law' and therefore supports our departure from *Whren*." *Id.* at 151 (quoting *State v. Cardenas-Alvarez*, 25 P.3d 225, 231 (N.M. 2001)). In contrast, we have declined to provide motorists with this same expectation of privacy in their automobiles and acknowledged "the reduced expectation of privacy [in automobiles] resulting from the 'configuration, use and regulation of automobiles.' " *State v. Storm*, 898 N.W.2d 140, 146 (Iowa 2017) (quoting *Arkansas v. Sanders*, 442 U.S. 753, 761, 99 S. Ct. 2586, 2591 (1979), *abrogated on other grounds by California v. Acevedo*, 500 U.S. 565, 575, 111 S. Ct. 1982, 1989 (1991)).

Finally, Brown's representation of the Washington Supreme Court's holding in *State v. Ladson*, 979 P.2d 833 (Wash. 1999) (en banc), as another persuasive example of departure from *Whren* under a state constitution, disregards the substantially different search and seizure

provision of the Washington Constitution. Specifically, article I, section 7 of the Washington Constitution provides, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." Wash. Const. art. I, § 7. As the court noted in *Ladson*, this provision "is explicitly broader than that of the Fourth Amendment" and operates under a different mechanism regarding the citizens' expectations of privacy. *Ladson*, 979 P.2d at 837. Given the differences between the Washington Constitution's search and seizure provision and that of the Iowa Constitution, *Ladson* carries little persuasive value in how we should decide this case.

In any event, Washington's approach "has not resulted in . . . significantly greater protections" from racial profiling. Margaret M. Lawton, *The Road to* Whren *and Beyond: Does the "Would Have" Test Work?*, 57 DePaul L. Rev. 917, 920 (2008). Rather, state courts in Washington continue to do "what courts have always done under the [*Whren*] test: determining the credibility of police officers and relying upon the totality of the circumstances in deciding whether a traffic stop was constitutionally permissible." *Id.* at 919. In doing so, they rarely find pretextual motivations for the officer's stop "unless the officer either testifies to her use of pretext or the court finds that the officer is lying about the reasons for the stop, both of which are relatively uncommon." *Id.* at 957.

In fact, the Washington Supreme Court more recently has retreated from *Ladson* and said that it will uphold a stop for a traffic violation "even if the legitimate reason for the stop is secondary and the officer is motivated primarily by a hunch or some other reason that is insufficient to justify a stop." *State v. Arreola*, 290 P.3d 983, 991 (Wash. 2012) (en banc); *see also State v. Alvarez*, 430 P.3d 673, 677 (Wash. 2018)

(Lawrence-Berrey, C.J., dissenting) ("It is clear that law enforcement can conduct an investigatory stop for traffic infractions.").

We conclude that the objective test articulated in *Whren* applies to constitutional challenges to traffic stops under article I, section 8 of the Iowa Constitution. Interpreting article I, section 8 coextensive with the Fourth Amendment in this case "ensure[s] that the validity of such stops is not subject to the vagaries of police departments' policies and procedures concerning the kinds of traffic offenses of which they ordinarily do or do not take note." *Ferguson*, 8 F.3d at 392. At the same time, it does not insulate people engaged in more egregious criminal activity "from criminal liability for those activities simply because a judge determines that the police officer who executed the traffic stop, had he been the mythical reasonable officer, would not have stopped them" for the traffic violation they committed. *Id.* Moreover, the objective standard set forth in *Griffin* and *Kreps* provides law enforcement officers with a degree of certainty that they are acting appropriately when they choose to enforce the traffic violations they witness. We should not penalize law enforcement for enforcing the law.

Our holding today recognizes this need for consistency by adhering to our prior holdings. *See Brewer-Strong v. HNI Corp.*, 913 N.W.2d 235, 249 (Iowa 2018) ("From the very beginnings of this court, we have guarded the venerable doctrine of stare decisis and required the highest possible showing that a precedent should be overruled before taking such a step." (quoting *McElroy v. State*, 703 N.W.2d 385, 394 (Iowa 2005))); *see also Book v. Doublestar Dongfeng Tyre Co.*, 860 N.W.2d 576, 594 (Iowa 2015) ("Stare decisis alone dictates continued adherence to our precedent absent a compelling reason to change the law."). Stare decisis "is an important restraint on judicial authority and provides needed stability in and respect

for the law." *Kiesau v. Bantz*, 686 N.W.2d 164, 180 (Iowa 2004) (Cady, J., dissenting), *overruled on other grounds by Alcala v. Marriott Int'l Inc.*, 880 N.W.2d 699, 708 & n.3 (Iowa 2016). Though it is "our role as a court of last resort . . . to occasionally reexamine our prior decisions, we must undertake this weighty task only for the most cogent reasons and with the greatest caution." *Id.*

We decided *Griffin* under the Iowa Constitution less than fifteen years ago, in which we made clear that an officer's ulterior "motive for making the arrest does not limit the right to conduct a search incident thereto" under the Iowa Constitution "[i]f probable cause exists for an arrest to be made." 691 N.W.2d at 737. Despite recognizing that we were not bound by Fourth Amendment precedent, we nevertheless "found no basis to distinguish the protections afforded by the Iowa Constitution from those afforded by the [F]ederal [C]onstitution under the facts of [the] case." *Id.* Brown provides no new arguments that show our holding in *Griffin*, or our approval of *Whren* in *Predka*, was clearly erroneous. *See Brewer-Strong*, 913 N.W.2d at 249 ("This highest possible showing [for overruling precedent] requires a demonstration that the precedent is clearly erroneous.").

**B. Brown's Ineffective-Assistance-of-Counsel Claim.** Brown acknowledges her trial counsel did not specifically address her claim on appeal that Officer Brandt lacked probable cause for the stop because she did not violate any traffic laws. However, she asks the court to analyze this issue under an ineffective-assistance-of-counsel claim. The record before us is sufficient to address Brown's ineffective-assistance claim, and we proceed to consider her claim.

To succeed on her ineffective-assistance-of-counsel claim, Brown must prove (1) counsel failed to perform an essential duty and (2) prejudice

resulted. *State v. Hopkins*, 576 N.W.2d 374, 378 (Iowa 1998). To establish the first prong, Brown must show her counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. We approach the first prong with the presumption counsel performed her duties competently; "we measure counsel's performance against the standard of a reasonably competent practitioner." *State v. Maxwell*, 743 N.W.2d 185, 195 (Iowa 2008). Although not required to predict changes in the law, "counsel must 'exercise reasonable diligence in deciding whether an issue is "worth raising." ' " *State v. Dudley*, 766 N.W.2d 606, 620 (Iowa 2009) (quoting *State v. Westeen*, 591 N.W.2d 203, 210 (Iowa 1999)). Counsel is not burdened with the duty to raise an issue that has no merit. *Id.*; *see also State v. Schaer*, 757 N.W.2d 630, 637 (Iowa 2008). The second prong—prejudice—results when "there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different." *Wills*, 696 N.W.2d at 22 (quoting *Hopkins*, 576 N.W.2d at 378).

Because we did not find a basis to diverge from the protection afforded by the Iowa Constitution from that afforded by the United States Constitution under the facts of this case, our analysis will apply equally to both state and federal grounds. *See* Iowa Const. art. I, § 10; *State v. Nitcher*, 720 N.W.2d 547, 553 (Iowa 2006).

If a traffic violation occurred, and the peace officer witnessed it, the State has established probable cause.[6] *State v. Tyler*, 830 N.W.2d 288, 292 (Iowa 2013); *see also United States v. Mendoza*, 677 F.3d 822, 827

---

[6]A peace officer may also stop a vehicle on less than probable cause for the investigation of unusual behavior that reasonably causes the peace officer to believe criminal activity is afoot. *Tague*, 676 N.W.2d at 204; *see also Terry v. Ohio*, 392 U.S. 1, 30, 88 S. Ct. 1868, 1884 (1968).

(8th Cir. 2012); *Tague*, 676 N.W.2d at 201 ("When a peace officer observes a violation of our traffic laws, however minor, the officer has probable cause to stop a motorist."). However, the State must bear the burden of proof by a preponderance of the evidence that the officer had probable cause to stop the vehicle. *Tyler*, 830 N.W.2d at 293. If the State does not meet this burden, all evidence obtained at the stop must be suppressed. *State v. Louwrens*, 792 N.W.2d 649, 651–52 (Iowa 2010). "The existence of probable cause for a traffic stop is evaluated 'from the standpoint of an objectively reasonable police officer.'" *Tyler*, 830 N.W.2d at 293–94 (quoting *Ornelas v. United States*, 517 U.S. 690, 696, 116 S. Ct. 1657, 1661–62 (1996)).

Brown claims her trial counsel was ineffective for failing to challenge the establishment of probable cause for the stop. She concedes her trial counsel did properly challenge the legality of a pretextual stop, but ultimately failed to address the required probable cause. The State responds to the ineffective-assistance claim by indicating a peace officer witnessed the multiple traffic violations Brown committed. Specifically, that Brown acted in violation of Iowa Code section 321.257, thereby providing probable cause for the stop.

At the suppression hearing, Officer Brandt testified to witnessing Brown in violation of multiple traffic laws prior to initiating the stop. Foremost, Officer Brandt observed Brown's vehicle accelerate through an intersection after the traffic-control signal changed from yellow to red. This is in clear violation of Iowa's regulation of vehicular traffic. *See* Iowa Code § 321.257. A yellow light "means vehicular traffic is warned that the related green movement is being terminated and vehicular traffic shall no longer proceed into the intersection and shall stop." *Id.* § 321.257(2)(*b*). A red light "means vehicular traffic shall stop." *Id.* § 321.257(2)(*a*). This

traffic violation alone, however minor, is sufficient probable cause to stop a motorist. *Tague*, 676 N.W.2d at 201. It is undisputed Officer Brandt witnessed this traffic violation while queued at the same intersection Brown accelerated through. The State carried its burden. *See Tyler*, 830 N.W.2d at 293; *see also Mendoza*, 677 F.3d at 827. Officer Brandt's stop of Brown's vehicle was based on probable cause—violation of Iowa Code section 321.257. For that reason, Brown's trial counsel was not ineffective for failing to challenge probable cause. *See Nitcher*, 720 N.W.2d at 555 (noting trial counsel was not ineffective for failing to raise an issue with no merit). Accordingly, Brown has failed to establish the first prong of her ineffective-assistance-of-counsel claim, and her claim must fail. *See Hopkins*, 576 N.W.2d at 380 (acknowledging failure to prove either ineffective-assistance prong is fatal to the claim).

## IV. Conclusion.

We affirm the district court decision for the aforementioned reasons.

**AFFIRMED.**

Waterman and Mansfield and McDonald, JJ., join this opinion. McDonald, J., files a separate concurring opinion. Cady, C.J., files a dissenting opinion in which Wiggins, J., joins. Appel, J., files a separate dissenting opinion in which Wiggins, J., joins.

**McDONALD, Justice (concurring specially).**

Scottize Brown failed to establish a violation of her rights arising under the Federal or Iowa Constitutions, and the district court did not err in denying Brown's motion to suppress. I thus concur in Justice Christensen's opinion affirming Brown's conviction and sentence. I write separately to address Brown's argument the Federal Constitution sets the floor for claims arising under the Iowa Constitution.

### I.

"Beginning in the 1960s . . . , a growing number of states began to rediscover the independent nature of their state constitutional provisions. [This movement is s]ometimes called the 'new judicial federalism' . . . ." *State v. Baldon*, 829 N.W.2d 785, 814 (Iowa 2013) (Appel, J., specially concurring). In 1977, Justice William Brennan galvanized this movement with "his call to arms for state courts." *Id.* at 790 (majority opinion); *see* William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*, 90 Harv. L. Rev. 489, 503 (1977). Several decades after Justice Brennan's call to arms, this court began to systematically address legal questions arising under the Iowa Constitution.

The fundamental premise of this court's most recent jurisprudence in the area of state constitutional law has been that "although this court cannot interpret the Iowa Constitution to provide *less* protection than that provided by the United States Constitution, the court is free to interpret our constitution as providing *greater* protection for our citizens' constitutional rights." *State v. Cline*, 617 N.W.2d 277, 285 (Iowa 2000) (en banc), *abrogated on other grounds by State v. Turner*, 630 N.W.2d 601, 606 n.2 (Iowa 2001). Pursuant to this premise, this court has treated the

Iowa Constitution as a one-way ratchet to provide only greater rights and remedies than a parallel provision of the United States Constitution. *See, e.g.*, *Behm v. City of Cedar Rapids*, 922 N.W.2d 524, 566 (Iowa 2019) ("As a result, we apply the substantive federal standards, reserving the right to apply these standards in a more stringent fashion than under federal caselaw."); *Schmidt v. State*, 909 N.W.2d 778, 793 (Iowa 2018) ("The Iowa Constitution affords individuals greater rights than does the United States Constitution."); *State v. Pettijohn*, 899 N.W.2d 1, 26 (Iowa 2017) ("In assessing that caselaw, we remain mindful that decisions of the Supreme Court addressing the scope of a right guaranteed by the United States Constitution set a floor below which the scope of a right guaranteed by the Iowa Constitution may not fall, but not a ceiling above which it may not rise."); *State v. Sweet*, 879 N.W.2d 811, 832 (Iowa 2016) ("In any event, the rulings of the United States Supreme Court create a floor, but not a ceiling, when we are called upon to interpret parallel provisions of the Iowa Constitution."); *Nguyen v. State*, 878 N.W.2d 744, 755 (Iowa 2016) ("We are free to interpret our constitution more stringently than its federal counterpart, providing greater protection for our citizens' constitutional rights."); *Baldon*, 829 N.W.2d at 791 & n.1 ("[T]he Supreme Court's jurisprudence regarding the freedom from unreasonable searches and seizures under the Fourth Amendment—or any other fundamental, civil, or human right for that matter—makes for an admirable floor, but it is certainly not a ceiling. . . . The incorporation doctrine commands that we no longer use independent state grounds to sink below the federal floor.").

The fundamental premise of our recent jurisprudence is not sound. This court is free to interpret our constitution to provide less or more protection than the Federal Constitution. *See State v. Hampton*, No. 18-0061, 2019 WL 476471, at *1–3 (Iowa Ct. App. Feb. 6, 2019) (explaining

Iowa courts can interpret the state constitution to provide less protection than the Federal Constitution); *State v. Halverson*, No. 16-1614, 2017 WL 5178997, at *3 (Iowa Ct. App. Nov. 8, 2017) (explaining the relevant question is what the state constitutional text means and how it applies to the facts and circumstances of the case at hand and not whether Iowa courts should interpret the Iowa Constitution "more strictly" or "more broadly" than the Federal Constitution); *State v. Bohl*, No. 15–1546, 2016 WL 4543957, at *1–2 (Iowa Ct. App. Aug. 31, 2016) ("Depending upon the particular issue, our precedents interpreting article I, section 8 may provide greater or lesser protection than cases interpreting the Fourth Amendment."); *State v. Barth*, No. 14–1929, 2016 WL 740302, at *3 (Iowa Ct. App. Feb. 24, 2016) ("Barth contends the Iowa Constitution provides greater protection than the Federal Constitution without specifying why or how.  Regardless, Barth misstates the issue.  Depending upon the particular issue, our precedents interpreting article I, section 8 may provide greater or lesser protection than cases interpreting the Fourth Amendment.").

The conclusion that this court can interpret the Iowa Constitution to provide less or more protection than a parallel provision of the Federal Constitution is inherent in the federal system.  The Bill of Rights, in and of itself, applies only to the federal government.  *See Timbs v. Indiana*, ___ U.S. ___, ___, 139 S. Ct. 682, 687 (2019) ("When ratified in 1791, the Bill of Rights applied only to the Federal Government."); *Danforth v. Minnesota*, 552 U.S. 264, 269, 128 S. Ct. 1029, 1034 (2008); *Barron v. Mayor & City Council of Baltimore*, 32 U.S. (7 Pet.) 243, 247 (1833).  The Supreme Court is the final arbiter of the meaning of the Federal Constitution.  In contrast, the Iowa Constitution applies to the state government.  This court is the final arbiter of the meaning of the Iowa Constitution.  *See Minnesota v.*

*Nat'l Tea Co.*, 309 U.S. 551, 557, 60 S. Ct. 676, 679 (1940) ("It is fundamental that state courts be left free and unfettered by us in interpreting their state constitutions."). In determining the meaning of state constitutional law, this court has a duty to independently determine the meaning of the Iowa Constitution. *See State v. Gaskins*, 866 N.W.2d 1, 7 (Iowa 2015). This is true whether we interpret the Iowa Constitution to provide less or more protection than the Federal Constitution.

Brown's contention that the incorporation doctrine dictates the minimum required content of state constitutional law misapprehends the incorporation doctrine. Incorporation did not change the substantive content of state constitutional law; it changed the substantive content of federal constitutional law. Specifically, the Supreme Court held the Due Process Clause of the Fourteenth Amendment incorporated most of the Bill of Rights. *See Timbs*, ___ U.S. at ___, 139 S. Ct. at 687 ("With only 'a handful' of exceptions, this Court has held that the Fourteenth Amendment's Due Process Clause incorporates the protections contained in the Bill of Rights, rendering them applicable to the States." (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 765, 130 S. Ct. 3020, 3035 (2010))). "Incorporated Bill of Rights guarantees are 'enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment.' " *Id.* (quoting *McDonald*, 561 U.S. at 765, 130 S. Ct. at 3035). Pursuant to the Supremacy Clause, this court is bound to apply the Supreme Court's Fourteenth Amendment jurisprudence to resolve claims arising under the Fourteenth Amendment. *See Armstrong v. Exceptional Child Ctr., Inc.*, ___ U.S. ___, ___, 135 S. Ct. 1378, 1383 (2015) (explaining the Supremacy Clause is not a source of substantive rights but instead provides for a federal rule of decision where a litigant asserts a federal claim). The

Supreme Court's Fourteenth Amendment jurisprudence does not dictate the substance of the state law or the remedy for any violation of the same. *See Virginia v. Moore*, 553 U.S. 164, 178, 128 S. Ct. 1598, 1608 (2008) ("[I]t is not the province of the Fourth Amendment to enforce state law. That Amendment does not require the exclusion of evidence obtained from a constitutionally permissible arrest."); *Fuller v. Oregon*, 417 U.S. 40, 48 n.9, 94 S. Ct. 2116, 2122 n.9 (1974) ("[T]he dissent purports to resolve questions of state [constitutional] law that this Court does not have power to decide."); *Nat'l Tea Co.*, 309 U.S. at 557, 60 S. Ct. at 679 ("It is fundamental that state courts be left free and unfettered by us in interpreting their state constitutions."); *see also Collins v. Virginia*, ___ U.S. ___, ___, 138 S. Ct. 1663, 1680 n.6 (2018) (Thomas, J., concurring) ("[T]he States are free to adopt their own exclusionary rules as a matter of state law. But nothing in the Federal Constitution requires them to do so."); *Massachusetts v. Upton*, 466 U.S. 727, 738, 104 S. Ct. 2085, 2091 (1984) (per curiam) (Stevens, J., concurring in the judgment).

This understanding that incorporation does not dictate the meaning of state law is supported by former Oregon Supreme Court Justice Hans Linde. Justice Linde is widely considered the "intellectual godfather" of the new judicial federalism. James A. Gardner, *The Failed Discourse of State Constitutionalism*, 90 Mich. L. Rev. 761, 774 (1992) (quoting Ronald K.L. Collins, *Forward: The Once "New Judicial Federalism" & Its Critics*, 64 Wash. L. Rev. 5, 5 (1989)). Members of this court have favorably cited the work of Justice Linde when interpreting the Iowa Constitution. *See Gaskins*, 866 N.W.2d at 55 (Waterman, J., dissenting) (citing Hans A. Linde, *First Things First: Rediscovering the States' Bills of Rights*, 9 U. Balt. L. Rev. 379, 392 (1980) [hereinafter Linde, *First Things First*]); *Baldon*, 829 N.W.2d at 821 (Appel, J., specially concurring) (quoting Justice Linde's

opinion in *State v. Kennedy*, 666 P.2d 1316, 1322 (Or. 1983)). In *Baldon*, Justice Appel noted Justice Linde was an "extraordinary state court judge[] with [an] outstanding reputation[ who] ha[s] helped to develop what is now a substantial body of independent state constitutional law." 829 N.W.2d at 828. He further noted there was "no basis to discount the work of th[is] outstanding state supreme court justice[]." *Id.* He also lauded Justice Linde's outstanding extrajudicial scholarship. *See id.* at 828 n.23 (citing Hans A. Linde, *E Pluribus—Constitutional Theory and State Courts*, 18 Ga. L. Rev. 165 (1984) [hereinafter Linde, *E Pluribus*]; Linde, *First Things First*, 9 U. Balt. L. Rev. 379).

Justice Linde has concluded in both his judicial and extrajudicial work that state courts are free to interpret a parallel provision of a state constitution as providing less protection than the Federal Constitution:

> The state argues, correctly, that diversity does not necessarily mean that state constitutional guarantees always are more stringent than decisions of the Supreme Court under their federal counterparts. A state's view of its own guarantee may indeed be less stringent, in which case the state remains bound to whatever is the contemporary federal rule. Or it may be the same as the federal rule at the time of the state court's decision, which of course does not prevent that the state's guarantee will again differ when the United States Supreme Court revises its interpretation of the federal counterpart. The point is not that a state's constitutional guarantees are more or less protective in particular applications, but that they were meant to be and remain genuine guarantees against misuse of the state's governmental powers, truly independent of the rising and falling tides of federal case law both in method and in specifics.

*Kennedy*, 666 P.2d at 1323. Stated differently,

> The right question is not whether a state's guarantee is the same as or broader than its federal counterpart as interpreted by the Supreme Court. The right question is what the state's guarantee means and how it applies to the case at hand. The answer may turn out the same as it would under federal law. The state's law may prove to be more protective than federal law. The state law also may be less protective. In

that case the court must go on to decide the claim under federal law, assuming it has been raised.

Linde, *E Pluribus*, 18 Ga. L. Rev. at 179.

The Michigan Supreme Court reached the same conclusion in *Sitz v. Department of State Police*, 506 N.W.2d 209, 216–17 (Mich. 1993). That court's discussion of the issue is worth quoting at length here:

> [A]ppropriate analysis of our constitution does not begin from the conclusive premise of a federal floor. Indeed, the fragile foundation of the federal floor as a bulwark against arbitrary action is clearly revealed when, as here, the federal floor falls below minimum state protection. As a matter of simple logic, because the texts were written at different times by different people, the protections afforded may be greater, lesser, or the same.

*Id.* at 217 (footnote omitted). The court continued,

> The image of federal constitutional law as a "floor" in state court litigation pervades most commentary on state constitutional law. Commentators contend that in adjudicating cases, state judges must not adopt state constitutional rules which fall below this floor; courts may, however, appeal to the relevant state constitution to establish a higher "ceiling" of rights for individuals. . . .
>
> Certainly, as a matter of federal law, state courts are bound not to apply any rule which is inconsistent with decisions of the Supreme Court; the Supremacy Clause of the Federal Constitution clearly embodies this mandate. It would be a mistake, however, to view federal law as a floor for state constitutional analysis; principles of federalism prohibit the Supreme Court from dictating the content of state law. In other words, state courts are not required to incorporate federally-created principles into their state constitutional analysis; the only requirement is that in the event of an irreconcilable conflict between federal law and state law principles, the federal principles must prevail.
>
> . . . .
>
> [S]uch courts must undertake an independent determination of the merits of each claim based solely on principles of state constitutional law. If the state court begins its analysis with the view that the federal practice establishes a "floor," the state court is allowing a federal governmental body—the United States Supreme Court—to define, at least in part, rights guaranteed by the state constitution.

*Id.* at 217 n.12 (alterations in original) (quoting Earl M. Maltz, *False Prophet—Justice Brennan and the Theory of State Constitutional Law*, 15 Hastings Const. L.Q. 429, 443–44 (1988)).

Other courts have reached the same conclusion. *See State v. Oliver*, 372 S.E.2d 256, 259 (Ga. Ct. App. 1988) ("If anything, the Georgia Constitution is less protective than the Fifth Amendment, for it recognizes an exception to the bar against double jeopardy when the first trial ends in a mistrial."); *State v. Jackson*, 503 S.E.2d 101, 103–04 (N.C. 1998) ("Strictly speaking, however, a state may still construe a provision of its constitution as providing less rights than are guaranteed by a parallel federal provision."); *Alva State Bank & Tr. Co. v. Dayton*, 755 P.2d 635, 638 (Okla. 1988) (per curiam) (recognizing that if the state constitution provides less protection than federal law, then "the question must be determined by federal law"); *Ex parte Tucci*, 859 S.W.2d 1, 32 n.34 (Tex. 1993) (Phillips, C.J., concurring) ("Literally read, this position makes no logical sense. If our text was written at a different time by different people with different concerns, then the protection it affords may be greater, lesser, or the same as that provided by a different provision in the United States Constitution."); *Hulit v. State*, 982 S.W.2d 431, 436–37 (Tex. Crim. App. 1998) (en banc) ("The Supremacy Clause means that, in practical terms, persons will always be able to avail themselves of the greater right. This is very important to litigants and their counsel, who are naturally and properly result-oriented. But it does not mean that a court, faithfully interpreting state laws, can only find in them protections that equal or exceed federal laws."); *State v. Briggs*, 199 P.3d 935, 942 (Utah 2008) (recognizing state law may "provide a lesser level of protection," in which case the court addresses the federal claim).

I thus conclude this court has a duty to independently interpret the Iowa Constitution. This court discharges that duty by looking to the text of the document through the prism of our precedent, tradition, and custom. This court's interpretation of the Iowa Constitution may be the same as the Supreme Court's interpretation of a parallel provision of the Federal Constitution. This court's interpretation of the Iowa Constitution may be different than the Supreme Court's interpretation of a parallel provision of the Federal Constitution. But this court's interpretation of the Iowa Constitution is not dictated by the Supreme Court's precedents under the incorporation doctrine of the Federal Constitution.

## II.

"Metaphors in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it." *Berkey v. Third Ave. Ry.*, 155 N.E. 58, 61 (N.Y. 1926). This has been true of the floor–ceiling metaphor. "However useful that floor-ceiling metaphor may be, it obscures the larger truth that the level of protection of rights under the state constitutions can be the same as, higher than, or lower than that provided by the federal constitution." *Malyon v. Pierce County*, 935 P.2d 1272, 1281 n.30 (Wash. 1997) (en banc) (quoting Neil McCabe, *The State and Federal Religion Clauses: Differences of Degree and Kind*, 5 St. Thomas L. Rev. 49, 50 (1992)). The failure of the metaphor has caused this court to undertake its interpretive function with a results-oriented approach that has created distortions in Iowa legal doctrine. *Cf. Tucci*, 859 S.W.2d at 32 n.34 (stating the recognition "that 'an independent state judiciary may interpret its fundamental law as affording less protection than our federal charter' . . . will enhance the possibility of principled state constitutional development" (quoting *id.* at 13 (plurality opinion))).

As an example of how the metaphor changed doctrine, consider this court's treatment of the exclusionary rule. In *Boyd v. United States* and *Weeks v. United States*, the Supreme Court held that evidence obtained in violation of the Federal Constitution was inadmissible in a criminal proceeding. *Weeks v. United States*, 232 U.S. 383, 398, 34 S. Ct. 341, 346 (1914), *overruled on other grounds by Mapp v. Ohio*, 367 U.S. 643, 654–57, 81 S. Ct. 1684, 1691–92 (1961); *Boyd v. United States*, 116 U.S. 616, 638, 6 S. Ct. 524, 536–37 (1886), *abrogations recognized by Fisher v. United States*, 425 U.S. 391, 407–09, 96 S. Ct. 1569, 1579–80 (1976). In *State v. Tonn*, 195 Iowa 94, 102–03, 104–07, 191 N.W. 530, 534, 535–36 (1923), *abrogated by State v. Hagen*, 258 Iowa 196, 203–05, 137 N.W.2d 895, 899–900 (1965), *as recognized in State v. Taylor*, 260 Iowa 634, 641–42, 144 N.W.2d 289, 293–94 (1966), this court considered *Boyd* and *Weeks* and declined to adopt the exclusionary rule as a remedy for the violation of the Iowa Constitution. *Tonn* remained good law for decades. *See, e.g., State ex rel. Hanrahan v. Miller*, 250 Iowa 1369, 1375, 98 N.W.2d 859, 863 (1959); *State v. Gillam*, 230 Iowa 1287, 1289, 300 N.W. 567, 568 (1941); *State v. Rowley*, 216 Iowa 140, 145–46, 248 N.W. 340, 342–43 (1933); *State v. Lambertti*, 204 Iowa 670, 672, 215 N.W. 752, 753 (1927); *State v. Wenks*, 200 Iowa 669, 670, 202 N.W. 753, 753 (1925); *McNamara v. Utterback*, 200 N.W. 699, 700 (Iowa 1924); *Lucia v. Utterback*, 197 Iowa 1181, 1186, 198 N.W. 626, 628 (1924); *Foley v. Utterback*, 196 Iowa 956, 958, 195 N.W. 721, 722 (1923) (per curiam); *Joyner v. Utterback*, 196 Iowa 1040, 1044, 195 N.W. 594, 596 (1923).

In 2000, in *Cline*, this court concluded *Mapp* had abrogated *Tonn*. *See* 617 N.W.2d at 287 ("Iowa did not again have a state exclusionary rule until compelled to do so by the United States Supreme Court's decision in *Mapp*."). The *Cline* court reasoned the authority to deviate from federal

law was limited to providing greater protection than the Federal Constitution. *See id.* at 284–85.

*Cline*'s conclusion that *Mapp* required this court to adopt the exclusionary rule as a remedy for a violation of state constitutional law was incorrect. *Cline*'s conclusion is predicated on a misunderstanding of federal law. In *Wolf v. Colorado*, the Supreme Court held the principles underlying the Fourth Amendment were "enforceable against the States through the Due Process Clause." 338 U.S. 25, 27–28, 69 S. Ct. 1359, 1361 (1949), *overruled on other grounds by Mapp*, 367 U.S. at 654–55, 81 S. Ct. at 1691. The Supreme Court specifically declined to require the states to adopt the exclusionary rule as the remedy for a violation of the Federal Due Process Clause. *See id.* at 33, 69 S. Ct. at 1364 ("We hold, therefore, that in a prosecution in a State court for a State crime the Fourteenth Amendment does not forbid the admission of evidence obtained by an unreasonable search and seizure."). Subsequently, in *Mapp*, the Supreme Court overruled *Wolf* and held the required remedy for a violation of the Fourteenth Amendment right recognized in *Wolf* was the exclusion of unlawfully obtained evidence from a criminal proceeding.

It is surprising this court immediately moved away from *Tonn* after *Mapp* without explicitly overruling *Tonn*. A majority of the court in *Mapp* did not even support the conclusion that a violation of the Fourth Amendment, standing alone, required exclusion of the evidence. Justice Stewart expressed no view on the constitutional issue. *Mapp*, 367 U.S. at 672, 81 S. Ct. at 1701 (Stewart, J., concurring in the judgment) ("I express no view as to the merits of the constitutional issue which the Court today decides."). Justice Black concluded the Fourth Amendment, standing alone, compelled no right to the exclusion of evidence. *Id.* at 661–62, 81 S. Ct. at 1695 (Black, J., concurring) ("I am still not persuaded that the

Fourth Amendment, standing alone, would be enough to bar the introduction into evidence against an accused of papers and effects seized from him in violation of its commands."). Instead, he found the remedy to be required due to the interaction of the Fourth and Fifth Amendments. *Id.* at 662, 81 S. Ct. at 1695; *see also Collins*, ___ U.S. at ___, 138 S. Ct. at 1677–80, 1677 nn.2–3 (discussing *Mapp*). Justice Harlan, joined by Justices Frankfurter and Whitaker, dissented. *Mapp*, 367 U.S. at 678–80, 81 S. Ct. at 1704–05 (Harlan, J., dissenting) ("I would not impose upon the States this federal exclusionary remedy. The reasons given by the majority for now suddenly turning its back on *Wolf* seem to me notably unconvincing.").

Regardless of whether *Mapp* was rightly or wrongly decided, the important point of the discussion is this: *Wolf* and *Mapp* both involved the resolution of claims arising under the Fourteenth Amendment. Neither case compelled any state court to reach a particular resolution—whether less protective, more protective, or as protective—of any legal claim arising under its own state constitution. *Cline* was thus incorrect in stating *Mapp* abrogated *Tonn* and precluded this court from interpreting the state constitution to provide less protection than the Federal Constitution. While there may be reasons why this court would want to adopt the exclusionary rule for violations of the Iowa Constitution, many of which are discussed in *Cline*, it was incorrect to say *Mapp* compelled this court to do so.

III.

This special concurrence is not intended as a call to arms to find less or more protection of individual rights under the Iowa Constitution as compared to the United States Constitution. Instead, it is a call to

determine the meaning of the Iowa Constitution without an interpretive predisposition that the Iowa Constitution must, as a matter of law, be interpreted to provide only greater protection than the United States Constitution. *See* Linde, *E Pluribus*, 18 Ga. L. Rev. at 179; *see also Gaskins*, 866 N.W.2d at 21 n.7 (Iowa 2015) (Appel, J., concurring specially) ("This case makes the powerful point that independent state constitutional law is neither conservative nor liberal. It simply preserves what the United States Supreme Court has referred to as our 'free and unfettered' authority in interpreting our state constitution." (quoting *Nat'l Tea Co.*, 309 U.S. at 557, 60 S. Ct. at 679)); *King v. State*, 797 N.W.2d 565, 571 (Iowa 2011) ("[W]e reserve the right to apply the principles differently under the state constitution compared to its federal counterpart."). In this particular case, I concur with my colleagues that neither the United States Constitution nor the Iowa Constitution provides Brown with any relief and that her conviction should be affirmed.

**CADY, Chief Justice (dissenting).**

I respectfully dissent from the decision of the majority to continue to address claims of pretextual traffic stops without considering the subjective motives of the officer involved once probable cause is found. Our law must, instead, prohibit pretextual traffic stops motivated by race or any other classification, even when probable cause for a traffic violation exists. They are offensive to the values of our constitution and abhorrent to the concept of justice expected by our constitution. They are one of many reasons to explain why our criminal justice system has disproportionally affected African-Americans in our state and across the nation. In turn, they have helped create disproportionate paths and outcomes in life and continue to prolong inequality within a system of governing built on achieving equality. None of this will change, however, until our law governing this issue changes. Law, in every instance, must first reflect our highest understanding and then pass that understanding onto those people it affects and those who implement it. While a legal requirement for officers to exclude race as a motivation for a stop may be difficult to enforce, this difficulty should itself not deny its force and effect. Law enforcement officers place their lives on the line every day to uphold the law under the most difficult circumstances. They serve to protect the people at all costs. They would strive to enforce this law too, driven by the understanding that identifying and removing race as a motivation for a stop will extend protections to people far beyond the moment. This change would work to eliminate the unconscious origin of a pervasive source of discrimination and allow us to better achieve the equality promised in life by our constitution. The law must always serve as the means to achieve this end.

The majority suggests our previous interpretations of article I, section 8 of the Iowa Constitution to mirror the Fourth Amendment of the United States Constitution warrants a parallel analysis of pretextual stops. While I respect the wisdom and competency of the Supreme Court, we should not adopt its analysis of this issue at the expense of the rights of Iowa's citizens and, in particular, the rights of our citizens of color.[7] The Supreme Court's interpretation of constitutional rights under the Federal Constitution need not limit the rights provided to Iowans under the Iowa Constitution. *State v. Baldon*, 829 N.W.2d 785, 791 (Iowa 2013) ("[T]he Supreme Court's jurisprudence regarding the freedom from unreasonable searches and seizures under the Fourth Amendment—or any other fundamental, civil, or human right for that matter—makes for an admirable floor, but it is certainly not a ceiling."). We have routinely recognized our authority in "independently construing provisions of the Iowa Constitution that are nearly identical to the federal counterpart." *State v. Pals*, 805 N.W.2d 767, 771 (Iowa 2011) ("[W]e jealously protect this court's authority to follow an independent approach under our state constitution.").

Unfortunately, the majority has not utilized our independence in deciding the present case. Instead, it ultimately follows the reasoning of

---

[7][T]he dual sovereignty found in our federal system provides state courts with freedom to formulate their own answers to issues such as what is an unreasonable search and seizure, what offends due process, and what violates equal protection. But with freedom comes responsibility. And responsibility can seem overwhelming. One way to deal with this is to refuse to make difficult choices and to rely on ready-made interpretations from the U.S. Supreme Court. But this is not the way the federal system was intended to work. State courts must resist the temptation to "escape from freedom." The ongoing American experiment in federalism deserves nothing less.

Timothy P. O'Neill, *Escape from Freedom: Why "Limited Lockstep" Betrays Our System of Federalism*, 48 J. Marshall L. Rev. 325, 333–34 (2014).

the United States Supreme Court's decision in *Whren v. United States*, 517 U.S. 806, 819, 116 S. Ct. 1769, 1777 (1996).

The *Whren* doctrine is wrong largely because it gives police officers too much authority, which has led to the misuse of that authority and has allowed police officers to engage in fishing expeditions based on offensive motivations. *Whren* recognized race-based law enforcement as unconstitutional but held "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Id.* at 813, 116 S. Ct. at 1774. In effect, the decision masks an officer's improper racial motivations when making a traffic stop. Impure motivations are deemed justified by finding a traffic violation was committed, however minor that violation may be. For this reason, *Whren* has been widely criticized as legalizing racial profiling in the context of traffic stops. *See* Devon W. Carbado, *From Stopping Black People to Killing Black People: The Fourth Amendment Pathways to Police Violence*, 105 Calif. L. Rev. 125, 129 (2017) [hereinafter Carbado] ("[T]he Court's legalization of racial profiling exposes African Americans not only to the violence of ongoing police surveillance and contact but also to the violence of serious bodily injury and death."); Darrell D. Jackson, *Profiling the Police: Flipping 20 Years of* Whren *on Its Head*, 85 UMKC L. Rev. 671, 680 (2017) [hereinafter Jackson] (arguing the Court's discussion of racial profiling under the Fourth Amendment "authorized the use of racial profiling for all criminal investigations"); Kevin R. Johnson, *How Racial Profiling in America Became the Law of the Land:* United States v. Brignoni-Ponce *and* Whren v. United States *and the Need for Truly Rebellious Lawyering*, 98 Geo. L.J. 1005, 1070 (2010) [hereinafter Johnson] ("The Court's refusal to consider the intent of police officers in its Fourth Amendment analysis created a safe haven for racial profiling by the police."). In effect, the Supreme Court "balanced the need of law

enforcement officers to engage in [discriminatory traffic stops] to root out crime against the right of minority communities to be free from race-based practices." I. Bennett Capers, *Crime, Legitimacy, and Testilying*, 83 Ind. L.J. 835, 859 (2008) [hereinafter Capers] (discussing the consequences of the court's stop-and-frisk decision).

The majority's suggestion that the proper constitutional basis for a discrimination claim is the Equal Protection Clause neglects the significant difficulties in bringing a successful equal protection claim.[8] Furthermore, the Equal Protection Clause's civil remedy does not provide relief to defendants facing criminal penalties. *United States v. Nichols*, 512 F.3d 789, 795 (6th Cir. 2008) (barring the exclusionary rule as a remedy for an equal protection claim following an alleged racially motivated stop), *overruled on other grounds as recognized in United States v. Buford*, 632 F.3d 264, 269 (6th Cir. 2011). *But see Terry v. Ohio*, 392 U.S. 1, 12, 88 S. Ct. 1868, 1875 (1968) (stating that the exclusionary rule "is the only effective deterrent to police misconduct in the criminal context[] and that without it the constitutional guarantee against unreasonable searches and seizures would be a mere 'form of words' " (quoting *Mapp v. Ohio*, 367 U.S. 643, 648, 81 S. Ct. 1684, 1688 (1961))).

Even under an equal protection analysis, the ultimate issue is whether the disparate treatment is reasonable. Yet, it is article I, section 8 of the Iowa Constitution and the Fourth Amendment to the United States Constitution that specifically require all seizures by law enforcement to be "reasonable." Clearly, the text of the Search and Seizure Clauses support

---

[8]"On average, to take an equal protection claim to trial costs anywhere from $45,000 up to $125,000. Since the average defendant's income is approximately between $23,000 and $60,000," most avenues for such litigation are unavailable. Jackson, 85 UMKC L. Rev. at 680 (footnote omitted).

a reasonableness test, and it is not enough to brush the issue of racial profiling off as only an equal protection claim.[9]

The *Whren* decision "has greatly expanded the authority and power of law enforcement officers, and that discretion has exacerbated problems with racial profiling in law enforcement." Johnson, 98 Geo. L.J. at 1076. Many people of color feel racial profiling is endemic in current criminal enforcement. *Id.* Amici curiae, in support of Brown, state pretextual traffic stops

> [a]ffect[] minorities disproportionately[;] they put People of Color in reasonable fear for the bodily safety and even the lives of themselves, their children, their loved ones and friends; and they exacerbate and perpetuate the profound problem of racial disparities in the criminal justice system and society.

Brief of ACLU of Iowa et al. as Amici Curiae Supporting Appellant at 10, *State v. Brown*, ___ N.W.2d ___ (Iowa 2019) (No. 17–0367). Amici also provide statistical data showing people of color, particularly African-Americans, are stopped, cited, and arrested at higher rates than Caucasian drivers throughout Iowa. *Id.* at 16–22 (finding nineteen percent of traffic stops in Iowa City involved minority drivers, although they made up only ten percent of the city's drivers, and black drivers in Scott County

---

[9]Moreover,

> [t]he Fourth Amendment . . . should be read as a protection of what it means to be "of the people," a limitation upon the ability of government to infringe upon the right to equal citizenship, equal worth, and equal autonomy in conducting searches and seizures. To be clear, I am not suggesting that the Fourth Amendment should be read as including causes of action based on the denial of equal protection, or as incorporating equal protection jurisprudence. What I am suggesting is that Fourth Amendment jurisprudence be guided by a commitment to equal citizenship.

I. Bennett Capers, *Policing, Race, and Place*, 44 Harv. C.R.-C.L. L. Rev. 43, 74 (2009).

were stopped "nearly *three times* as often as white drivers") These disturbing trends are present nationwide.[10]

Even more alarming are instances when "an ordinary traffic stop [is] a gateway to extraordinary police violence." Carbado, 105 Calif. L. Rev. at 150, 163–64 (noting the police killings of Michael Brown, Walter Scott, Eric Garner, Alexia Christian, Sheneque Proctor, and Kendra James started as ordinary police interactions).

The majority contends that Brown has not provided any new arguments to justify departing from our holdings in *State v. Griffin*, 691 N.W.2d 734, 737 (Iowa 2005), and *State v. Predka*, 555 N.W.2d 202, 215–16 (Iowa 1996). It also suggests that racial profiling concerns should not inform our decision now because such concerns were present when we previously addressed the issue of pretext stops and did not influence our decisions. The very fact that racial profiling concerns persist should inform our decision today. Time has given us the opportunity to understand the importance of addressing these issues, not only for people of color who are negatively impacted, but also for all citizens.[11]

---

[10]The State of Missouri compiles an annual summary of traffic stop data. Att'y Gen. Josh Hawley, *2017 Vehicle Stops Executive Summary*, Mo. Att'y Gen., https://www.ago.mo.gov/home/vehicle-stops-report/2017-executive-summary# (last visited May 17, 2019). The summary includes a disparity index calculated by dividing the percentage of traffic stops of a particular group by the percentage of the driving population constituted by the same group. *Id.* Data from 2017 revealed that "accounting for their respective proportions of Missouri's driving-age population, African-Americans were stopped at a rate 85% higher than Whites." *Id.*

Data from a similar 2017 Illinois report indicated nearly sixty percent of law enforcement agencies reported minority drivers were stopped at a higher rate than were Caucasian drivers. Alexander Weiss Consulting, LLC, *Illinois Traffic and Pedestrian Stop Study: Traffic Stop Analysis* 4–5 (Ill. Dep't of Transp. 2017).

[11]Conceptual writings and empirical research have suggested that Whites experience both positive (i.e., privileges) and negative (i.e., costs) consequences as a result of racism. . . . The phrase *costs of racism to Whites* is defined as negative psychosocial consequences that Whites experience as a result of the existence of racism. Examples of these costs include guilt and shame, irrational fear of people of other races, distorted

Since *Griffin* and *Predka,* our understanding of justice and the rights entailed in maintaining justice have evolved. Marginalized groups have continued to mobilize so that their voices can be heard and their struggles recognized. *See, e.g.,* Kimberlé Williams Crenshaw et al., African Am. Policy Forum, *Say Her Name: Resisting Police Brutality Against Black Women* 2 (2015) ("*Say Her Name* sheds light on Black women's experiences of police violence in an effort to support a gender-inclusive approach to racial justice that centers all Black lives equally."). The efforts of marginalized groups have been impactful in raising awareness and altering society's collective understanding of the role race plays in policing. While it is unfortunate we did not recognize racial bias as a compelling consideration when deciding *Griffin* and *Predka,* it would be a deliberate oversight not to do so now. As a branch of government committed to justice and protection of the rights of all Iowans, we should not be so beholden to the past that we prevent ourselves from enacting justice in the present. In fact, Iowa's judiciary has consistently led the charge in recognizing civil liberties through thoughtful consideration of our constitution and application of the truth as derived by cultural understandings, societal changes, and research. *See Varnum v. Brien,* 763 N.W.2d 862, 906 (Iowa 2009) (holding a statute prohibiting same-sex couples from marriage unconstitutional six years before the United States Supreme Court followed suit); *Coger v. Nw. Union Packet Co.,* 37 Iowa 145, 159–60 (1873) (barring common carriers from discriminating on the basis

---

beliefs regarding race and racism, and limited exposure to people of different races and cultures.

Lisa B. Spanieman et al., *Psychosocial Costs of Racism to Whites: Exploring Patterns Through Cluster Analysis*, 53 J. of Counseling Psychol. 434, 434–35 (2006) (citations omitted) (analyzing the psychosocial costs of racism to Whites through a study of 230 White students, aged 18–44, attending a Midwestern university).

of race); *Clark v. Bd. of Dirs.*, 24 Iowa 266, 277 (1868) (concluding the segregation of schools based on race was unconstitutional eighty-six years before the United States Supreme Court decided the same); *In re Ralph*, 1 Morris 1, 7 (1839) (recognizing the freedom of a former slave in the Iowa Supreme Court's premier case); Russell E. Lovell II, *Shine on, You Bright Radical Star:* Clark v. Board of School Directors (of Muscatine)—*the Iowa Supreme Court's Civil Rights Exceptionalism*, 67 Drake L. Rev. 175, 192 (2019) (discussing, among others, a 1869 Iowa court decision that allowed Arabella Mansfield to become the nation's first female attorney).

Additionally, the passage of time since *Whren, Griffin,* and *Predka* has not only given way to a greater understanding of implicit bias,[12] but also a greater understanding of the adverse role it can play in the vast discretionary decisions that occur throughout our criminal justice system. This new understanding supports a new approach to confronting implicit bias in all areas of our justice system, including racial profiling in traffic offenses. Moreover, the time and place for this new approach fits Iowa. The growing understanding of implicit bias within the last decade has supported a branchwide initiative to educate all Iowa judges and judicial branch employees on implicit bias. This initiative has provided training to all judges and continues today. Thus, our response in Iowa has not been to see the problem as too big or too hard to solve, but it has been to work to find a solution through greater understanding. We should follow this same approach today in response to the problem of racial profiling in traffic offenses.

---

[12]"Implicit biases are the plethora of fears, feelings, perceptions, and stereotypes that lie deep within our subconscious, without our conscious permission or acknowledgement." Mark W. Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection: The Problems of Judge-Dominated Voir Dire, the Failed Promise of* Batson*, and Proposed Solutions*, 4 Harv. L. & Pol'y Rev. 149, 149 (2010).

Accordingly, the claim by the majority that a departure from *Whren* "would create instability in the law, hinder law enforcement efforts, weaken the strength of our adversarial system, and undermine public confidence in the legal system" is misplaced. In truth, the reasons expressed by the majority to follow *Whren* better describe the consequences of the failure to depart from it.

The majority suggests relying on a reasonableness standard would result in judicial overreach, unfairly focusing on an officer's subjective state of mind. Yet, the suggestion that requiring officers to justify their objective reasoning would greatly hinder law enforcement is cause for concern, particularly because officers *should* only be utilizing objective reasoning when effectuating a traffic stop. It indicates there may be too heavy a reliance on pretextual stops. There is no element inherent in enforcing traffic laws that require a police officer to engage in subjective reasoning before making a traffic stop. Adopting a reasonableness standard would not hinder law enforcement's ability to enforce traffic laws. Instead, it encourages equality in the enforcement of these laws.

The problem with pretextual stops does not stem from officers' enforcement of legitimate traffic laws; it comes from the disparate impact resulting from an officer's ability to make a stop motivated by subjective reasons, many times racial, and then only needing to justify the stop by citing a minor traffic violation. Or, as in the present case, it comes from an officer initially choosing not to enforce a traffic law, then deciding to make the stop based on subjective criteria, and then justifying the stop based on earlier objective reasons. For all that is known in this case, race could have been an unconscious motive operating in the mind of the officer from the beginning. Yet, our law does not make the officer accountable for the unconscious motive, but allows it to be left in the recesses of the mind

and washed over with other motives such as gang affiliation in this case. But even this motive has its own implicit bias because there was no evidence of a criminal record or any particular background to show the affiliation was of a criminal nature. Gang affiliation can exist in neighborhoods for reasons independent of criminal activity and when broadly used as a motivation for a stop can have the same effects as using race.[13]

This permissible use of discretion contributes to inequality in the enforcement of traffic laws and subsequent prosecutions. In other cases, officers stop drivers not because of known gang affiliation but because of the color of their skin or their appearance, the neighborhood they are driving in, or any number of impermissible factors. These people are subjected to police stops, although others with different affiliations, skin color, or neighborhoods, committing similar minor traffic offenses are not. This type of policing results in a higher volume of violations found. In the many instances in which no wrongdoing is discovered, those subjected to the pretextual stops are left feeling targeted, unsettled, and apprehensive of law enforcement.[14] The "protections meant to curtail law enforcement's abuse of authority during traffic stops" cited by the majority do not address

---

[13]When applied to "gangs", risk analyses typically take the form of *social profiling*. This involves constructing a matrix of variables and matching individuals to the variables described in the gang matrix. Such processes tend to be descriptive and do little to provide a basis for understanding *why* and *how* specific groups of young people experience problems or find meaning in their lives. . . . [T]here is a strong correlation between poverty and crime, yet all poor people do not become engaged in criminal activity; nor do all 'criminals' originate from poor backgrounds. The same applies to gang membership and gang activities.

Rob White, *Disputed Definitions and Fluid Identities: The Limitations of Social Profiling in Relation to Ethnic Youth Gangs*, 8 Youth Justice 149, 157 (2008) (citation omitted).

[14]"For these target groups, the perception is that being black or Hispanic alone carries a penalty: the taint of suspicion, the risk of a traffic stop, the risk of a canine sniff, the risk of a search." Capers, 83 Ind. L.J. at 849.

the disparity in making traffic stops and do nothing to address the problem of racial profiling.

By placing a reasonableness component on the pretext, police will still be able to use minor traffic stops to investigate reasonable suspicion of other criminal activity, but the practice of pretextual stops unrelated to specific and articulable facts of criminal activity will be significantly reduced. This approach strikes the balance needed to advance the interests of all in our society.

The majority suggests that the reasonable-officer standard would place an undue burden on law enforcement. In criticizing the "mythical reasonable officer," the majority ignores the fact that a reasonable-person standard has been routinely applied within the field of search and seizure and has not crippled law enforcement's ability to do their jobs. *See, e.g., Terry*, 392 U.S. at 30, 88 S. Ct. at 1884 (applying a reasonableness standard to analysis of stop-and-frisk situations).

Finally, unlike the majority, I do not believe that departing from *Whren* would weaken our adversarial system or undermine public confidence. Just the opposite is true. Applying a reasonableness standard would enhance the legitimacy of traffic stops and resulting prosecutions. Departing from *Whren* would demonstrate this court's refusal to provide a safe harbor for implicit biases to thrive. Employing a standard that demands fair and unbiased stops could also help to restore trust in law enforcement amongst disillusioned demographics.[15]

---

[15]In 2017, a nationwide survey indicated confidence in police had risen to fifty-seven percent after a downward slope in 2014 and a record-tying low of fifty-two percent in 2015. Jim Norman, *Confidence in Police Back at Historical Average*, Gallup (July 10, 2017), https://news.gallup.com/poll/213869/confidence-police-back-historical-average.aspx [https://perma.cc/5BGE-JH34]. However, these overall trends disguise significant drops across several demographics. *Id.*

> Though the overall numbers have rebounded, the years of national turmoil
> have only deepened the divide in the confidence that Americans of different

In effect, the majority concludes that our inability to control every variable leading to disparate enforcement means we should avoid addressing the issue of pretextual stops altogether.  I disagree.  The factors leading to disparate enforcement may be numerous, but the vastness of the problem emphasizes the necessity of our attention and in no way absolves us from evaluating the constitutional issue presented in this case.  The difficulties in addressing this issue cannot excuse its continuation.

The majority remains hopeful that the employment of technology, such as police body cams and cell phone videos, will help monitor racial profiling.  Furthermore, the majority quotes *State v. Lopez* for the proposition that "[t]he more evidence that a detention was motivated by police suspicions unrelated to the traffic offense, the less credible the officer's assertion that the traffic offense occurred."  873 P.2d 1127, 1138–39 (Utah 1994).  Yet, under *Whren*, the consequences remain the same no matter whether the officer was racially motivated or whether video footage caught the encounter as long as a traffic offense occurred.  Thus, people of color are still left with little protection against subjective enforcement of the law.

Current solutions to the problem of pretextual stops may not be perfect.[16]  However, they are a profound step in the right direction.  There

---

ages, ethnicities and political beliefs say they have in the police.  The loss of confidence is most apparent among Hispanics, liberals and those younger than age 35.

*Id.*  Confidence rates also dropped among Black citizens, moderates, and Democrats.  *Id.*

[16]It has been suggested the value of the "would have" test is limited to situations when police officers admit to using subjective motivations.  Margaret M. Lawton, *The Road to* Whren *and Beyond: Does the "Would Have" Test Work?*, 57 DePaul L. Rev. 917, 918–19 (2008).  Additionally, despite adopting the test, Washington courts may be reluctant to find that a police officer is lying about their motivations or "have difficulty discerning pretextual behavior without an admission."  *Id.* at 919.

is value in providing a constitutionally sound standard for defendants to challenge police stops motivated by impermissible considerations. It reinforces and legitimizes the principle "that the Constitution prohibits selective enforcement of the law based on considerations such as race." *Whren*, 517 U.S. at 813, 116 S. Ct. at 1774. Moreover, it provides defendants with the opportunity to meaningfully appeal adverse decisions, an avenue effectively closed to them now. This is not only beneficial for defendants but to our court system and the development of our caselaw. It signals to law enforcement and courts that the use of implicit bias must be acknowledged and curtailed.

The majority's suggestion that the proposed solution will not achieve the desired result because an officer who engages in racial profiling is likely to be untruthful about it is off the mark. It neglects what might be the most important aspect of this case and this issue. Police officers, like the rest of us, have implicit biases they might not recognize. Simply acting on these biases does not indicate an officer's propensity to be untruthful. We should have more faith in our law enforcement and give them the opportunity to recognize their biases so that they can acknowledge and limit acting on them. For example, officers should take the opportunity to review the statistical data from their stops and analyze whether it reveals disproportionate enforcement. Furthermore, law enforcement agencies should invest in implicit-bias training so that all officers are aware of it. These types of changes can be enacted even in the absence of judicial action.[17] As it stands, the majority makes no move toward eliminating a

---

[17]It has been suggested that historically marginalized groups should utilize profiling as a tool themselves "to identify, surveil, and if necessary, instigate proceedings against problem police officers." Jackson, 85 UMKC L. Rev. at 688. "[D]eveloping an offender profile[] is to present information that describes the characteristics of a probable offender and aid[s] in the analysis of the data for predicting future offenses and/or victims." *Id.* at 685; *see also* Linh Ta, *Des Moines Police Know They're Biased. Here's*

practice that we recognize as unconstitutionally discriminatory. If our law projects that this practice is wrong, we can properly assume officers have enough respect for the law to comply with it. We would take a big step forward today if we were to use article I, section 8 of our constitution to at least say it is illegal for a police officer to use race or any other protected classification as the motivating factor to make a stop for a minor traffic violation, instead of following the *Whren* doctrine.

Judges have always been called upon to understand each issue that comes into the court from both perspectives and to then use this dual vision to build a model that solves the problem. The issues of racial profiling and implicit bias presented in this case are uniquely complex, but they can only be solved by understanding this complexity and by building a standard that projects this understanding to all.

---

*How They're Trying to Mitigate It*, Des Moines Register (Aug. 13, 2017, 4:04 PM), https://www.desmoinesregister.com/story/news/crime-and-courts/2017/08/13/des-moines-police-know-theyre-biased-heres-how-theyre-trying-mitigate-it/311895001/.

Another proposal supports harsher penalties for officers who commit perjury when testifying about an incident. Capers, 83 Ind. L.J. at 873. Such officers "should be investigated and prosecuted to the same extent a civilian witness would be." *Id.*

**APPEL, Justice (dissenting).**

Under article I, section 8 of the Iowa Constitution, can a police officer use a common minor traffic violation as an after-the-fact pretext to seize a vehicle and its passengers when the actual reason for the stop was constitutionally inadequate?  Today's majority says yes.  I say NO!

## I.  Summary.

History demonstrates that one of the fundamental purposes of search and seizure law is to cabin the discretion of police officers in choosing whom to subject to search and seizure.  Generalized discretion in the hands of a law enforcement official has been anathema to the search and seizure provisions of both the Fourth Amendment and article I, section 8 of the Iowa Constitution.  No case considering search and seizure issues can be consistent with the history and purpose of the constitutional provisions without carefully considering whether the discretion of police officers is so unbridled that it vests in them power equivalent to the hated general authority to search.

As will be seen below, in my view, law enforcement officers have what amounts to general authority to seize drivers on the open road due to the density of traffic regulations and the pervasiveness of minor violations.  That means that the traditional limitations to search and seize do not apply on the open road and the risk of arbitrary enforcement is great.  As a result, consistent with the history and purpose of search and seizure law, there must be constitutional restraints on the generalized discretion in order to protect citizens from arbitrary actions of law enforcement.

For many years, our legal tradition frowned on pretextual searches as violating search and seizure principles.  Early federal cases questioned the validity of pretextual searches.  And up until the 1990s, the trend

among state courts was to disapprove pretextual searches as violating search and seizure. Iowa caselaw was part of the general trend for decades.

All that changed when the Supreme Court announced its decision in *Whren v. United States*, 517 U.S. 806, 811–16, 116 S. Ct. 1769, 1773–76 (1996). As will be explored below, *Whren* departed from the trend in state courts and made a flawed turn in the development of search and seizure law. In my view, the wrong turn made in *Whren* should not be emulated by this court in its interpretation of the Iowa Constitution.

As a state supreme court, we are not bound by *Whren* but should only consider it to the degree it is persuasive. It is well established in other states and in Iowa that the mere fact there is a similarity in the language of the Fourth Amendment and article I, section 8 of the Iowa Constitution does not mean that federal precedent has any more power beyond its ability to persuade. I find *Whren* unpersuasive because of its failure to limit general police discretion to engage in roadway seizures. In light of its unconvincing rationale and the weakness of existing authority, the doctrine of stare decisis does not excuse us from considering the validity of pretextual stops under the Iowa Constitution.

The decision in this case is bad law. The approach of the majority fails to recognize the history of search and seizure law and the importance of curbing generalized law enforcement discretion, fails to recognize that law enforcement in practice has general authority to stop vehicles on the open road due to the pervasiveness of regulations, fails to recognize or deal with the problems of implicit bias, fails to recognize the reality of racial profiling, fails to recognize the shortcomings of alternative remedies, and fails to recognize the constitutional harms caused by generalized seizures on the open road.

Because of the importance of the issue, an in-depth analysis of the history of search and seizure law, the doctrinal developments in the law, and the impact on the law in light of current realities is appropriate. We simply should not bless pretextual stops by law enforcement without a thorough understanding of where the law has been, how it has evolved, and how it might develop.

## II. Factual Background and Proceedings.

**A. Initial Proceedings.** On November 23, 2015, the State filed a trial information charging Scottize Brown with a second offense of operating a motor vehicle while intoxicated, an aggravated misdemeanor, in violation of Iowa Code section 321J.2(2)(*b*) (2016). Brown pled not guilty. She subsequently filed a motion to suppress, claiming she was unlawfully subjected to a pretextual stop. In her motion to suppress, Brown claimed that the stop violated both the Fourth Amendment of the United States Constitution and article I, section 8 of the Iowa Constitution.

**B. Evidence Presented at the Motion to Suppress Hearing.** At the motion to suppress hearing, Waterloo police officer Justin Brandt testified that he observed a Lincoln Navigator cross the centerline while driving through an intersection on a yellow light in Waterloo, Iowa, in the early morning hours. Officer Brandt told the court he followed the vehicle and "ended up running the license plate on it." He determined that the registered owner of the vehicle had a valid license. Officer Brandt testified that he then "got curious" and, "having the time to do so," opened up a database and "somewhere in that database [he] ended up seeing that there is some kind of connection with gang activity or something with the registered owner." Officer Brandt further testified that he noticed that one of the two license plate lamps on the vehicle was not operating. According to Brandt, he "wasn't even going to stop" the car for the traffic violations

until he ran the plate and learned of the gang affiliation of the owner. Upon learning of the gang affiliation, he wanted to "poke around and see what's up."

Officer Brandt told the court he then followed the vehicle for a couple of blocks, after which he activated his emergency lights to conduct a traffic stop. The vehicle continued on, however, and Officer Brandt initiated his siren. At that point, the vehicle stopped.

Officer Brandt approached the vehicle and obtained identification from Brown as the driver of the vehicle. Officer Brandt testified that he could smell alcohol and saw an open can of beer in the front cup holder. According to Officer Brandt, Brown admitted to drinking earlier but said the open can was not hers. Officer Brandt determined that Brown was driving with a suspended license and transported her to the police station. At the police station, Officer Brandt stated, Brown failed several field sobriety tests and refused to submit to a breath test.

**C. District Court Ruling on the Motion to Suppress.** The district court denied Brown's motion to suppress. It noted that Officer Brandt first observed the vehicle at a red light where it made an improper turn. The district court found that after observing the improper turn, Officer Brandt determined that the registered owner was associated with local gang activity. It further found that Officer Brandt followed the vehicle to another red light, where he observed one of the vehicle's license plate lights was not properly functioning. According to the district court, it was apparent that Officer Brandt would not have made the stop absent the gang affiliation of the registered owner.

The district court held that notwithstanding the subjective motivation of Officer Brandt, he had observed a traffic infraction—the improper turn—as well as an equipment violation—the license plate light.

It held that because there were objective violations, the subjective motive of Officer Brandt did not matter. In support of its legal conclusion, the district court cited *State v. Aderholdt,* 545 N.W.2d 559, 563 (Iowa 1996), and *State v. Harrison,* 846 N.W.2d 362 (Iowa 2014). As a result, the district court denied the motion to suppress.[18]

The matter proceeded to trial on the minutes of testimony. The district court found Brown guilty of operating a motor vehicle while intoxicated, second offense. Brown appealed.

**D. Issues on Appeal.** On appeal, Brown argues that the district court erred by failing to suppress the evidence arising from the seizure of the automobile she was driving. Brown claims that the stop was not, in fact, initiated as a result of a minor traffic infraction but was pretextual in nature and that the real reason for the stop was constitutionally insufficient. On appeal, Brown makes her claim solely under article I, section 8 of the Iowa Constitution.

**III. Standard of Review.**

This court reviews claims of unconstitutional searches and seizures de novo. *State v. Gaskins,* 866 N.W.2d 1, 5 (Iowa 2015). In engaging in de novo review, "[w]e independently evaluate the totality of the circumstances found in the record, including the evidence introduced at both the suppression hearing and at trial." *State v. Vance,* 790 N.W.2d

---

[18]The district court did not cite either the Fourth Amendment of the United States Constitution or article I, section 8 of the Iowa Constitution. Under these circumstances, claims under both Constitutions are preserved. *See Lamasters v. State,* 821 N.W.2d 856, 864 (Iowa 2012) ("If the court's ruling indicates that the court *considered* the issue and necessarily ruled on it, even if the court's reasoning is 'incomplete or sparse,' the issue has been preserved." (quoting *Meier v. Senecaut,* 641 N.W.2d 532, 540 (Iowa 2002)); *cf. State v. Childs,* 898 N.W.2d 177, 191 (Iowa 2017) (Hecht, J., dissenting) (" '[W]hen there are parallel constitutional provisions in the Federal and State Constitutions and a party does not indicate the specific constitutional basis, we regard both federal and state constitutional claims as preserved,' even if the district court did not rule on both." (quoting *State v. Gaskins,* 866 N.W.2d 1, 6 (Iowa 2015))).

775, 780 (Iowa 2010). Here, however, Brown waived her right to a jury trial and pled guilty. As a result, there is no trial court evidentiary record to review.

**IV. Overview of Search and Seizure Law.**

**A. Historical Overview of Relevant Search and Seizure Law.**

1. *Hatred of general warrants and writs of assistance animates the American Revolution.* In several recent cases, this court explored the history of search and seizure law under the Federal and Iowa Constitutions. *See, e.g., Godfrey v. State,* 898 N.W.2d 844, 866–67 (Iowa 2017); *State v. Short,* 851 N.W.2d 474, 481–84 (Iowa 2014); *State v. Baldon,* 829 N.W.2d 785, 805–09 (Iowa 2013) (Appel, J., specially concurring); *State v. Ochoa,* 792 N.W.2d 260, 269–75 (Iowa 2010). A brief summary of this history provides the context for consideration of the questions posed in this case.

One of the great advancements in English law during the eighteenth century was the development and clear articulation of judicial protection of individuals from arbitrary, government-sponsored search and seizure. The key cases center around the efforts of Lord Halifax's government to suppress dissent. Government agents generally ransacked residences and premises looking for telltale signs of involvement in the publication of a scurrilous antigovernment broadside. Thomas K. Clancy, *The Fourth Amendment: Its History and Interpretation* § 2.2.3.2, at 36 (2008); Andrew E. Taslitz, *Reconstructing the Fourth Amendment: A History of Search and Seizure, 1789–1868,* at 20 (2006). In a series of cases, the English courts held that such searches without probable cause were illegal and imposed hefty fines against the perpetrators. *Entick v. Carrington* (1765) 95 Eng. Rep. 807, 818; 2 Wils. K.B. 275, 292; *Wilkes v. Wood* (1763) 98 Eng. Rep.

489, 498–99; Lofft 1, 18–19; *Huckle v. Money* (1763) 95 Eng. Rep. 768, 768–69; 2 Wils. K.B. 205, 205–07.

The forces of resistance to generalized governmental searches traveled in the boats over to the New World and landed in the infamous *Paxton's Case.* *See* Tracey Maclin, *The Complexity of the Fourth Amendment: A Historical Review,* 77 B.U. L. Rev. 925, 946 (1997) [hereinafter Maclin, *The Complexity of the Fourth Amendment*]. In *Paxton's Case,* James Otis Jr., a prominent Massachusetts lawyer and powerful orator, bitterly attacked the Crown's provincial agents for engaging in arbitrary searches under generalized writs of assistance that did not name a specific individual but authorized the Crown's minions to search in their discretion for evidence of evasion of British mercantile policy. William J. Cuddihy, *The Fourth Amendment: Origins and Original Meaning, 602–1791,* at 377–82, 385–95 (2009) [hereinafter Cuddihy]; Maclin, *The Complexity of the Fourth Amendment,* 77 B.U. L. Rev. at 946.

Otis lost the case, but the powerful blows struck by his forceful argument were not lost on John Adams, who declared, "Then and there the Child Independence was born." Jacob W. Landynski, *Search and Seizure and the Supreme Court: A Study in Constitutional Interpretation* 37 (1966) (quoting Letter from John Adams to William Tudor (Mar. 29, 1817), *in* 10 *The Works of John Adams* 244, 247–48 (Charles Francis Adams ed., Bos., Little, Brown & Co. 1856)). Adams remembered the lessons of *Paxton's Case* when he drafted the Massachusetts Constitution of 1780. Leonard W. Levy, *Origins of the Bill of Rights* 158 (1999); John M. Murrin, *From Liberties to Rights: The Struggle in Colonial Massachusetts, in The Bill of Rights and the States: The Colonial and Revolutionary Origins of American Liberties* 63, 91 (Patrick T. Conley & John P. Kaminski eds., 1992). In the Massachusetts Constitution, Adams included a search and

seizure provision that limited the authority of the government to engage in searches without a particularized warrant.  Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 Mich. L. Rev. 547, 684–85 (1999) [hereinafter Davies].  *But cf.* Tracey Maclin, *Race and the Fourth Amendment*, 51 Vand. L. Rev. 333, 333–36 (1998) [hereinafter Maclin, *Race and the Fourth Amendment*] (discussing arbitrary and discriminatory search and seizure practices of slave patrols in the colonial American South).  *See generally* Akhil Reed Amar, *Fourth Amendment First Principles*, 107 Harv. L. Rev. 757, 779–80 & n.87 (1994) (discussing historical predicate for the particularized-warrant requirement in American law).

The precedent set in the Massachusetts Constitution, and other state constitutions enacted shortly thereafter, had a dramatic influence on the development of the United States Constitution.  *See Short*, 851 N.W.2d at 481–82.  The United States Constitution was ratified only upon the assurance by James Madison and others that a series of amendments known as the Bill of Rights would be adopted after enactment.  In drafting the Bill of Rights, Madison looked to state constitutional tradition in developing what became the Fourth Amendment to the United States Constitution.  William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*, 90 Harv. L. Rev. 489, 501 (1977); *see* Steven G. Calabresi et al., *State Bills of Rights in 1787 and 1791: What Individual Rights Are Really Deeply Rooted in American History and Tradition?*, 85 S. Cal. L. Rev. 1451, 1454–55, 1491–92 (2012) [hereinafter Calabresi et al.].  Indeed, all of the Bill of Rights provisions had predecessors in prior state constitutions.  *See* Calabresi et al., 85 S. Cal. L. Rev. at 1454–55, 1491–92.  The notion of a bill of rights was not a concept developed by the federal framers and then copied by the states,

but was a concept embraced by state constitutions and later adopted by the federal framers. *Short*, 851 N.W.2d at 481–82.

Iowa adopted two state constitutions: the first in 1846 and the second in 1857. *See id.* at 482. The search and seizure language adopted in article I, section 8 of both the Iowa Constitution of 1846 and of 1857 is nearly identical to the Federal Constitution except for the use of a semicolon instead of a comma between the reasonableness clause and the warrant clause. *Compare* U.S. Const. amend. IV, *with* Iowa Const. art. I, § 8. The language in the Federal Constitution was largely derived from eight state constitutions that had search and seizure provisions prior to the adoption of the federal document. *See* Bernard Schwartz, *The Great Rights of Mankind: A History of the American Bill of Rights* 88 (expanded ed. 1992).

Although the language in the Fourth Amendment and article I, section 8 is similar. there is no reason for a state court to be "bound" by federal interpretations of the Fourth Amendment. As noted by Judge Jeffrey Sutton, "There is no reason to think, as an interpretive matter, that constitutional guarantees . . . , even guarantees with the same or similar words, must be construed the same." *Short*, 851 N.W.2d at 487 (quoting Jeffrey S. Sutton, *What Does—and Does Not—Ail State Constitutional Law*, 59 U. Kan. L. Rev. 687, 707 (2011) [hereinafter Sutton]). We have explained the principles of independent interpretation of the Iowa Constitution on several occasions. *See, e.g.*, *id.* at 481–92; *Baldon*, 829 N.W.2d at 803–34; *State v. Pals*, 805 N.W.2d 767, 771–72 (Iowa 2011); *Ochoa*, 792 N.W.2d at 264–67.

We are not alone. *See, e.g.*, *Wright v. State*, 108 N.E.3d 307, 315 (Ind. 2018) (explaining that the state constitution demands independent analysis in light of its uniqueness); *State v. Gerschoffer*, 763 N.E.2d 960,

965 (Ind. 2002) ("The Indiana Constitution has unique vitality, even where its words parallel federal language."); *People v. Barber*, 46 N.E.2d 329, 331 (N.Y. 1943) (pointing out that the New York Court of Appeals is "bound to exercise its independent judgment and is not bound by a decision of the Supreme Court of the United States limiting the scope of similar guarantees in the Constitution of the United States"); *State v. Arrington*, 319 S.E.2d 254, 260 (N.C. 1984) ("In construing provisions of the Constitution of North Carolina, this Court is not bound by opinions of the Supreme Court of the United States construing even identical provisions in the Constitution of the United States."); *Commonwealth v. Edmunds*, 586 A.2d 887, 895–96 (Pa. 1991) ("Although the wording of the Pennsylvania Constitution is similar in language to the Fourth Amendment of the United States Constitution, we are not bound to interpret the two provisions as if they were mirror images, even where the text is similar or identical."); *O'Boyle v. State*, 117 P.3d 401, 408 (Wyo. 2005) (noting that the search and seizure provision of the Wyoming Constitution, which parallels the Fourth Amendment, "constitutes a separate and independent source of protection of the rights of Wyoming citizens"). *See generally Baldon*, 829 N.W.2d at 824.

2. *Search and seizure concepts: Requirement of justification supporting particular searches and protection of the public against arbitrary government action.* The search and seizure provisions of the Federal Constitution and the Iowa Constitution perform two functions. First, the search and seizure provisions are designed to ensure that government searches and seizures are justified. The justification ordinarily requires the state to establish to the satisfaction of a neutral magistrate that the proposed search or seizure is supported by probable cause and that the search is limited both with respect to its scope and purpose.

Second, however, the search and seizure provisions are designed to ensure that the government does not engage in the arbitrary exercise of power. For example, in *Entick*, Judge Pratt bristled at the notion that the Crown could willy-nilly engage in searches based on common activity. 95 Eng. Rep. at 818; 2 Wils. K.B. at 292. Judge Pratt acknowledged that although prior caselaw said that a man may be "punishable for having a libel in his private custody," "half the kingdom would be guilty . . . if libels may be searched for and seized by whomsoever and wheresoever the Secretary of State thinks fit." *Id.*

Just as in *Wilkes, Entick*, and other cases, the attacks against writs of assistance in America prior to the American Revolution were also based on the potential of arbitrary enforcement of broadly framed, general power. As noted by the Supreme Court in one of its first Fourth Amendment cases, James Otis declared the writs of assistance were

> "the worst instrument of arbitrary power, the most destructive of English liberty and the fundamental principles of law, that ever was found in an English law book;" since they placed "the liberty of every man in the hands of every petty officer."

*Boyd v. United States*, 116 U.S. 616, 625, 6 S. Ct. 524, 529 (1886) (quoting Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union* 368 (Bos., Little, Brown & Co., 5th ed. 1883)), *abrogations on other grounds recognized by Fisher v. United States*, 425 U.S. 391, 407–09, 96 S. Ct. 1569, 1579–80 (1976). "[C]olonists who battled the British did not trust or defer to the judgments of British customs officials" in furthering what the British, no doubt, thought was the critically important public policy of financing the cost of the public defense of the colonists, through arbitrary search and seizure of untaxed goods authorized by open-ended writs. *See* Tracey Maclin, *The Central Meaning of the Fourth Amendment*, 35 Wm. &

Mary L. Rev. 197, 248 (1993) [hereinafter Maclin, *The Central Meaning of the Fourth Amendment*].

Indeed, just as, according to *Entick*, half the kingdom would be subject to arbitrary search and seizure because of the prevalence of private libel, 95 Eng. Rep. at 818; 2 Wils. K.B. at 292, smuggling to avoid taxes in the colonies was extremely common, Barbara C. Salken, *The General Warrant of the Twentieth Century?  A Fourth Amendment Solution to Unchecked Discretion to Arrest for Traffic Offenses*, 62 Temp. L. Rev. 221, 255–56 (1989).  It is not surprising that, in the New World, warnings arose about unfettered discretion to search and seize.  In words echoing Judge Pratt, Mercy Otis Warren, James Otis's daughter, cautioned that without a Bill of Rights, the proposed Federal Constitution would tolerate "the insolence of any petty revenue officer to enter our houses, search, insult, and seize at pleasure."  Paul Finkelman, *The Ten Amendments as a Declaration of Rights*, 16 S. Ill. U. L.J. 351, 392 (1992) [hereinafter Finkelman] (quoting A Columbian Patriot (Mercy Otis Warren), *Observations on the New Constitution, and on the Federal and State Conventions* (1788), *reprinted in* 16 *The Documentary History of the Ratification of the Constitution* 272, 281 (Merrill Jensen ed., 1976)).  In short, the "general warrants known as writs of assistance [that] . . . bedeviled the colonists" remained "[v]ivid in the memory of the newly independent Americans."  *Stanford v. Texas*, 379 U.S. 476, 481, 85 S. Ct. 506, 510 (1965).

In the words of Professor Anthony Amsterdam in his often cited and unsurpassed article on the Fourth Amendment, search and seizure law protects against not only unjustified searches but also arbitrary searches and seizures "conducted at the discretion of executive officials, who may act despotically and capriciously in the exercise of the power to search and

seize." Anthony G. Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn. L. Rev. 349, 411 (1974) [hereinafter Amsterdam]. Professor Amsterdam went on to explain,

> A paramount purpose of the fourth amendment is to prohibit arbitrary searches and seizures as well as unjustified searches and seizures. . . . Arbitrary searches and seizures are "unreasonable" searches and seizures; ruleless searches and seizures practiced at the varying and unguided discretion of thousands of individual peace officers are arbitrary searches and seizures; therefore, ruleless searches and seizures are "unreasonable" searches and seizures.

*Id.* at 417. Before the innovations in search and seizure doctrine in the Burger–Rehnquist–Roberts era, the Supreme Court repeatedly recognized that the constitutional limitations on search and seizure protect people against arbitrary government acts. *See, e.g., Camara v. Mun. Ct. of S.F.*, 387 U.S. 523, 528, 87 S. Ct. 1727, 1730 (1967); *see also United States v. Ortiz*, 422 U.S. 891, 895, 95 S. Ct. 2585, 2588 (1975); *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S. Ct. 2574, 2579 (1975).

By controlling otherwise unfettered search and seizure discretion of law enforcement, the Fourth Amendment, from the get-go, protected unpopular minorities against majoritarian government institutions. For example, Madison—the author of the Fourth Amendment—was well aware of the general searches of the homes of unpopular minority Philadelphia Quakers whose pacifist inclinations were thought to be evidence that they were British spies. *See* Cuddihy at 618–19; Anthony C. Thompson, *Stopping the Usual Suspects: Race and the Fourth Amendment*, 74 N.Y.U. L. Rev. 956, 996 (1999) [hereinafter Thompson]. Although African-Americans were not afforded equal status by the federal government until at least the passage of the Reconstruction Amendments, the notion that the Fourth Amendment was designed to protect powerless minorities seems to have been well established. *See* Thompson, 74 N.Y.U. L. Rev. at

996–98. As noted by prominent legal scholar John Hart Ely, the Fourth Amendment is "concerned with avoiding indefensible inequities in treatment" as it may be seen as a "harbinger of the Equal Protection Clause." John Hart Ely, *Democracy and Distrust: A Theory of Judicial Review* 97 (1980).

In light of the above history, Chief Justice Warren Burger, then serving on the D.C. Circuit Court of Appeals, accurately observed that the search and seizure provisions of the Fourth Amendment reflect "deeply rooted national skepticism toward police and indeed all public authority," "a sort of briny irreverence toward officials." Warren E. Burger, *Who Will Watch the Watchman?*, 14 Am. U. L. Rev. 1, 1, 4 (1964) [hereinafter Burger] (quoting Edmond Cahn, *The Predicament of Democratic Man* 24 (1961) [hereinafter Cahn]). The founders "viewed official power with an almost paranoid suspicion; and they believed that suspicion justified by power's *inherent* nature." Donald Dripps, *Living With* Leon, 95 Yale L.J. 906, 938 (1986). Professor Amsterdam, after reviewing the history of the Fourth Amendment, wrote that "[t]he Bill of Rights in general and the fourth amendment in particular are profoundly anti-government documents." Amsterdam, 58 Minn. L. Rev. at 353. Professor Tracey Maclin agrees, noting that "the central meaning of the Fourth Amendment is distrust of police power and discretion." Maclin, *The Central Meaning of the Fourth Amendment*, 35 Wm. & Mary L. Rev. at 201.

The Supreme Court reflected the attitude of the Revolutionary Era when it observed in *McDonald v. United States* that "[p]ower is a heady thing; and history shows that the police acting on their own cannot be trusted." 335 U.S. 451, 456, 69 S. Ct. 191, 193 (1948). Similarly, in *Trupiano v. United States*, the Supreme Court stated that "sad experience had taught [the people of the United States] that the right to search and

seize should not be left to the mere discretion of the police."  334 U.S. 699, 709–10, 68 S. Ct. 1229, 1234 (1948), *overruled in part on other grounds by United States v. Rabinowitz*, 339 U.S. 56, 65–66, 70 S. Ct. 430, 435 (1950), *overruled by Chimel v. California*, 395 U.S. 752, 766–68, 89 S. Ct. 2034, 2041–43 (1969).  In *Johnson v. United States*, the Supreme Court emphasized that the Constitution places individual interests in privacy, personal security, and human dignity on a higher plane than society's interest in catching criminals.  *See* 333 U.S. 10, 13–14, 68 S. Ct. 367, 368–69 (1948).

While article I, section 8 of the Iowa Constitution was adopted several decades after the Federal Constitution and the Bill of Rights, the Iowa constitutional provision was also designed to protect individuals against the unjustified and arbitrary exercise of government power.  Indeed, the placement of the Iowa Bill of Rights in the very first article of the Iowa Constitution emphasizes its constitutional importance.  *See Baldwin v. City of Estherville*, 915 N.W.2d 259, 285 (Iowa 2018) (Appel, J., dissenting).  Further, article I, section 1 of the Iowa Constitution, the prelude to all other provisions of article I, emphasizes the "inalienable" rights of Iowans.  Iowa Const. art. I, § 1; *see Baldwin*, 915 N.W.2d at 285.  According to George Ells, chair of the Committee on the Preamble and Bill of Rights of the 1857 Iowa Constitutional Convention, our Bill of Rights

> would enlarge, and not curtail[,] the rights of the people . . . [and] put upon record every guarantee that could be legitimately placed there in order that Iowa . . . [would] have the best and most clearly defined Bill of Rights.

1 *The Debates of the Constitutional Convention of the State of Iowa* 100 (W. Blair Lord rep., 1857) [hereinafter *The Debates*], https://www.statelibraryofiowa.org/services/collections/law-library/iaconst. *See generally Short*, 851 N.W.2d at 482–83 (discussing development of Iowa's

Bill of Rights).  If the Fourth Amendment is to be read with a "briny irreverence" toward government power, Burger, 14 Am. U. L. Rev. at 4 (quoting Cahn at 24), the approach applies with equal if not greater force to article I, section 8 of the Iowa Constitution.

**B. Dynamic Development of State and Federal Search and Seizure Doctrine.**

1.  *Federal doctrine: Abandonment of warrant-preference approach in favor of open-ended "reasonableness."*  Over the years, the United States Supreme Court has struggled to develop a coherent body of law under the Fourth Amendment.  *See generally, e.g.*, *Coolidge v. New Hampshire*, 403 U.S. 443, 483, 91 S. Ct. 2022, 2047 (1971) (acknowledging lack of consistency and clarity in the Court's Fourth Amendment cases); Amsterdam, 58 Minn. L. Rev. at 349.  Particularly after the horrifying search and seizure abuses in Germany before and during World War II, however, the United States Supreme Court increasingly emphasized the role of the Fourth Amendment in cabining the exercise of arbitrary governmental power.

The leading Court historians on search and seizure were Justice Robert Jackson, the chief counsel at Nuremburg, and Justice Felix Frankfurter.  *See generally Rabinowitz*, 339 U.S. at 68–69, 70 S. Ct. at 436 (Frankfurter, J., dissenting); Amsterdam, 58 Minn. L. Rev. at 369; Victoria A. Graffeo, *Robert H. Jackson: His Years as a Public Servant "Learned in the Law,"* 68 Albany L. Rev. 539, 546 (2005).  Justice Jackson noted,

> [T]he forefathers, after consulting the lessons of history, designed our Constitution to place obstacles in the way of a too permeating police surveillance, which they seemed to think was a greater danger to a free people than the escape of some criminals from punishment.

*United States v. Di Re*, 332 U.S. 581, 595, 68 S. Ct. 222, 229 (1948). Further, Justice Jackson wrote that search and seizure rights

> are not mere second-class rights but belong in the catalog of indispensable freedoms.  Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart.  Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government.

*Brinegar v. United States*, 338 U.S. 160, 180, 69 S. Ct. 1302, 1313 (1949) (Jackson, J., dissenting).  Similarly, Justice Frankfurter observed, "The security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment—is basic to a free society."  *Wolf v. Colorado*, 338 U.S. 25, 27, 69 S. Ct. 1359, 1361 (1949), *overruled on other grounds by Mapp v. Ohio*, 367 U.S. 643, 654–55, 81 S. Ct. 1684, 1691 (1961).[19]

The influence of Justices Jackson and Frankfurter continued after they left the bench.  Eventually, the Supreme Court developed an approach to the open-textured language of the Fourth Amendment known as the warrant-preference theory.  *See generally* Cuddihy at 602, 633–37, 734–42 (concluding that the warrant-preference approach was the most consistent with the founders' intentions); Morgan Cloud, *Searching*

---

[19]State courts have also recognized the fundamental importance of search and seizure law to a democratic society.  As the Florida Supreme Court observed,

> Roving patrols, random sweeps, and arbitrary searches or seizures would go far to eliminate such crime in this state.  Nazi Germany, Soviet Russia, and Communist Cuba have demonstrated all too tellingly the effectiveness of such methods.  Yet we are not a state that subscribes to the notion that ends justify means.  History demonstrates that the adoption of repressive measures, even to eliminate a clear evil, usually results only in repression more mindless and terrifying than the evil that prompted them.

*Bostick v. State*, 554 So. 2d 1153, 1158–59 (Fla. 1989), *rev'd on other grounds*, 501 U.S. 429, 439–40, 111 S. Ct. 2382, 2389 (1991); *see also McCoy v. State*, 491 P.2d 127, 138 (Alaska 1971) ("Certainly the Fourth Amendment guarantee against unreasonable searches and seizures is at the very core of the protections needed to preserve democracy against the excesses of government.").

*Through History; Searching for History*, 63 U. Chi. L. Rev. 1707, 1732–43 (1996) (reviewing Cuddihy) (examining early history); Davies, 98 Mich. L. Rev. at 559 (noting that the Supreme Court for most of the twentieth century embraced a warrant-preference approach). Under the warrant-preference theory, the Supreme Court emphasized the close relationship between the Reasonableness Clause and the Warrant Clause of the Fourth Amendment. Maclin, *The Complexity of the Fourth Amendment*, 77 B.U. L. Rev. at 928. The touchstone of the Fourth Amendment was the warrant requirement, subject to limited exceptions. *Johnson,* 333 U.S. at 14–15, 68 S. Ct. at 369; *State v. Ingram*, 914 N.W.2d 794, 804 (Iowa 2018). The warrant-preference approach stresses that ordinarily, in order to be "reasonable" under the Fourth Amendment, a warrant must be obtained prior to the search or seizure. *See* Maclin, *The Complexity of the Fourth Amendment*, 77 B.U. L. Rev. at 928 ("[T]he 'warrant preference rule' . . . requires that the safeguards of the Warrant Clause define the reasonableness of a given search or seizure.").

In recent years, however, the United States Supreme Court has begun to diminish search and seizure protections. The Court has departed from its earlier precedents grounded in history and recent experience in Europe in favor of a more expansive view of government power. Doctrinally, the Court has generally downgraded the protections of the Warrant Clause by significantly limiting its application and adopting an expansive, modern-day approach to the meaning of the Reasonableness Clause. *See Ingram*, 914 N.W.2d at 804–06, 816; Silas J. Wasserstrom, *The Court's Turn Toward a General Reasonableness Interpretation of the Fourth Amendment*, 27 Am. Crim. L. Rev. 119, 127, 129–30, 148 (1989). It has now made the new discovery that the "touchstone" of analysis under the Fourth Amendment is no longer the warrant requirement but is "the

reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Pennsylvania v. Mimms*, 434 U.S. 106, 108–09, 98 S. Ct. 330, 332 (1977) (quoting *Terry v. Ohio*, 392 U.S. 1, 19, 88 S. Ct. 1868, 1878–79 (1968)); *cf. Ingram*, 914 N.W.2d at 815–16 (contrasting the Supreme Court's recent departure from the traditional warrant-preference approach with Iowa's continued maintenance of a warrant preference).

The United States Supreme Court has also undermined the strength of the exclusionary rule. Long ago, Justice Oliver Wendell Holmes declared in *Silverthorne Lumber Co. v. United States* that "[t]he essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all." 251 U.S. 385, 392, 40 S. Ct. 182, 183 (1920). Yet in *United States v. Leon*, the Court found a good-faith exception to the exclusionary rule. 468 U.S. 897, 913, 104 S. Ct. 3405, 3415 (1984). In contrast to Justice Holmes's approach in *Silverthorne Lumber*, the Supreme Court in *Leon* divorced the exclusionary rule from the substantive commands of the Fourth Amendment, noting that no provision of the Fourth Amendment expressly precludes the use of evidence when the provision was violated. *Id.* at 905–06, 104 S. Ct. at 3411. The *Leon* Court stressed that the exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect." *Id.* at 906, 104 S. Ct. at 3412 (quoting *United States v. Calandra*, 414 U.S. 338, 348, 94 S. Ct. 613, 620 (1974)). Applying a pragmatic analysis, the Court concluded that the marginal benefits of deterrence would be small where a law enforcement officer acts in objective good faith in a search and seizure context. *See id.* at 922, 104 S. Ct. at 3420.

2. *Basis for independent state law interpretation of search and seizure provisions.* One of the opinions issued today has an affinity for following federal precedent in search and seizure law. My views on the constitutional history and the flaws of following United States Supreme Court precedent in any lockstep or quasi-lockstep way have been thoroughly explored in *Short,* 851 N.W.2d at 481–92, the majority and concurring opinions in *Baldon,* 829 N.W.2d at 790–91 (majority opinion); *id.* at 803–34 (Appel, J., specially concurring), and *Ochoa,* 792 N.W.2d at 264–67. I highlight only a handful of important points today.

First, the suggestion is advanced that Iowa's constitutional history does not support departing from Fourth Amendment jurisprudence. But at the time of the Iowa constitutional convention, there was very little Fourth Amendment jurisprudence. Most of that came later. What is clear, however, is that the Iowan founding generation had no particular reverence for the decisions of the United States Supreme Court on the important constitutional issues of the day. Indeed, at the time of the Iowa Constitutional Convention of 1857, and for many years prior, the United States Supreme Court was intent on shoring up the institution of chattel slavery through its decisions regarding the Fugitive Slave Act, culminating in the infamous *Dred Scott* case. *See, e.g., Dred Scott v. Sandford*, 60 U.S. (19 How.) 393, 404 (1857), *superseded by constitutional amendment,* U.S. Const. amend. XIV.

For example, the fugitive slave decisions were decried at the Iowa constitutional convention in 1857. According to George Ells, the Due Process Clause was "violated again and again by the dominant party in the land, which rides rough-shod oves the necks of freemen." 1 *The Debates* at 102. And Ells's criticism extended to interpretation of the Due Process Clause in federal courts:

> If the words "due process of law," shall in time be recognized by our judicial tribunals to mean what they really do mean, . . . [t]hen, sir, that infamous Fugitive Slave Law will become a nullity, and the American people will trample its odious enactments in the dust.

*Id.* Of course, it was the United States Supreme Court that upheld the Fugitive Slave Act against constitutional attack. *See, e.g., Ableman v. Booth*, 62 U.S. (21 How.) 506, 526 (1858). Ells was not an admirer of the jurisprudence of the United States Supreme Court and was no lockstep guy.

When *Dred Scott* was rendered, there was an outpouring of scathing criticism of the United States Supreme Court, including a resolution of condemnation from the Iowa legislature. The Iowa legislature declared "the case of Dred Scott, is not binding in law or conscience upon the government or people of the United States." *Short*, 851 N.W.2d at 484 (quoting 1858 Iowa Acts Res. 12, at 433). Can't find much lockstep here. Further, the resolution stated,

> [W]e should be ungrateful to those whose care and foresight provided for us free homes, and derelict in our duty to those who still come after us, did we not promptly and sternly denounce this new doctrine, which if established, degrades the free states.

*Id.* (quoting 1858 Iowa Acts Res. 12, at 433). If members of this court would have appeared at the Iowa Constitutional Convention of 1857 or the well of the Iowa legislature during the debates about the meaning of Due Process Clause or the *Dred Scott* matter and advocated the presumptive validity of federal caselaw on the Iowa courts, they would have received glares, not applause.

Although there was not a lot of state search and seizure law in the early days, there is one case that showed Iowa judges were willing to use the Iowa Constitution to protect personal liberty. This is the 1863 Polk

County case of *Webb v. Griffith.* *See* Nathan E. Coffin, *The Case of Archie P. Webb, A Free Negro*, 11 Annals of Iowa 200, 211–12 (1913) [hereinafter Coffin]. In the *Webb* case, an African-American, who had received a certificate of emancipation, was held in the Polk County jail pursuant to Billy Haun's Law, a statute that forbade African-American settlement in Iowa. *See id.* at 202–03; *see also* Robert R. Dykstra, *Bright Radical Star: Black Freedom and White Supremacy on the Hawkeye Frontier* 198–99 (1993). Judge John Gray held that Webb's arrest violated the search and seizure provision of article I, section 8 of the Iowa Constitution. Coffin, 11 Annals of Iowa at 211–12. Judge Gray declared that Webb's arrest was unconstitutional when the only crime charged was that he was a freeman who settled in the state. *See id.* It is hard to imagine a federal court under the tutelage of the United States Supreme Court coming to a similar conclusion under the Fourth Amendment.

Surely it is clear beyond peradventure that the Iowa founders were devoted to civil liberties. Iowa's state motto—"Our liberties we prize and our rights we will maintain"—is not just a slogan but reflects a libertarian spirit rather than state authoritarianism. The Iowa Constitution includes sweeping language in the inalienable rights clause of article I, section 1 based on the Virginia Declaration of Rights, incorporated by Thomas Jefferson into the Declaration of Independence, but not embraced by Madison in the United States Constitution because of fear such language would provoke controversy with slave states. No such hesitation in Iowa. Indeed, George Ells, Chairman of the Committee on the Preamble and Bill of Rights, stated the committee wanted provisions in the Iowa Bill of Rights that "would enlarge, and not curtail the rights of the people" and would "put upon record every guarantee that could be legitimately placed there in order that Iowa . . . might also have the best and most clearly defined

Bill of Rights." 1 *The Debates* at 100. Ells further stated that "the Bill of Rights is of more importance than all the other clauses in the Constitution put together, because it is the foundation and written security upon which the people rest their rights." *Id.* at 103.

There is reason to think the devotion to civil liberties extended beyond the Iowa constitutional convention. For instance, writing in response to Judge Gray's decision in *Webb*, the *Burlington Hawk-Eye* declared, "The people of Iowa will thank Judge Gray for vindicating the charter of their liberties, and throwing the shield of the law over the weak and helpless." Coffin, 11 Annals of Iowa at 214.

Second, on turning to our federal founders, it is worth noting that Madison, among others, looked to the states as the primary source of the protection of civil liberties. *See Baldon*, 829 N.W.2d at 808. The very purpose of the federalist system—with sovereignty divided between the states and the federal government—was to allow the states to protect the liberties of the citizen. *See id.* Indeed, if uniformity was the goal, there would be no states and no state constitutions. The founders' understanding of the role of the states in protecting individual liberties was summarized in *Baldon* as follows:

> Overall, . . . the founders looked to the states to protect individual liberties. At the Constitutional Convention, James Wilson observed that the purpose of the states was "to preserve the rights of individuals." Similarly, in Federalist No. 45, Madison stressed that under the Constitution, "The powers reserved to the several States will extend to all the objects, which, in the ordinary course of affairs, concern the lives, liberties and properties of the people. . . ." Madison repeated the liberty theme in Federalist No. 51 by declaring, "In the compound republic of America, the power surrendered by the people, is first divided between *two distinct governments*. . . . Hence, *a double security* arises to the rights of the people."

829 N.W.2d at 808 (first quoting I *Records of the Federal Convention of 1787*, at 356 (Max Farrand ed., 1937); and then quoting *The Federalist No. 45*, at 236 (James Madison) (Garry Wills ed., 1982); and then quoting *The Federalist No. 51*, at 264 (James Madison) (Garry Wills ed., 1982)). But "[i]f we choose to follow federal precedent to bolster nationwide conformity, we destroy the 'double security' designed to protect our citizens."  Stanley G. Feldman & David L. Abney, *The Double Security of Federalism: Protecting Individual Liberty Under the Arizona Constitution*, 20 Ariz. St. L.J. 115, 117 (1988) (quoting *Alderwood Assocs. v. Wash. Envtl. Council*, 635 P.2d 108, 113 (Wash. 1981) (en banc)).

Or, as has been noted by Chief Justice Cady,

> Our Iowa Constitution, like other state constitutions, was designed to be the primary defense for individual rights, with the United States Constitution Bill of Rights serving only as a second layer of protection, especially considering the latter applied only to actions by the federal government for most of our country's history.

Mark S. Cady, *A Pioneer's Constitution: How Iowa's Constitutional History Uniquely Shapes Our Pioneering Tradition in Recognizing Civil Rights and Civil Liberties*, 60 Drake L. Rev. 1133, 1145 (2012).  It would be ironic, and tragic, if this court surrenders its historically appointed role as a protector of liberty and hands over the liberty keys to the United States Supreme Court under some kind of ahistorical reverse federalism.

Third, the mere fact that the language of article I, section 8 and the Fourth Amendment are similar does not mean that this court must bow to federal interpretations of the Fourth Amendment in interpreting our state constitutional counterpart.  It is, of course, true that the language of article I, section 8 and the Fourth Amendment are very similar.  And this court has sometimes said that because of the similarity of language, the

provisions are "deemed to be identical in scope, import, and purpose." *State v. Groff*, 323 N.W.2d 204, 207 (Iowa 1982).

But the conclusory bromide is stating the obvious at a very high degree of generality and has very little value, or even no value, in deciding cases. *Ochoa*, 792 N.W.2d at 267 (noting the general language similarity does nothing to aid us in deciding concrete cases); *see also* Richard M. Re, Essay, *Narrowing Precedent in the Supreme Court*, 114 Colum. L. Rev. 1861, 1875–89 (2014) (arguing that healthy stare decisis can require methods of narrowing broadly stated precedent in order to avoid overruling a case when its "best reading," i.e. the precedent as actually stated, would require an outcome inconsistent with other legal principles). The purpose of both provisions is to limit arbitrary conduct of law enforcement, to generally require warrants, and to protect the rights of persons to be secure in their persons, houses, papers, and effects. Yet we have stated, for example, that when it comes to the exclusionary rule, article I, section 8 serves different purposes than the Fourth Amendment. *State v. Cline*, 617 N.W.2d 277, 289–93 (Iowa 2000) (en banc), *abrogated on other grounds by State v. Turner*, 630 N.W.2d 601, 606 n.2 (Iowa 2001). In contrast to the federal exclusionary rule, the purposes of the exclusionary rule under article I, section 8 include protecting constitutional rights and maintaining the integrity of the courts as well as deterrence. *Id.*

Indeed, on a wide range of search and seizure issues, a variety of options are plausible under the open-textured language. Due to the marvels of electronic research, there is a cornucopia of caselaw waiting to be harvested by thoughtful judges looking to make the best possible choices under their state constitutions. This court is not in any way bound by federal precedent, or for that matter, the precedent of any other jurisdiction. Instead, we make our own independent choices under the

Iowa Constitution. *Pals*, 805 N.W.2d at 771 (endorsing the principle that United States Supreme Court opinions provide guidance only based upon their persuasive power); *see Baldon*, 829 N.W.2d at 790–91 (majority opinion) (same); *see also State v. James*, 393 N.W.2d 465, 468 (Iowa 1986) (en banc) (Lavorato, J., dissenting) ("We push aside our constitutional responsibilities when we merely look to the Supreme Court for answers in examining the state constitution.").

A highly regarded jurist has nailed it in a recent piece of scholarship. According to Judge Sutton of the United States Court of Appeals for the Seventh Circuit,

> There is no reason to think, as an interpretive matter, that constitutional guarantees of independent sovereigns, even guarantees with the same or similar words, must be construed the same. Still less is there reason to think that a highly generalized guarantee, such as a prohibition on "unreasonable" searches, would have just one meaning for a range of differently situated sovereigns.

Sutton, 59 U. Kan. L. Rev. at 707.

Judge Sutton's observations are consistent with what happens on the ground in many states. There are thousands, not hundreds, of state search and seizure cases following a path independent of federal courts under state constitutional provisions similar to the Fourth Amendment. *See* Michael J. Gorman, *Survey: State Search and Seizure Analogs*, 77 Miss. L.J. 417, 418–64 (2007) (citing search and seizure departures in almost three dozen states as of 2007).

In the past, some of our cases utilized what is called a lockstep approach or lockstep-lite approach where federal law was either followed as a matter of course or presumptively followed. We abandoned that approach in *Ochoa*, 792 N.W.2d at 267. In *Ochoa*, we unanimously declared,

In order to resolve any inconsistency in our prior cases [following the lockstep or quasi-lockstep approach], we now hold that, while United States Supreme Court cases are entitled to respectful consideration, we will engage in independent analysis of the content of our state search and seizure provisions. A Fourth Amendment opinion of the United States Supreme Court, the Eighth Circuit Court of Appeals, or any other federal court is no more binding upon our interpretation of article I, section 8 of the Iowa Constitution than is a case decided by another state supreme court under a search and seizure provision of that state's constitution. The degree to which we follow United States Supreme Court precedent, or any other precedent, depends solely upon its ability to persuade us with the reasoning of the decision. When both federal and state constitutional claims are raised, we may, in our discretion, choose to consider either claim first in order to dispose of the case, or we may consider both claims simultaneously.

*Id.* In short, we rejected the recently discovered and historically strange doctrine of constitutional nationalism and, instead, declared our allegiance to the vertical distribution of power in a federalist system just as the federal framers intended.

Under *Ochoa* and subsequent cases, it is true, as suggested in one of the court's opinions today, divergence from federal authority is not required or even favored. Fair enough. But what is required is our best independent judgment by each and every one of us whose privilege it is to serve on this court. No one would suggest that a legislator or a governor should defer to Washington politicians. Why should a state court defer to the United States Supreme Court if the precedent is unpersuasive? Indeed, the United States Supreme Court has declared that "[i]t is fundamental that state courts be left free and unfettered by us in interpreting their state constitutions." *Minnesota v. Nat'l Tea Co.*, 309 U.S. 551, 557, 60 S. Ct. 676, 679 (1940). We lose our way when we fail to embrace and apply this fundamental independence from federal law.

Fourth, it is true that our cases have departed from past precedents. But there was a good reason for that. In the past, as noted in *Ochoa*, we

tended to follow federal precedent without much thought. 792 N.W.2d at 266. We were often a lockstep-lite jurisdiction, theoretically reserving the right to engage in independent constitutional analysis but rarely bothering to do so. *See id.* That approach was, and is, unacceptable. We should decide state constitutional issues based on our best judgment of the proper course, based upon all available authorities and precedents. A prior case that simply pasted a federal approach into the North Western Reporter without further thought is a very slender reed and not entitled to stare decisis.

An opinion in this case suggests that our search and seizure cases under the Iowa Constitution are generally interpreted to mirror federal law. I beg to differ. It is clear that our caselaw, like that of many states, no longer generally interprets the Iowa Constitution to mirror federal caselaw in the search and seizure area. *See, e.g., Ingram*, 914 N.W.2d at 799; *State v. Coleman*, 890 N.W.2d 284, 299 (Iowa 2017); *Gaskins*, 866 N.W.2d at 6–7; *Short*, 851 N.W.2d at 482–85; *Baldon*, 829 N.W.2d at 792–97, 802–03; *Pals*, 805 N.W.2d at 771; *Ochoa*, 792 N.W.2d at 291; *Cline*, 617 N.W.2d at 293. Instead of using a mirror, in recent years we have exercised our independent judgment in determining independent state constitutional claims involving search and seizure. That is the teaching of *Ochoa*, 279 N.W.2d at 267 (explaining that the degree to which we follow federal or other precedents depends upon their persuasive power).

And we recently have not used mirrors in other constitutional contexts. In *Puntenney v. Iowa Utilities Board*, ___ N.W.2d. ___, ___ (Iowa 2019), we departed from United States Supreme Court precedent in an eminent domain case. In *Baldwin*, 915 N.W.2d at 281 (majority opinion), we developed our own independent approach to immunity for state constitutional tort claims. And in *Varnum v. Brien*, 763 N.W.2d 862, 872,

878 n.6 (Iowa 2009), we exercised our independent judgment under the Iowa Constitution with respect to same-sex marriage. Our recent cases do not emphasize using a mirror for mirror's sake but instead emphasize that we "jealously" protect our authority to follow an independent approach. *State v. Fleming*, 790 N.W.2d 560, 564 (Iowa 2010); *Zaber v. City of Dubuque*, 789 N.W.2d 634, 654 (Iowa 2010); *State v. Bruegger*, 773 N.W.2d 862, 883 (Iowa 2009); *Racing Ass'n of Cent. Iowa v. Fitzgerald*, 675 N.W.2d 1, 6–7 (Iowa 2004).

Fifth, it must be acknowledged that the decisions of the United States Supreme Court on individual liberties involve a federalist discount. The most conservative justice of the Warren court, Justice John Marshall Harlan, repeatedly cautioned that application of the Bill of Rights to the states would lead to a dilution in the scope of federal rights. Justice Harlan saw "a major danger of the 'incorporation' approach—that provisions of the Bill of Rights may be watered down in the needless pursuit of uniformity." *Duncan v. Louisiana*, 391 U.S. 145, 182 n.21, 88 S. Ct. 1444, 1466 n.21 (1968) (Harlan, J., dissenting). In a draft opinion not published because of his untimely death, Justice Harlan wrote that incorporation " 'threaten[ed] . . . to "chill" the Sixth Amendment out of existence' and 'might well spell the demise—under the inescapable pressures of federalism—of many other provisions of the Bill of Rights.' " Tinsley E. Yarbrough, *John Marshall Harlan: Great Dissenter of the Warren Court* 291 (1992) (alterations in original) (quoting John Marshall Harlan, Draft Opinion to *Apodaca v. Oregon*, 406 U.S. 404, 92 S. Ct. 1628 (1972), and *Johnson v. Louisiana*, 406 U.S. 356, 92 S. Ct. 1620 (1972) (on file in the John Marshall Harlan Papers, Secley G. Mudd Manuscript Library, Princeton University, Box 441)).

Justice Harlan, of course, time and time again, has been proven correct. When looking to United States Supreme Court precedent, it is imperative we understand that its approach to individual rights is discounted from constitutional norms in light of federalism concerns. Indeed, in the search and seizure areas since incorporation, the United States Supreme Court has persistently cut back on substantive protections while repeatedly emphasizing the ability of the states to expand the constitutional protections under their state constitutions. *See, e.g., California v. Greenwood*, 486 U.S. 35, 41–44, 108 S. Ct. 1625, 1629–31 (1988); *Michigan v. Mosley*, 423 U.S. 96, 120, 96 S. Ct. 321, 334 (1975) (Brennan, J., dissenting); *Oregon v. Hass*, 420 U.S. 714, 719, 95 S. Ct. 1215, 1219 (1975); *Cooper v. California*, 386 U.S. 58, 62, 87 S. Ct. 788, 791 (1967).

Sixth, it must be acknowledged that the current United States Supreme Court is a rights-restricting court. Ever since *Brown v. Board of Education of Topeka*, 347 U.S. 483, 74 S. Ct. 686 (1954), and the Southern Manifesto, political actors have sought to move the Supreme Court in a conservative direction that reduces the role of the courts in the protection of civil liberties. *See* Reva B. Siegel, *Equality Talk: Antisubordination and Anticlassification Values in Constitutional Struggles over* Brown, 117 Harv. L. Rev. 1470, 1489 (2004). Southern strategies have been employed and litmus tests applied. Nominees to the high court have been made, withdrawn, hung up without a hearing, and narrowly confirmed.

In the end, there has been what nearly all observers agree is a significant shift in the Supreme Court's jurisprudence. And time and time again, the Court, often over strong objections of dissenters, has whittled away at the scope of individual liberties using innovative contemporary documents to extend state authority. *See, e.g., Samson v. California*, 547

U.S. 843, 846, 126 S. Ct. 2193, 2196 (2006) (permitting warrantless search of parolee); *Atwater v. City of Lago Vista*, 532 U.S. 318, 323, 354, 121 S. Ct. 1536, 1541, 1557 (2001) (permitting warrantless arrest and jailing for misdemeanor violation when sanction does not include jail time); *Ohio v. Robinette*, 519 U.S. 33, 35, 117 S. Ct. 417, 419 (1996) (holding that police need not tell driver he or she is "free to go" to obtain consent to search); *Colorado v. Bertine*, 479 U.S. 367, 371, 107 S. Ct. 738, 741 (1987) (allowing warrantless inventory searches of automobiles); *Leon*, 468 U.S. at 920–25, 104 S. Ct. at 3420–22 (embracing good-faith exception to exclusionary rule); *Schneckloth v. Bustamonte*, 412 U.S. 218, 235–41, 93 S. Ct. 2041, 2051–55 (1973) (abandoning knowing-and-voluntary test for consent to search). Frankly, I have very little interest in importing whole hog to Iowa the approach adopted by the Supreme Court in Washington, D.C. Not only should we not incorporate the federal cases, there should be no presumption, or special weight, given to the Supreme Court's precedents. We should think for ourselves.

That said, I agree with Justice McDonald that there should be no artificial presumption that the Iowa Constitution is more protective than federal caselaw in any given case. Instead, we should independently examine each case, free from any predisposition, and engage in a thorough review of plausible legal options without any artificial doctrines that block independent thinking. In light of Justice McDonald's opinion, it is clear that a majority of this court continues to embrace this approach.

3. *Iowa search and seizure: Embracing the warrant-preference approach and the constitutional underpinnings of the exclusionary rule.* Our search and seizure law has followed a different path than that of the United States Supreme Court. Early on, we emphasized that the Iowa Constitution's protections against unconstitutionally obtained evidence

were to apply "in a broad and liberal" spirit. *State v. Height*, 117 Iowa 650, 654–65, 91 N.W. 935, 936–40 (1902) (quoting *People ex rel. Taylor v. Forbes*, 38 N.E. 303, 305 (N.Y. 1894)). We also recognized the ability of this court to interpret our search and seizure provision independently of federal interpretations of the United States Constitution. *State v. Tonn*, 195 Iowa 94, 104–08, 191 N.W. 530, 535–36 (1923), *abrogated on other grounds by State v. Hagen*, 258 Iowa 196, 203–05, 137 N.W.2d 895, 899–900 (1965), *as recognized in State v. Taylor*, 260 Iowa 634, 641–42, 144 N.W.2d 289, 293–94 (1966).

But, noted in *Ochoa*, we have at times simply adopted decisions of the United States Supreme Court without analysis. 792 N.W.2d at 265–66. In *Cline*, however, we departed from the lockstep approach by emphasizing that "[i]f precedent is to have any value it must be based on a convincing rationale." 617 N.W.2d at 285 (quoting *James*, 393 N.W.2d at 472). In *Ochoa*, we stated, "The degree to which we follow United States Supreme Court precedent, or any other precedent, depends solely upon its ability to persuade us with the reasoning of the decision." 792 N.W.2d at 267. While we recognized that in the past we have been inconsistent in our willingness to engage in independent state constitutional interpretation, we held in *Ochoa*,

> In order to resolve any inconsistency in our prior cases, we now hold that, while United States Supreme Court cases are entitled to respectful consideration, we will engage in independent analysis of the content of our state search and seizure provisions.

*Id.*; *see also Short*, 851 N.W.2d at 481–92 (outlining principles of independent state constitutional jurisprudence).

Under our current caselaw, we have departed from the United States Supreme Court in two fundamental ways. First, as noted in *Ingram*, our

recent cases have embraced a strong warrant-preference interpretation of article I, section 8. 914 N.W.2d at 816; *see Gaskins*, 866 N.W.2d at 7 (" 'A warrantless search is presumed unreasonable' unless an exception applies." (quoting *State v. Moriarty*, 566 N.W.2d 866, 868 (Iowa 1997))); *Short*, 851 N.W.2d at 502 ("[W]e have little interest in allowing the reasonableness clause to be a generalized trump card to override the warrant clause in the context of home searches and reject the cases suggesting otherwise."); *Baldon*, 829 N.W.2d at 791 ("It is well-settled that warrantless searches are virtually 'per se unreasonable . . . .' " (quoting *Schneckloth*, 412 U.S. at 219, 93 S. Ct. at 2043)); *Ochoa*, 792 N.W.2d at 269 ("[T]he Reasonableness Clause cannot be used to override the Warrant Clause."). Our approach does not mean that warrantless searches are always invalid, particularly when it is impractical to obtain a warrant and an exigency is present, but it insists that a warrant based on probable cause issued by a neutral magistrate is required in most circumstances and that exceptions to the warrant requirement be narrowly construed. *See, e.g., Ochoa*, 792 N.W.2d at 285 ("[W]arrantless searches and seizures that d[o] not fall within one of the 'jealously and carefully drawn exceptions' are unreasonable." (quoting *State v. Strong*, 493 N.W.2d 834, 836 (Iowa 1992))); *State v. McGrane*, 733 N.W.2d 671, 677 (Iowa 2007) ("The search-incident-to-arrest exception to the warrant requirement must be narrowly construed and limited to accommodating only those interests it was created to serve.").

Second, in *Cline*, we rejected the narrow, pragmatic approach of *Leon*, which viewed the exclusionary rule as simply a judicially created remedy. 617 N.W.2d at 293; *see Leon*, 468 U.S. at 906, 104 S. Ct. at 3412. We emphasized that Iowa was one of the first states to exclude evidence "as an integral part of its state constitution's protection against

unreasonable searches and seizures." *Cline*, 617 N.W.2d at 285. We noted that the United States Supreme Court originally took a similar position in cases such as *Weeks v. United States*, 232 U.S. 383, 398, 34 S. Ct. 341, 346 (1914), *overruled on other grounds by Mapp*, 367 U.S. at 654–57, 81 S. Ct. at 1691–92. *Cline*, 617 N.W.2d at 283, 285. We also noted that the United States Supreme Court had recently distanced itself from its early cases. *Id.* at 284. We declined to drift away from what we viewed as the substantive constitutional protections afforded by the exclusionary rule. *Id.* at 292–93.

In support of our position in *Cline*, we quoted the familiar language of *Height*, which declared that the "guaranty [of article I, section 8 of the Iowa Constitution] . . . has . . . received a broad and liberal interpretation for the purpose of preserving the spirit of constitutional liberty." *Id.* at 285 (quoting *Height*, 117 Iowa at 661, 91 N.W. at 938). We further quoted with approval language from *State v. Sheridan*, where we noted that to hold evidence obtained in violation of article I, section 8 could be admitted would "emasculate the constitutional guaranty, and deprive it of all beneficial force or effect." *Id.* at 286 (emphasis omitted) (quoting *State v. Sheridan*, 121 Iowa 164, 168, 96 N.W. 730, 731 (1903)). We rejected the United States Supreme Court's view that the purpose of the exclusionary rule was to deter misconduct, noting that the exclusionary rule was originally justified as a remedy for constitutional violations and to preserve judicial integrity. *Id.* at 289.

*Cline* thus represents a substantial departure from United States Supreme Court precedent in the interpretation of constitutional search and seizure provisions. It rejected pragmatic calculations of the Court and recognized the exclusion of unconstitutionally obtained evidence in "preserving the spirit of constitutional liberty." *Id.* at 285 (quoting *Height*,

117 Iowa at 661, 91 N.W. at 938). *Cline* is thus consistent with the skeptical attitude toward government power embraced by the generations that adopted the Fourth Amendment and article I, section 8 of the Iowa Constitution.

Because of our insistence on emphasizing the preference for warrants under article I, section 8 and our conclusion that the substantive search and seizure provisions of the Iowa Constitution require the exclusion of evidence obtained in violation of the constitutional commands, our Iowa framework for search and seizure questions is different from the more recent innovations introduced by the United States Supreme Court in its search and seizure cases.

**C. Application of Search and Seizure Doctrine to Automobiles.**

1. *Federal approach: Shrinking protection.* With the advent of the automobile, questions arose regarding the application of search and seizure protections to vehicles on public highways. In *Carroll v. United States*, 267 U.S. 132, 134–36, 45 S. Ct. 280, 281 (1925), government agents engaged in a warrantless search and seizure of an automobile believed to be engaged in illegal bootlegging. The *Carroll* Court compared an automobile to a vessel at sea, concluding that it would be impracticable to obtain a warrant in light of the mobile character of the vehicle. *Id.* at 151–53, 45 S. Ct. at 284–85. The *Carroll* Court recognized that "[i]t would be intolerable and unreasonable if a prohibition agent were authorized to stop every automobile on the chance of finding liquor." *Id.* at 153–54, 45 S. Ct. at 285. The *Carroll* Court reasoned, however, that if there was probable cause that the vehicle was "carrying contraband or illegal merchandise," the stop would be lawful even without a warrant. *Id.* at 154, 45 S. Ct. at 285.

In a sharp dissent in *Carroll*, Justice McReynolds found that only mere suspicion and not probable cause supported the warrantless action of the government agents in the case. *Id.* at 163, 45 S. Ct. at 289 (McReynolds, J., dissenting). He observed that "[t]he damnable character of the 'bootlegger's' business should not close our eyes to the mischief which will surely follow any attempt to destroy it by unwarranted methods." *Id.* at 163, 45 S. Ct. at 288. In short, for Justice McReynolds, the important ends demanded by current exigency did not justify the use of unconstitutional means.

Almost fifty years later, the Supreme Court decided *Chambers v. Maroney*, 399 U.S. 42, 90 S. Ct. 1975 (1970). In *Chambers*, the Court considered whether a Fourth Amendment violation arose when an automobile was thoroughly searched after it was taken to the police station. *Id.* at 43, 90 S. Ct. at 1977. The *Chambers* Court ruled that because there was probable cause to support a warrantless search at the time the vehicle was stopped, that probable cause also supported the subsequent warrantless search of the vehicle even though the automobile, at that point, was no longer mobile. *Id.* at 52, 90 S. Ct. at 1981–82. Permitting a warrantless search of a seized automobile was a striking development because the basis of the automobile exception in *Carroll* was the mobility of the vehicle. *See Carroll*, 267 U.S. at 153, 45 S. Ct. at 285 (majority opinion).

Yet the Supreme Court has also at times expressed concern about search and seizure involving automobiles. For example, Justice Jackson declared, "I am convinced that there are, many unlawful searches of . . . automobiles of innocent people which turn up nothing incriminating, in which no arrest is made, about which courts do nothing, and about which we never hear." *Brinegar*, 338 U.S. at 181, 69 S. Ct. at 1313. In this

observation, Justice Jackson recognized that the real beneficiary of enforcement of the Fourth Amendment is not the guilty party before the court but rather the innocent public generally, which the Fourth Amendment protects from arbitrary search and seizure. In addition, the Supreme Court has emphasized that "[t]he word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears." *Coolidge*, 403 U.S. at 461, 91 S. Ct. at 2035.

And the Supreme Court concluded that a traffic stop, even for a brief period, constitutes a seizure. *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S. Ct. 1391, 1396 (1979). In *Prouse*, the Court considered the constitutionality of a random stop when there was no reasonable suspicion that any violation occurred. *Id.* at 650, 99 S. Ct. at 1394. The *Prouse* Court noted that an automobile stop is not a minor inconvenience, stressing that the automobile is one of the most visible symbols of our liberty. *See id.* at 657, 662, 99 S. Ct. at 1398, 1400–01. According to the *Prouse* Court, "[P]eople are not shorn of all Fourth Amendment protection when they step from their homes onto the public sidewalks" or "from the sidewalks into their automobiles." *Id.* at 663, 99 S. Ct. at 1401. The Supreme Court held the "kind of standardless and unconstrained discretion" presented in the case is not permitted under the Fourth Amendment. *Id.* at 661, 99 S. Ct. at 1400.

Beginning in the mid-1970s, however, the Supreme Court embarked on an aggressive course designed to trim back more robust search and seizure protections of automobiles. In a series of cases, the Supreme Court held that the warrant requirement of the Fourth Amendment did not apply to automobiles in a variety of settings. *See, e.g., Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 447, 110 S. Ct. 2481, 2483 (1990); *Bertine*, 479 U.S.

at 368–69, 107 S. Ct. at 739–40; *South Dakota v. Opperman*, 428 U.S. 364, 375–76, 96 S. Ct. 3092, 3100 (1976).

These cases established an important backdrop to the *Whren* Court's rejection of control of pretextual stops. 517 U.S. at 819, 116 S. Ct. at 1777. When a warrant is obtained, of course, the state must make a particularized showing of probable cause and the purpose and scope of a search is limited by the magistrate. A warrantless search, however, contains no such restraints. The combination of the lack of a warrant requirement in the automobile context and the tolerance of pretextual searches in *Whren* presents a clear path for unregulated, arbitrary police conduct.

And developments in Supreme Court caselaw after *Whren* further increased the dangers of unregulated police searches and seizures involving automobiles. In the case of *Atwater*, 532 U.S. at 323, 354, 121 S. Ct. at 1541, 1557, the Supreme Court held that a driver of an automobile could be subject to a full custodial arrest for a minor traffic infraction even if incarceration was not a permissible sanction for the offense. Thus, the driver of a vehicle stopped pretextually for a minor traffic offense is, according to the *Atwater* majority, subject to a full custodial arrest and the resulting impoundment of the vehicle even if the sanctions for the minor traffic violation do not include incarceration. *Id.* That impoundment, in turn, could be the basis for a warrantless search at the police station. *See Chambers*, 399 U.S. at 52, 90 S. Ct. at 1981–82. The end result of the confluence of these United States Supreme Court cases is that persons pretextually stopped for minor traffic violations may be subject to a full custodial arrest, an impounded vehicle, and a warrantless search of the impounded vehicle without offending the Fourth Amendment.

And there is one more twist. In *Heien v. North Carolina*, 574 U.S. 54, ___, 135 S. Ct. 530, 534 (2014), the Supreme Court held that an officer's mistake of law can still provide sufficient reasonable suspicion to engage in a warrantless stop if the mistake is reasonable. Thus, the officer's stop of a vehicle with one brake light out did not violate the Fourth Amendment even though the underlying regulation required only a single working brake light. *Id.* As a result, under the Supreme Court cases, a warrantless pretextual stop based upon a mistaken belief that a minor traffic law was violated may lead to a full custodial arrest, subsequent impoundment of the vehicle, and a warrantless search of the vehicle without offending the Fourth Amendment.

2. *Approaches under state law: Independence.* The Supreme Court's determination to cut back on robust interpretation of search and seizure law under the Fourth Amendment was not universally admired in state courts. Indeed, on several notable occasions, when the United States Supreme Court reversed state supreme court rulings providing Fourth Amendment protection in the context of automobiles, the state supreme courts on remand followed their prior approaches on state constitutional grounds. For instance, after the United States Supreme Court upheld a roadblock-type seizure in *Sitz,* 496 U.S. at 447, 110 S. Ct. at 2483, the Michigan Supreme Court on remand declined to follow the Supreme Court in its interpretation of the Michigan Constitution. *See Sitz v. Dep't of State Police,* 506 N.W.2d 209, 224–25 (Mich. 1993). Similarly, the South Dakota Supreme Court declined to follow the lead of the United States Supreme Court on remand after *Opperman,* 428 U.S. at 375–76, 96 S. Ct. at 3100, where the Court upheld a warrantless inventory search. *State v. Opperman,* 247 N.W.2d 673, 674–75 (S.D. 1976).

There are many other occasions where state supreme courts have declined to follow federal precedents in the interpretation of state constitutions. For example, the New Hampshire Supreme Court rejected the automobile exception in *State v. Sterndale*, 656 A.2d 409, 411–12 (N.H. 1995), *abrogated in part on other grounds by State v. Goss*, 834 A.2d 316, 318–19 (N.H. 2003), *as recognized in State v. Cora*, 167 A.3d 633, 641–42 (N.H. 2017), the Minnesota Supreme Court rejected *Atwater* in *State v. Askerooth*, 681 N.W.2d 353, 361–63 (Minn. 2004) (en banc), the New Jersey Supreme Court rejected application of *Schneckloth* to an automobile stop in *State v. Carty*, 790 A.2d 903, 907, 912–14, *modified on other grounds*, 806 A.2d 798, 798 (N.J. 2002), and the Alaska Supreme Court imposed greater limitations on inventory searches in *State v. Daniel*, 589 P.2d 408, 416 (Alaska 1979).

3. *Iowa approach: Resilience.* In recent years, we have been increasingly concerned with the expansive reach of federal law in the search and seizure of automobiles. We have limited the reach of government power in the automobile context in a series of cases by relying on article I, section 8 of the Iowa Constitution. Thus, while the United States Supreme Court has trimmed back its search and seizure protections in the automobile context, we have generally held firm.

For instance, in *State v. Tague*, 676 N.W.2d 197, 205–06 (Iowa 2004), we confronted the question of whether an automobile stop may be based upon momentarily crossing the edge line of a road. We held that on the facts presented, the police lacked probable cause or reasonable suspicion to stop the vehicle. *Id.* Notably, we based our decision on article I, section 8 of the Iowa Constitution and not on the Fourth Amendment. *Id.* at 206.

A few years later, in *Vance*, 790 N.W.2d at 786, we considered whether counsel was ineffective for failure to consider whether the holding in *New York v. Belton*, 453 U.S. 454, 460–61, 101 S. Ct. 2860, 2864 (1981), *overruled in part by Arizona v. Gant*, 556 U.S. 332, 350–51, 129 S. Ct. 1710, 1723 (2009), remained good law under the Iowa Constitution. The thrust of our *Vance* opinion strongly suggested that it would be ineffective assistance to not launch an independent challenge under article I, section 8 of the Iowa Constitution. 790 N.W.2d at 789–90. But because it was possible that counsel did not raise the issue of *Belton*'s vitality under the Iowa Constitution because of a reasonable belief that another exception to the warrant requirement might be present, we denied relief on direct appeal. *Id.* at 790.

Next, in *Pals*, 805 N.W.2d at 770–71, we explored the validity of a consent search in the context of an automobile stop under article I, section 8 of the Iowa Constitution. At the outset, we observed that the proper scope of police authority in cases involving minor traffic infractions had been the subject of controversy. *Id.* at 772. We specifically noted claims of racial profiling and that a number of consent decrees had been entered to provide a framework for limiting the exercise of police authority in traffic stops. *Id.* at 772–73 & nn.2–9. We noted that at least one Iowa jurisdiction had entered into a consent decree related to alleged racial profiling in traffic stops. *Id.* at 773 & n.9.

In *Pals*, we also noted criticism of the *Schneckloth* test for consent both because of its failure to require a knowing and voluntary waiver of rights and in the lack of stringent application. *Id.* at 779–82. In *Pals*, we reserved for another day the question of whether Iowa should require knowing and voluntary waiver of constitutional rights in the context of automobile searches. *Id.* at 782. Instead, we applied the multi-factored

*Schneckloth* test in a stringent fashion, emphasizing that the officer in the case had exercised authority over the driver through a pat-down search, that Pals was detained in the police vehicle at the time of consent, that Pals was not told he was free to leave or that he could voluntarily refuse consent without any retaliation by police, and that he was not advised that police had concluded their business. *Id.* at 782–83. We held that the consent in the case was invalid under article I, section 8 of the Iowa constitution. *Id.* at 783.

In *State v. Tyler*, 830 N.W.2d 288, 293–96 (Iowa 2013), we considered whether a search could be valid where the officer made a mistake of law in believing he had probable cause to seize a vehicle. We held that when a mistake of law was the sole justification of the stop, the evidence gathered pursuant to the stop was invalid. *Id.* at 294, 296, 298.

In *Tyler*, we came to our approach under both the Iowa and Federal Constitutions. *Id.* at 298. The United States Supreme Court has since held that suppression is not required if a stop is made for a reasonable mistake of law. *Heien*, 574 U.S. at ___, 135 S. Ct. at 534. While the Supreme Court has declined to follow the approach in *Tyler* under the Fourth Amendment, the holding of *Tyler* under article I, section 8 of the Iowa Constitution remains good law. *Coleman*, 890 N.W.2d at 298 n.2 ("Of course, the ruling in *Tyler* under the Iowa Constitution is unaffected by *Heien*."). Although the *Tyler* case had discriminatory overtones of race and place, it was not necessary to address any issue of pretext. 830 N.W.2d at 297 & n.4; *see* I. Bennett Capers, *Policing, Race, and Place*, 44 Harv. C.R.-C.L. L. Rev. 43, 65–66 (2009) (noting policing may depend upon whether members of a race are deemed to be in the right place).

Our next recent automobile case is *Gaskins*, 866 N.W.2d 1. In *Gaskins*, we considered the scope of a search incident to arrest in the

context of an automobile stop for an expired license plate. *Id.* at 3. After the stop, police smelled marijuana and confiscated a marijuana blunt from the motorist. *Id.* The motorist and a passenger were arrested and placed in a police car. *Id.* Police then searched a safe in the car without first obtaining a warrant. *Id.*

We concluded that the search of the safe was not a valid search incident to arrest. *Id.* In doing so, we considered whether to continue following the approach of the United States Supreme Court in *Belton*, 453 U.S. 454, 101 S. Ct. 2860. *Gaskins*, 866 N.W.2d at 8–10. In *Belton*, the Supreme Court ruled that once the driver of an automobile was arrested, police could engage in a warrantless search of the entire passenger compartment of the vehicle, including searching any containers found within the passenger compartment, without violating the Fourth Amendment. *See* 453 U.S. at 460, 101 S. Ct. at 2864. *Belton* thus stood for the doubtful proposition that a search of the interior compartment of an automobile was justified as a search incident to arrest even though the driver and passengers were not physically capable of retrieving a weapon or destroying contraband or evidence.

In *Gaskins*, we chose to reject the *Belton* approach under the Iowa Constitution. 866 N.W.2d at 12. We noted, among other things, that *Belton* had been subject to searing criticism, citing courts and scholars who declared that "[t]he drumbeat of scholarly opposition to *Belton* has remained constant," that "[t]here is good reason to be critical of the Court's work in *Belton*," and that "[c]riticism of *Belton* has been vigorous and sustained." *Id.* at 9 (first quoting *State v. Eckel*, 888 A.2d 1266, 1272–73 (N.J. 2006); and then quoting Wayne R. LaFave, *The Fourth Amendment in an Imperfect World: On Drawing "Bright Lines" and "Good Faith,"* 43 U. Pitt. L. Rev. 307, 332 (1982); and then quoting Eugene L. Shapiro, New York v.

Belton *and State Constitutional Doctrine*, 105 W. Va. L. Rev. 131, 137 (2002)). We also noted that members of the United States Supreme Court after *Belton* had expressed reservations about its scope and that the Supreme Court itself had limited *Belton*'s reach. *Id.* at 9–10; *see Gant*, 556 U.S. at 350–51, 129 S. Ct. at 1723–24; *Thornton v. United States*, 541 U.S. 615, 624, 124 S. Ct. 2127, 2133 (2004) (O'Connor, J., concurring in part); *id.* at 626–29, 124 S. Ct. at 2134–35 (Scalia, J., concurring in the judgment).

In analyzing the case, we recognized that we had adopted *Belton* in a lockstep fashion in *State v. Sanders*, 312 N.W.2d 534, 539 (Iowa 1981). *See Gaskins*, 866 N.W.2d at 9. We noted, however, that New Jersey, Washington, New Hampshire, and other states had declined to adopt *Belton* under their state constitutions. *Id.* at 11–12. After canvassing the authorities, we concluded that we could no longer follow *Belton*. *Id.* at 12. We reasoned that when the driver and the passenger were secured in the police car, nothing within the vehicle posed a threat to the officers and there was no possibility that the driver and passenger could destroy evidence in the backseat of the vehicle. *Id.* at 14. In short, the scope of the *Belton* rule far exceeded its justification under the facts presented in *Gaskins*. *See id.* at 14. We overruled *Sanders* as we no longer believed *Belton* provided the proper scope of searches incident to arrest under article I, section 8 of the Iowa Constitution. *Id.* at 16.

We returned to another automobile search in *Coleman*, 890 N.W.2d at 285. In *Coleman*, we considered whether an automobile stop could be extended to require production of a driver's license or registration after the underlying basis for the stop had been resolved. *Id.* After surveying federal and state court authorities, we concluded that under article I, section 8 of the Iowa Constitution, the traffic stop could not be extended so that the

officer could request papers from the driver after the original basis for the stop had been resolved. *Id.* at 299–301. We emphasized that "cabining official discretion to conduct searches is designed to prevent arbitrary use of police power." *Id.* at 299. We noted that our recent cases "evinced an awareness of the potential for arbitrary government action on the state's roads and highways." *Id.* at 300. We noted that in *Pals* and *Tyler*, "we put traffic stops in the larger context of concerns surrounding racial profiling." *Id.*

In *State v. Storm*, 898 N.W.2d 140, 141 (Iowa 2017), we considered whether it was time to do away entirely with the automobile exception to the warrant requirement. Although three members of the court were prepared to abandon the rule, *see id.* at 157–58 (Hecht, J., dissenting) (joined by Justices Wiggins and Appel), a majority of the court declined to do so, *id.* at 142 (majority opinion).

In his special concurrence, however, Chief Justice Cady emphasized that on the record developed in the case, the defendant had not shown that technological developments rendered the automobile exception obsolete. *Id.* at 157 (Cady, C.J., concurring specially). Thus, Chief Justice Cady regarded the result as fact intensive and implied that when adequate technology is available, a warrant may be required to support a search of an automobile. *Id.* Chief Justice Cady stated that he remained "convinced the automobile exception has a limited lifespan" but concluded that its longevity depended on the ability of the state to integrate and use technological developments that would make the categorical rule unreasonable. *Id.*

Last, we considered the proper approach to warrantless inventory searches pursuant to automobile stops in *Ingram*, 914 N.W.2d at 797. In *Ingram*, we used a method of analysis similar to that in *Gaskins*, exploring

the validity of the stated rationale for warrantless inventory searches and canvassing applicable state and federal authorities. *See id.* at 801–12. We observed, among other things, that the Supreme Court's approach to warrantless inventory search and seizure caselaw was highly contested. *Id.* at 805. Yet we recognized that thirty-five years before *Ingram*, we held in *State v. Roth*, 305 N.W.2d 501, 507–08 (Iowa 1981) (en banc), that a closed container—such as a paper bag, but not a purse, suitcase, or briefcase—could be opened as part of an inventory search of a seized automobile. *Ingram*, 914 N.W.2d at 813. The container in *Ingram* involved a bag with a drawstring. *See id.* at 798.

Nonetheless, we concluded in *Ingram* that the time had come to depart from federal precedent in our inventory search doctrine under article I, section 8 of the Iowa Constitution. *Id.* at 820–21. We also noted the powerful intersection of *Whren*, *Atwater*, and *Bertine* to provide law enforcement with "virtually unlimited discretion to stop arbitrarily whomever they choose, arrest the driver for a minor offense that might not even be subject to jail penalties, and then obtain a broad inventory search of the vehicle—all without a warrant." *Id.* at 814. We observed that "[a]n essentially unregulated legal framework allowing wide police discretion in stopping, arresting, and conducting warrantless inventory searches of the driver's automobile amounts to a general warrant regime that is anathema to search and seizure law." *Id.* at 815. We rejected the approach of the United States Supreme Court in downgrading and demoting the warrant clause in favor of a general, free-floating reasonableness standard in its search and seizure law. *Id.* at 815–16. We reiterated that our recent cases embrace "a strong warrant preference interpretation of article I, section 8." *Id.* at 816.

4. *Summary.* While the United States Supreme Court has engaged in a dramatic reduction of search and seizure protections in the automobile context, the trend in our law has been in the opposite direction. Unlike the recent innovative search and seizure decisions of the United States Supreme Court, this court has insisted on our traditional strong preference for search warrants even in the automobile context. In particular, we have been careful to ensure that our law does not permit law enforcement to operate with what amounts to the equivalent of a general warrant and expose large segments of the population to search and seizure without a particularized showing of the basis for the intrusion on liberty.

**V. The Constitutionality of Searches Based on Pretext.**

**A. Overview of Pretextual Searches.** In the earliest court cases, pretextual searches appear to have been disfavored in the few cases that addressed the issue. In the 1960s, "the Kerner Commission identified [pretextual stops] as racially discriminatory and a key trigger of the urban riots" of the decade. Charles R. Epp et al., *Pulled Over: How Police Stops Define Race and Citizenship* 27, 31 (2014) [hereinafter Epp et al.].

With the commencement of the "war on drugs" in the early 1980s, pretextual searches made something of a comeback. For instance, the Drug Enforcement Administration embarked on a cooperative, state–federal program, called Operation Pipeline, that was intended to halt the flow of drugs on interstate highways through traffic stops designed to allow officers to investigate whether the drivers were involved in drug trafficking. Wayne R. LaFave, *The "Routine Traffic Stop" from Start to Finish: Too Much "Routine," Not Enough Fourth Amendment,* 102 Mich. L. Rev. 1843, 1844 & n.8 (2004) [hereinafter LaFave, *"Routine Traffic Stop"*]. Then, in 1996, in *Whren,* the Supreme Court gave the practice a major boost by declaring

that any stop for a traffic violation based on probable cause was immune from Fourth Amendment review regardless of the motivation for the stop. *Whren*, 517 U.S. at 811–16, 116 S. Ct. at 1773–76. Many state courts that had previously condemned pretextual searches reversed course under the glare of Supreme Court precedent. *See, e.g., Gama v. State*, 920 P.2d 1010, 1012–13 (Nev. 1996) (per curiam); *People v. Robinson*, 767 N.E.2d 638, 640 (N.Y. 2001). While the Kerner Commission in 1968 decried pretextual search and seizure practice, the Supreme Court in *Whren* gave it a Fourth Amendment license.

The potential abuses arising from pretextual investigative traffic stops were apparent at the time of *Whren*. *See, e.g., United States v. Harvey*, 16 F.3d 109, 110 (6th Cir. 1994) ("The officers stopped the vehicle for speeding and equipment violations and because, as one officer later testified at the suppression hearing, '[t]he vehicle that I observed with the defective equipment was very similar in appearance and profile to several other vehicles that I have stopped which ultimately ended in arrests of drug traffickers.'" (Alteration in original.)); *id.* at 113 (Keith, C.J., dissenting) (noting that the police officer testified that the basis or part of the basis for the stop was that "[t]here were three young black male occupants in an old vehicle"); *State v. Arroyo*, 796 P.2d 684, 688 n.3 (Utah 1990) ("As a result [of] Trooper Mangelson's training . . . whenever he observed an Hispanic individual driving a vehicle he wanted to stop the vehicle."). Both *Harvey* and *Arroyo* involved traffic stops of racial minorities.

Events after *Whren* have put the issue into even sharper relief. In the more than twenty years since *Whren*, many studies have found that African-Americans and other minorities are disproportionately subject to police seizures. *See, e.g.,* Frank R. Baumgartner et al., *Racial Disparities*

*in Traffic Stop Outcomes*, 9 Duke F. for L. & Soc. Change 21, 24–26 (2017) [hereinafter Baumgartner et al., *Racial Disparities in Traffic Stop Outcomes*] (noting ubiquity of substantial racial disparities stemming from traffic stops in each of the sixteen states with available data, including Missouri, Nebraska, and Illinois); Ronnie A. Dunn, *Racial Profiling: A Persistent Civil Rights Challenge Even in the Twenty-First Century*, 66 Case W. Res. L. Rev. 957, 986 (2016) [hereinafter Dunn] (discussing study showing racial disparities in traffic stops in Ohio communities); Samuel R. Gross & Katherine Y. Barnes, *Road Work: Racial Profiling and Drug Interdiction on the Highway*, 101 Mich. L. Rev. 651, 660 (2002) [hereinafter Gross & Barnes] (finding Maryland state troopers discriminate against African-American and Hispanic motorists at every stage of encounter, from initial stop to final search); Mary N. Beall, Article, *Gutting the Fourth Amendment: Judicial Complicity in Racial Profiling and the Real-Life Implications*, 36 Law & Ineq. 145, 149 & n.27 (2018) [hereinafter Beall] (summarizing studies in North Carolina and Detroit showing racial disproportionality in traffic stops).

Finally, anecdotal evidence of what has become known as "driving while black" continues to accumulate.  When Dr. Martin Luther King Jr. was arrested on January 26, 1956, in Montgomery, Alabama, for driving thirty miles per hour in a zone with a speed limit of twenty-five miles per hour, no one seriously believed that King was arrested to protect the traveling public.  *See* Randall Kennedy, *Martin Luther King's Constitution: A Legal History of the Montgomery Bus Boycott*, 98 Yale L.J. 999, 1028 (1989).  Other negative experiences with traffic stops have been reported by sports stars Marcus Allen and Joe Morgan, prominent attorneys Johnnie Cochran and Christopher Darden, actors Wesley Snipes and Will Smith, politician and lawyer Deval Patrick, and federal judge Filemon Vela.

*See* David A. Harris, *The Stories, the Statistics, and the Law: Why "Driving While Black" Matters*, 84 Minn. L. Rev. 265, 265, 275 (1999); Lupe S. Salinas & Fernando Colon-Navarro, *Racial Profiling as a Means of Thwarting the Alleged Latino Security Threat*, 37 T. Marshall L. Rev. 5, 11 n.36, 41 (2011); David A. Sklansky, *Traffic Stops, Minority Motorists, and the Future of the Fourth Amendment*, 1997 Sup. Ct. Rev. 271, 312 n.196 [hereinafter Sklansky]; Juan R. Torruella, *Déjà vu: A Federal Judge Revisits the War on Drugs, or Life in a Balloon*, 20 B.U. Pub. Int. L.J. 167, 190 n.136 (2011) [hereinafter Torruella].  As noted by Representative John Conyers, "[T]here are virtually no African-American males—including Congressmen, actors, athletes, and office workers—who have not been stopped at one time or another for an alleged traffic violation, namely driving while black."  Sklansky, 1997 Sup. Ct. Rev. at 312 n.196 (quoting 143 Cong. Rec. E10 (daily ed. Jan. 7, 1997) (remarks of Rep. Conyers)).

**B.  Approaches to Pretext Prior to *Whren*.**

1.  *Approaches to pretextual investigative searches in United States Supreme Court cases prior to* Whren*.*  Prior to *Whren*, the United States Supreme Court in several cases indicated that pretextual searches were likely to be unlawful under the Fourth Amendment.  For example, in *United States v. Lefkowitz*, the Supreme Court considered whether the Fourth Amendment was violated where law enforcement conducted a thorough search of a premises solely armed with an arrest warrant.  285 U.S. 452, 463, 52 S. Ct. 420, 423 (1932), *abrogated in part by Harris v. United States*, 331 U.S. 145, 153, 67 S. Ct. 1098, 1102 (1947), *overruled in part by Chimel*, 395 U.S. at 768, 89 S. Ct. at 2042–43.  The *Lefkowitz* Court said yes.  *Id.* at 467, 52 S. Ct. at 424.  In clear terms, the *Lefkowitz* Court declared, "An arrest may not be used as a pretext to search for evidence."  *Id.*

Similarly, in *Abel v. United States*, the Supreme Court considered the use of an administrative warrant to gather evidence of espionage. 362 U.S. 217, 218–19, 80 S. Ct. 683, 686–87 (1960). In *Abel*, immigration officers obtained an administrative arrest warrant to seize Abel on the ground that he was violating immigration law. *Id.* at 221–22, 80 S. Ct. at 688. The FBI, who had an interest in Abel regarding potential espionage, accompanied the immigration officials to Abel's hotel to arrest him. *Id.* at 221–22, 80 S. Ct. at 688–89. Ultimately, the government obtained a number of documents tending to incriminate Abel on conspiracy to commit espionage. *Id.* at 224–25, 80 S. Ct. at 689–90. Abel sought to suppress the evidence on the ground that the immigration arrest effort was pretextual and designed in fact to allow the FBI to discover incriminating evidence without a warrant. *Id.* at 225–26, 80 S. Ct. at 690.

The Supreme Court rejected the claim based on the facts of the case. *Id.* at 226–30, 80 S. Ct. at 690–92. The *Abel* Court found that the arrest was not conducted in bad faith and was not pretextual in nature. *Id.* The Supreme Court noted, however, "Were this claim [of pretext] justified by the record, it would indeed reveal a serious misconduct by law-enforcing officers." *Id.* at 226, 80 S. Ct. at 690. The Supreme Court stated that the test for pretext was "whether the decision to proceed administratively toward deportation was influenced by, and was carried out for, a purpose of amassing evidence in the prosecution for crime." *Id.* at 230, 80 S. Ct. at 692. The *Abel* Court emphasized, however, that administrative searches conducted pursuant to standardized procedures should not be considered pretextual. *See id.* at 229, 80 S. Ct. at 692.

After *Lefkowitz* and *Abel*, a number of United States Supreme Court cases suggested that pretextual searches would raise serious constitutional problems. For instance, in *Steagald v. United States*, 451

U.S. 204, 205–07, 101 S. Ct. 1642, 1644–45 (1981), the Supreme Court considered a case where police armed with an arrest warrant entered a home and discovered drugs and other evidence. The defendant moved to suppress the drug-related evidence on grounds of pretext, arguing that it was illegally obtained because the agents had failed to secure a search warrant before entering the home. *Id.* at 207, 101 S. Ct. at 1645. The Supreme Court agreed, holding that an arrest warrant may not serve as "the pretext for entering a home in which the police have a suspicion, but not probable cause to believe, that illegal activity is taking place." *Id.* at 215, 101 S. Ct. at 1649.

And in several cases upholding searches, the Supreme Court emphasized the lack of evidence showing that the searches were pretextual. For example, in *Colorado v. Bannister*, 449 U.S. 1, 4 n.4, 101 S. Ct. 42, 44 n.4 (1980) (per curiam), the Supreme Court stressed, "There was no evidence whatsoever that the officer's presence to issue a traffic citation was a pretext to confirm any other previous suspicion about the occupants." Similarly, in *Florida v. Wells*, 495 U.S. 1, 2–3, 110 S. Ct. 1632, 1634 (1990), the Supreme Court considered whether incriminating evidence obtained in an inventory search should be suppressed. The Court declined to suppress the evidence but noted, "[A]n inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." *Id.* at 4, 110 S. Ct. at 1635. Further, in *Bertine*, 479 U.S. at 372, 107 S. Ct. at 741, the Supreme Court declined to suppress the evidence obtained in an administrative search but observed that the defendant made "no showing that the police . . . acted in bad faith."

Finally, in *New York v. Burger*, 482 U.S. 691, 693, 107 S. Ct. 2636, 2639 (1987), the Court reviewed a state statute authorizing a warrantless

search of an automobile junkyard. One question presented in the case was

> whether an otherwise proper administrative inspection is unconstitutional because the ultimate purpose of the regulatory statute pursuant to which the search is done—the deterrence of criminal behavior—is the same as that of penal laws, with the result that the inspection may disclose violations not only of the regulatory statute but also of the penal statutes.

*Id.* The Court disagreed with the New York Court of Appeals that the administrative goal was pretextual because "a State can address a major social problem *both* by way of an administrative scheme *and* through penal sanctions." *Id.* at 712, 107 S. Ct. at 2649. The Court also explained that the legislative history to the statute revealed proper regulatory purposes for the administrative scheme. *Id.* at 716 n.27, 107 S. Ct. at 2651 n.27. Justice Brennan, joined by Justice Marshall, dissented finding that the pretextual nature of the administrative scheme was illustrated by the fact that police officers copied serial numbers from a wheelchair and a walker, objects that were in no way relevant to the automobile-related administrative scheme. *Id.* at 725 & n.12, 107 S. Ct. at 2656 & n.12 (Brennan, J., dissenting).

The *Lefkowitz–Abel* line of cases made sense, particularly during the years when the Supreme Court embraced a strong warrant-preference approach to the Fourth Amendment. Yet there were also cases that suggested that drawing the line at pretextual searches might not hold in light of pragmatic considerations embraced by some members of the Court.

For example, in *Massachusetts v. Painten*, 389 U.S. 560, 561, 88 S. Ct. 660, 661 (1968) (per curiam), the United States Supreme Court in a per curiam decision dismissed a petition for certiorari as improvidently

granted in a case involving an alleged pretextual search because the record in the case was not sufficiently clear and specific to permit a decision on important constitutional questions. In a dissenting opinion, however, Justice White, with two other Justices, expressed the view that "sending state and federal courts on an expedition into the minds of police officers would produce a grave and fruitless misallocation of judicial resources." *Id.* at 565, 88 S. Ct. at 663 (White, J., dissenting). Painten, however, did not defend on the ground that the "knock and talk" was pretextual but solely on the ground that he did not consent to the search. George E. Dix, *Subjective "Intent" as a Component of Fourth Amendment Reasonableness,* 76 Miss. L.J. 373, 385 (2006) [hereinafter Dix].

The United States Supreme Court seemed to wobble around the *Lefkowitz–Abel* line in *United States v. Robinson,* 414 U.S. 218, 94 S. Ct. 467 (1973). In *Robinson,* the Supreme Court considered a case where the defendant was arrested for driving while his operator's permit was revoked. *Id.* at 220, 94 S. Ct. at 469–70. Pursuant to the arrest, the police searched him and retrieved a crumpled cigarette package that contained heroine capsules. *Id.* at 221–23, 94 S. Ct. at 470–71. The defendant was then charged and convicted of drug-related offenses. *Id.* at 219, 94 S. Ct. at 469.

In *Robinson,* the Supreme Court concluded that a search incident to arrest in a traffic stop was always permitted, even without reasonable suspicion. *See id.* at 235, 95 S. Ct. at 477. In a footnote, the Court summarized Robinson's position in the lower court (but not the Supreme Court), where he asserted that the officer "may have used the subsequent traffic violation arrest as a mere pretext for a narcotics search." *Id.* at 221 n.1, 94 S. Ct. at 470 n.1. The *Robinson* Court noted that placing Robinson in custody following his arrest "was not a departure from established police

department practice." *Id.* The *Robinson* Court thus was not required to directly address the validity of a pretextual stop. *Id.*

Justice Marshall, joined by Justices Douglas and Brennan, dissented. *Id.* at 238, 94 S. Ct. at 477 (Marshall, J., dissenting). Justice Marshall emphasized that whether evidence should be suppressed as a result of a traffic stop raised a fact-specific question. *Id.* at 248, 94 S. Ct. at 482. He cited cases from state jurisdictions that stood for the proposition that an arrest for a minor traffic charge cannot be used as a lever for expanding the search, including unsupported pat-down searches. *Id.* at 244–46, 94 S. Ct. at 481–82. Justice Marshall emphasized the *Lefkowitz–Abel* line of cases in rejecting the majority's proposition that all that was required to support the search in the case was an objectively valid traffic arrest. *Id.* at 248, 94 S. Ct. at 483.

Next, in *Scott v. United States*, 436 U.S. 128, 130–31, 98 S. Ct. 1717, 1719–20 (1978), the Supreme Court considered a case involving a question of the alleged failure of agents to "minimize" wiretap interceptions under the Omnibus Crime Control and Safe Streets Act of 1968. A federal district court found a statutory violation and held that suppression should be granted, largely because the agents were aware of the statutory minimization requirement "but made no attempt to comply therewith." *Id.* at 133, 98 S. Ct. at 1721. The court of appeals reversed. *Id.* at 134, 98 S. Ct. at 1721.

In affirming the reversal of the district court, the Supreme Court held that under the facts of the case, the agents never reached the point where they had a duty to minimize the calls. *Id.* at 141–42, 98 S. Ct. at 1725–26. What they might have done had they crossed that threshold, however, was irrelevant. *See id.* The Supreme Court stated, "[T]he fact that the officer does not have the state of mind which is hypothecated by

the reasons which provide the legal justification for the officer's action does not invalidate the action." *Id.* at 138, 98 S. Ct. at 1723.

Another case of interest is *United States v. Villamonte-Marquez*, 462 U.S. 579, 103 S. Ct. 2573 (1983). In *Villamonte-Marquez,* the Supreme Court rejected an argument that, because customs officers were accompanied by a state police officer and were following a tip that the vessel may contain narcotics, the customs officers could not rely on statute authorizing the boarding of vessels for inspection. *Id.* at 584 & n.3, 103 S. Ct. at 2577 & n.3. In so construing the statute, the Supreme Court emphasized the need to protect the nation's borders and the minimal expectation of privacy associated with border situations. *Id.* at 588–89, 103 S. Ct. at 2579–80.

Prior to *Whren,* then, there were two competing strands of language in Supreme Court precedents. The *Lefkowitz–Abel* strand emphasized that pretextual searches were invalid and even amounted to serious misconduct by law enforcement. Yet in the *Scott–Robinson* line, the Supreme Court's language emphasized the burdens of engaging in subjective inquiry of the purposes of law enforcement.

2. *Pretextual investigative stops in lower federal courts prior to Whren.* Given the competing lines of Supreme Court authority, it is not surprising that a split in the federal circuit courts developed regarding the lawfulness of pretextual searches. The majority of federal circuit courts followed the approach in the *Scott–Robinson* line of cases by holding that where an officer has objective reasons to believe a traffic violation has occurred, the stop is reasonable. This approach is sometimes referred to as the "could have" test because what is important is not the officer's actual motivation but, instead, whether an objective officer, under all the facts and circumstances, could have a reasonable basis for the traffic stop.

*See, e.g.*, *United States v. Botero-Ospina*, 71 F.3d 783, 786–87 (10th Cir. 1995) (en banc); *United States v. Johnson*, 63 F.3d 242, 246–47 (3d Cir. 1995); *United States v. Scopo*, 19 F.3d 777, 782–84 (2d Cir. 1994); *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) (en banc); *United States v. Meyers*, 990 F.2d 1083, 1085 (8th Cir. 1993); *United States v. Causey*, 834 F.2d 1179, 1184–85 (5th Cir. 1987) (en banc).

A number of these federal circuit court cases, however, provoked strong dissents. For instance, in *Botero-Ospina*, the Tenth Circuit reversed its approach to pretextual searches announced in *United States v. Guzman*, 864 F.2d 1512, 1517 (10th Cir. 1988), in favor of the "could have" approach. 71 F.3d at 785–87. Chief Judge Seymour, with two other judges, wrote in a dissent that "the majority relies on reasons so logically or legally flawed as to be little more than self-serving rationalizations." *Id.* at 789 (Seymour, C.J., dissenting). She bemoaned that under the majority's approach, it is "irrelevant that the stop was motivated by racial animus, an inarticulable hunch, or any of the other improper reasons." *Id.*

Chief Judge Seymour urged application of a reasonable officer standard, such as that articulated in *Terry*, 392 U.S. at 21–24, 88 S. Ct. at 1879–81, in evaluating the validity of pretextual stops. 71 F.3d at 789–91. This amounted to a "would have" test. The test according to Chief Judge Seymour was whether a reasonable officer would have made the traffic stop notwithstanding any pretextual motive. *See id.* Anything less "would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches." *Id.* at 790–91 (quoting *Terry*, 392 U.S. at 22, 88 S. Ct. at 1880). In closing, Chief Judge Seymour observed,

> [T]he magnitude of the majority's deviation from Supreme
> Court precedent and the poverty of its reasons for doing so
> prompt me to observe that it is not for this court to provide
> law enforcement with a weapon in the war on drugs at the
> expense of the Fourth Amendment. A conviction won by
> eroding every individual's right to personal security is dearly
> bought indeed. In my judgment, we are perilously close to
> selling our birthright for bread and pottage.

*Id.* at 795.

Judge Lucero also filed a dissenting opinion in *Botero-Ospina*. *Id.* (Lucero, J., dissenting). He pointed out that the majority's message to law enforcement officers was, "You may stop motorists on a subterfuge; we don't care and we won't ask." *Id.* Judge Lucero found a similarity between the majority's approach and the general warrants and writs of assistance that triggered the American Revolution. *Id.* at 796. He closed with the following observation:

> I have every confidence in the ability of the trial courts
> to determine whether Fourth Amendment-related traffic stops
> are reasonable under a totality of the circumstances test. I do
> not agree that merely asking whether an officer could have
> made a stop is an objective standard for reasonableness;
> rather I see it as a warrant for arbitrary exercise of police
> power.

*Id.*

And in *Causey*, Judge Rubin filed a dissent worth pondering. 834 F.2d at 1186 (Rubin, J., dissenting). Judge Rubin, for himself and five other judges, emphasized, "When . . . a reasonable officer would not have made the seizure of the suspect's person absent an invalid purpose, the arrest must be condemned as pretextual." *Id.* at 1187. Further, he noted, "An arrest is arbitrary, hence unconstitutional, if it is made in accordance with a potentially discriminatory plan, even when the same action, undertaken in accordance with neutral principles, would be permissible." *Id.* at 1187–88.

Finally, in *Harvey*, Chief Judge Keith powerfully dissented. 16 F.3d at 112. In *Harvey*, an African-American was stopped for traveling three miles an hour over the speed limit and subsequently charged with drug crimes. *See id.* at 113. The officer involved testified, "Almost every time that we have arrested drug traffickers from Detroit, they're usually young black males driving old cars." *Id.* (emphasis omitted). Chief Judge Keith noted that "the majority acquiesces to an officer's substitution of race for probable cause and essentially licenses the state to discriminate." *Id.* at 114.

While the majority of the circuits had adopted the view that a traffic stop was permissible under the "could have" test, two circuits adopted what amounted to the "would have" test. For example, in *United States v. Cannon*, the Ninth Circuit adhered to the view that pretextual searches were unlawful. 29 F.3d 472, 474–75 (9th Cir. 1994). Citing precedent from the Tenth Circuit that was later reversed in a controversial en banc opinion, the *Cannon* court stated, "In the absence of some limit on police power to make such [pretextual] stops, 'thousands of everyday citizens who violate minor traffic regulations will be subject to unfettered police discretion as to whom to stop." *Id.* at 474–75 (quoting *Guzman*, 864 F.2d at 1516). As a result, the *Cannon* court embraced the "would have" test and rejected the "could have" test. *Id.* at 476.

Similarly, in *United States v. Smith*, 799 F.2d 704, 708 (11th Cir. 1986), the Eleventh Circuit embraced the "would have" approach to pretextual stops. The *Smith* court emphasized that under the "would have" approach, the stop "must be both 'justified at its inception' and 'reasonably related in scope to the circumstances which justified the interference in the first place.'" *Id.* at 711 (quoting *Terry*, 392 U.S. at 20, 88 S. Ct. at 1879). The *Smith* court noted that were it to abandon the "would have"

approach to pretextual stops, "[w]ith little more than an inarticulate 'hunch' of illegal activity an officer could begin following a vehicle and then stop it for the slightest deviation from a completely steady course." *Id.*

3. *Approaches to pretextual searches in state court decisions prior to* Whren. State courts have far more experience with traffic stops than do federal courts. Given their experience with the law of the road, state courts were more receptive than federal courts to penetrating pretextual stops. Prior to *Whren*, many state courts that considered the issue believed the proper test for whether an allegedly pretextual stop was valid was whether an objective police officer would have made the stop notwithstanding the pretextual motivation. *See, e.g.*, *Mings v. State*, 884 S.W.2d 596, 602 (Ark. 1994); *Kehoe v. State*, 521 So. 2d 1094, 1097 (Fla. 1988), *overruled by Dobrin v. Fla. Dep't of Highway Safety & Motor Vehicles*, 874 So. 2d 1171, 1174 (Fla. 2004); *People v. Mendoza*, 599 N.E.2d 1375, 1383 (Ill. App. Ct. 1992); *State v. Izzo*, 623 A.2d 1277, 1280 (Me. 1993); *State v. Hoven*, 269 N.W.2d 849, 852–53 (Minn. 1978) (en banc); *State v. Van Ackeren*, 495 N.W.2d 630, 642–45 (Neb. 1993); *Alejandre v. State*, 903 P.2d 794, 796 (Nev. 1995), *overruled by Gama*, 920 P.2d at 1013; *People v. James*, 630 N.Y.S.2d 176, 176–77 (App. Div. 1995); *State v. Hawley*, 540 N.W.2d 390, 392–93 (N.D. 1995); *State v. Spencer*, 600 N.E.2d 335, 337 (Ohio Ct. App. 1991), *overruled by Dayton v. Erickson*, 665 N.E.2d 1091, 1097–98 (Ohio 1996); *State v. Chapin*, 879 P.2d 300, 303–05 (Wash. Ct. App. 1994), *overruled in part by State v. Ladson*, 979 P.2d 833, 843 (Wash. 1999) (en banc) (stating that both subjective and objective factors are relevant to the pretext inquiry). With minor variations, therefore, these courts adopted the "would have" test.

Under the "would have" test, the question in a pretextual traffic stop is whether a reasonable officer would have made the stop notwithstanding

any improper investigative motive. By the mid-1990s, the reasonable officer standard for evaluating pretextual stops under the "would have" test seemed to be gaining ground among the states. *See Thanner v. State*, 611 A.2d 1030, 1032 (Md. Ct. Spec. App. 1992). A number of state supreme courts, however, declined to suppress evidence obtained in pretextual traffic stops. *See, e.g.*, *Ex parte Scarbrough*, 621 So. 2d 1006, 1010 (Ala. 1993); *State v. Law*, 769 P.2d 1141, 1144–45 (Idaho Ct. App. 1989); *Garcia v. State*, 827 S.W.2d 937, 942 (Tex. Crim. App. 1992) (en banc).

4. *Approaches to pretextual searches in Iowa prior to* Whren. Prior to *Whren*, this court had several occasions to consider the validity of pretextual stops. In *State v. Cooley*, 229 N.W.2d 755, 756 (Iowa 1975), police were on special assignment to investigate armed robberies and house prowling. They observed a vehicle with a passenger, Cooley, who left the vehicle and walked several times between the vehicle and a tavern. *Id.* After the vehicle traveled for several blocks, the officers stopped the vehicle. *Id.* When Cooley was asked to step out of the vehicle, police noticed the handle of a revolver protruding from beneath the front seat. *Id.* Cooley was arrested and charged with carrying a concealed weapon. *Id.*

Cooley sought to suppress evidence arising from the stop. *Id.* At the suppression hearing, one of the officers involved testified that the initial stop arose because the actions of the defendant coming and going from the tavern were suspicious. *Id.* at 758–59. The officer also testified that other factors leading to the stop included the high-crime rate and the predominantly African-American population in the area. *Id.* at 759.

Although a provision of the Iowa Code provided for a stop to inspect the operator's permit, we held that the police stop was unlawful. *Id.* at

757–59. Based on the record, we concluded that the car stop "was not effected for the motivative purpose of inspecting the operator's permit." *Id.* at 759. We further concluded there was no reasonable suspicion of crime to support the stop. *Id.* at 759–61. As a result, we concluded that the evidence obtained during the stop should be suppressed. *Id.* at 761. The *Cooley* case does not indicate whether it was based on the Iowa Constitution, the Federal Constitution, or both.

After *Cooley*, we repeatedly emphasized, in strong and direct language, that an officer is bound by the true reason for making a stop. *See State v. Wiese*, 525 N.W.2d 412, 415 (Iowa 1994) ("We hold officers to their true reason for stopping a vehicle in question and will not allow them to justify a stop with reasons upon which they did not actually act."), *overruled by Cline*, 617 N.W.2d at 281; *State v. Rosenstiel*, 473 N.W.2d 59, 61 (Iowa 1991) ("The officer is bound by the true reasons given for the stop."), *overruled by Cline*, 617 N.W.2d at 281; *State v. Bailey*, 452 N.W.2d 181, 182 (Iowa 1990) ("We have consistently held that in determining the validity of an investigatory stop police officers are bound by the real reasons for their actions."), *overruled by State v. Heminover*, 619 N.W.2d 353, 357 (Iowa 2000), *overruled on other grounds by Turner*, 630 N.W.2d at 606 n.2; *State v. Lamp*, 322 N.W.2d 48, 51 (Iowa 1982) (en banc) ("The officer is bound by the true reason or reasons for making the stop; that is, the officer may not rely on reasons that he or she could have had but did not actually have."), *overruled by Heminover*, 619 N.W.2d at 357; *State v. Aschenbrenner*, 289 N.W.2d 618, 619 (Iowa 1980) ("Officers are bound by their true reason for making the stop. They may not rely on reasons they could have had but did not actually have."), *overruled by Cline*, 617 N.W.2d at 281.

In one pre-*Whren* case, however, we recognized that the United States Supreme Court might be changing course on the question of pretextual arrests. In *State v. Garcia*, 461 N.W.2d 460, 463 (Iowa 1990), we observed, "The traditional response to this police tactic [of pretextual arrests] has been to suppress all evidence derived from the search incident to the pretextual arrest." We cited federal caselaw suggesting that the Supreme Court might be departing from the traditional position on pretext. *Id.* at 463–64. In *Garcia*, however, we concluded that even under the prevailing Iowa standard, the stop involved was not pretextual. *Id.* at 464.

The bottom line is that for twenty years prior to *Whren*, Iowa consistently held the actual subjective motivation of the officer provided the relevant yardstick in determining whether a search was unlawfully pretextual.

**C. Overview of *Whren*.** In 1996, the United States Supreme Court considered the case of *Whren v. United States*, 517 U.S. 806, 116 S. Ct. 1769. The Court held that the Fourth Amendment allows police to stop a motorist who the police have probable cause to believe has committed a traffic infraction regardless of the subjective motivation for the stop and even if a reasonable officer motivated by a desire to enforce the traffic laws would not have made the stop. *Id.* at 811–16, 116 S. Ct. at 1773–76.

In *Whren*, police in an unmarked car in a "high drug area" in the District of Columbia observed a truck wait at a stop sign for an unusually long time, turn suddenly without signaling, and speed off at an "unreasonable" speed. *Id.* at 808, 116 S. Ct. at 1772. When the vehicle stopped behind other traffic, a police officer approached the driver's door of the truck and directed that the vehicle be put in park. *Id.* When the officer neared the driver's window, the officer observed plastic bags of crack cocaine in Whren's possession. *Id.* at 808–09, 116 S. Ct. at 1772.

Whren was charged with drug offenses and convicted. *Id.* at 809, 116 S. Ct. at 1772. At a pretrial suppression hearing, Whren argued that the officer's asserted ground for approaching the vehicle—to give the driver a warning concerning traffic violations—was pretextual. *Id.* The district court denied the suppression motion, concluding that nothing demonstrated that the actions by the police were contrary to a normal traffic stop. *Id.* Whren's convictions were affirmed on appeal. *Id.*

At the Supreme Court, Whren challenged the district court's denial of his motion to suppress the evidence. *Id.* at 810, 116 S. Ct. at 1772–73. Whren conceded that the officers had probable cause to believe that various provisions of the traffic code had been violated. *Id.* at 810, 116 S. Ct. at 1772. Whren argued, however, that the proper test in the context of a highly regulated traffic stop was whether the police officers "would have made the stop for the reasons given" by the officers. *Id.* at 810, 116 S. Ct. at 1773.

The *Whren* Court indicated that the result in the case was dictated by prior precedent. *Id.* at 813, 116 S. Ct. at 1774. The Court characterized a footnote in *Villamonte-Marquez*, 462 U.S. at 584 n.3, 103 S. Ct. at 2577 n.3, as "flatly dismiss[ing] the idea that an ulterior motive might serve to strip the agents of their legal justification." *Whren*, 517 U.S. at 812, 116 S. Ct. at 1774. And the Court said *Robinson* "held that a traffic-violation arrest (of the sort here) would not be rendered invalid by the fact that it was 'a mere pretext for a narcotics search.'" *Id.* at 812–13, 116 S. Ct. at 1774 (quoting *Robinson*, 414 U.S. at 221 n.1, 94 S. Ct. at 470 n.1). Further, the Court cited *Gustafson v. Florida*, 414 U.S. 260, 266, 94 S. Ct. 488, 492 (1973), where it held that a post-arrest search was valid even though it was not justified by safety concerns. *Whren*, 517 U.S. at 813, 116 S. Ct. at 1774. Finally, the Court quoted *Scott* for the proposition that

"[s]ubjective intent alone . . . does not make otherwise lawful conduct illegal or unconstitutional." *Id.* (alterations in original) (quoting *Scott*, 436 U.S. at 138, 98 S. Ct. at 1723).

When the *Whren* Court asked itself rhetorically why its test would even preclude actual and admitted pretext from Fourth Amendment scrutiny, it simply observed that this "more sensible option" was foreclosed by its precedents. *Id.* at 814, 116 S. Ct. at 1774–75. The *Whren* Court further emphasized that the limiting precedents were not based on the difficulty of proving subjective intent but rather on the principle that "the Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the subjective intent." *Id.* at 814, 116 S. Ct. at 1775. With respect to the suggestion that Fourth Amendment reasonableness requires balancing, the Court emphasized that "the result of that balancing is not in doubt where the search or seizure is based upon probable cause." *Id.* at 817, 116 S. Ct. at 1776.

The *Whren* Court recognized the argument that traffic laws were so pervasive that virtually everyone is guilty of a violation of some kind. *Id.* at 818, 116 S. Ct. at 1777. It declared, however, that it could not discern a standard to decide when such laws become so expansive and so commonly violated that the infraction itself cannot be the ordinary measure of the lawfulness of enforcement. *Id.* at 818–19, 116 S. Ct. at 1777.

The *Whren* Court briefly acknowledged that racial profiling could be used in a discriminatory fashion in the context of pretextual search and seizure. *See id.* at 813, 116 S. Ct. at 1774. The *Whren* Court, however, declared that the remedy for such discrimination was found in the Equal Protection Clause, not the Fourth Amendment. *Id.*

**D. Approaches to Pretextual Search and Seizure After *Whren.***

1. Whren *in federal courts.* The Supreme Court has applied the principle of *Whren* in follow-up cases. *See, e.g., Devenpeck v. Alford*, 543 U.S. 146, 153, 125 S. Ct. 588, 593–94 (2004). And, of course, the Court's decisions on federal constitutional issues are binding upon lower federal courts.

Yet controversy remains. Consider the recent case of *United States v. Johnson*, 874 F.3d 571 (7th Cir. 2017) (en banc), *cert. denied*, ___ U.S. ___, ___, 139 S. Ct. 58, 58 (2018). In this case, police surrounded a car illegally parked within fifteen feet of a crosswalk. *Id.* at 572. After seeing Johnson make movements suggesting that he "was hiding something such as alcohol, drugs, or a gun," an officer ordered Johnson out of the car. *Id.* at 572–73. "Once the car's door was open, [the officer] saw a gun on the floor," leading to Johnson's arrest. *Id.* at 573.

The district court, relying on *Whren*, denied Johnson's motion to suppress. *Id.* According to the district court, the officers' desire to investigate drugs did not matter because the officers had objective reasons to believe that the car was illegally parked. *See id.* The majority opinion in *Johnson* held that *Whren* applies to parking violations and, because objective evidence of a parking violation subjected the driver to a parking ticket, there was sufficient reason to support the seizure of Johnson even if the officers' true motivation was investigatory in nature. *See id.* at 573–74.

The majority opinion in *Johnson* provoked a sharp dissent joined by two other judges. *Id.* at 575 (Hamilton, J., dissenting). The dissent noted that five officers swooped down on the vehicle with lights shining, opened the doors, pulled all the passengers from the vehicle, and handcuffed them, all because of a suspected parking violation of being too close to an

unmarked crosswalk. *Id.* The dissenters noted that *Whren,* when coupled with additional cases, including *Atwater,* 532 U.S. at 354, 121 S. Ct. at 1557, and *Heien,* 574 U.S. at ___, 135 S. Ct. at 536, "gives the police broad discretion to impose severe intrusions on the privacy and freedom of civilians going about their business." *Id.* at 578. The dissenters noted that the cumulative effect of the cases "mean[s] that authority to conduct an investigatory stop can trigger sweeping intrusions and even dangers." *Id.* The dissenters rejected the notion that pretextual parking violations can give rise to such "unreasonable" police conduct. *Id.* at 579–80.

Johnson sought certiorari. Petition for a Writ of Certiorari at i, *Johnson,* ___ U.S. ___, 139 S. Ct. 58 (No. 17-1349), 2018 WL 1505539, at *i. He received amicus support from the Cato Institute, which argued that *Whren* should be revisited if not limited. Brief of the Cato Institute as Amicus Curiae Supporting Petitioner at 2–3, *Johnson,* ___ U.S. ___, 139 S. Ct. 58 (No. 17-1349), 2018 WL 1981930, at *2–3. The Civil and Human Rights Clinic at Howard University School of Law also filed an amicus brief, which emphasized the disproportionate effect of *Whren* on African-Americans. Brief of Howard University School of Law, Civil & Human Rights Clinic in Support of the Petitioner at 2–3, *Johnson,* ___ U.S. ___, 139 S. Ct. 58 (No. 17-1349), 2018 WL 1910945, at *2–3. Finally, Fourth Amendment scholars entered the fray in support of Johnson, arguing that extending *Whren* to a civil parking violation was unreasonable under the Fourth Amendment and would "exacerbate the ill effects that *Whren* has already created." Brief of Fourth Amendment Scholars as Amici Curiae in Support of the Petitioner at 11–12, 16, *Johnson,* ___ U.S. ___, 139 S. Ct. 58 (No. 17-1349), 2018 WL 1942537, at *11–12, *16. The Supreme Court, however, denied certiorari. *Johnson,* ___ U.S. at ___, 139 S. Ct. at 58.

Nevertheless, there is reason to believe that members of the United States Supreme Court have at least some concern about how *Whren* has played out in the real world. Four cases illustrate the point.

In *Maryland v. Wilson*, 519 U.S. 408, 410, 117 S. Ct. 882, 884 (1997), the Supreme Court held that a police officer may order the passenger of a lawfully stopped car to exit the vehicle pending completion of the stop. In dissent, Justice Kennedy expressed concern about the interplay between *Whren* and other cases. *Id.* at 423, 117 S. Ct. at 890–91 (Kennedy, J., dissenting). Specifically, Justice Kennedy noted,

> The practical effect of our holding in *Whren*, of course, is to allow the police to stop vehicles in almost countless circumstances. When *Whren* is coupled with today's holding, the Court puts tens of millions of passengers at risk of arbitrary control by the police.

*Id.* at 423, 117 S. Ct. at 890. Further, in a dissent joined by Justice Kennedy, Justice Stevens said that he "firmly believe[d] that the Fourth Amendment prohibits routine and arbitrary seizures of obviously innocent citizens." *Id.* at 416, 117 S. Ct. at 887 (Stevens, J., dissenting). The focus on Fourth Amendment protection against arbitrariness in both dissenting opinions was nowhere to be found in *Whren*.

Later, in *Arkansas v. Sullivan*, 532 U.S. 769, 771–72, 121 S. Ct. 1876, 1878 (2001) (per curiam), the Court reversed a decision of the Arkansas Supreme Court suppressing evidence in a pretextual traffic stop. But Justice Ginsburg, joined by Justices Stevens, O'Connor, and Breyer, sent something of a warning shot. *See id.* at 772–73, 121 S. Ct. at 1879 (Ginsburg, J., concurring). She declared, "[I]f experience demonstrates 'anything like an epidemic of unnecessary minor-offense arrests,' I hope the Court will reconsider its recent precedent." *Id.* at 773, 121 S. Ct. at 1879 (quoting *Atwater*, 532 U.S. at 353, 121 S. Ct. at 1557).

Next, in *Utah v. Strieff*, 579 U.S. ___, ___, 136 S. Ct. 2056, 2059 (2016), the Court considered a case where an officer did not have cause for an initial stop but, after obtaining identification from the individual, learned that there was an outstanding warrant for a parking ticket. The officer arrested Strieff and discovered drugs in a search incident to the arrest. *Id.* at ___, 136 S. Ct. at 2060. The Supreme Court held that the initial illegality was sufficiently attenuated from the later search such that no constitutional violation was present. *Id.* at ___, 136 S. Ct. at 2062–63.

Justice Sotomayor, joined in part by Justice Ginsberg, dissented. *Id.* at ___, 136 S. Ct. at 2064 (Sotomayor, J., dissenting). Notably, Justice Sotomayor wrote passionately about what the Utah Supreme Court characterized as the "routine procedure" and "common practice" of running warrant checks on persons detained without reasonable suspicion. *Id.* at ___, 136 S. Ct. at 2069 (quoting *State v. Topanotes*, 76 P.3d 1159, 1160 (Utah 2003)). Writing just for herself, she emphasized that "unlawful 'stops' have severe consequences much greater than the inconvenience suggested by the name." *Id.* at ___, 136 S. Ct. at 2069. Justice Sotomayor also criticized the thrust of Supreme Court cases that allow stops that "factor in your ethnicity, where you live, what you were wearing, and how you behaved." *Id.* at ___, 136 S. Ct. at 2069 (citations omitted). Although Strieff was white, Justice Sotomayor noted that "it is no secret that people of color are disproportionate victims of this type of [suspicionless] scrutiny." *Id.* at ___, 136 S. Ct. at 2070.

Justice Kagan also dissented, joined by Justice Ginsburg. *Id.* at ___, 136 S. Ct. at 2071 (Kagan, J., dissenting). She noted that warrant checks are "routine procedure" and "common practice." *Id.* at ___, 136 S. Ct. at 2073 (quoting *Topanotes*, 76 P.3d at 1160). The majority opinion, according to Justice Kagan, thus allows police officers to engage in

unconstitutional stops and seek to cure them through routine warrant checks. *Id.* at \_\_\_, 136 S. Ct at 2073–74. An officer may consequently be encouraged to make an unconstitutional stop and conduct a check to see if the target is one of many millions of people, and if there is a hit, anything uncovered is fair game for a criminal prosecution. *Id.* Justice Kagan emphasized that police officers will see a potential advantage in unconstitutional stops without reasonable suspicion, exactly what the exclusionary rule was designed to avoid. *Id.* at \_\_\_, 136 S. Ct. at 2074.

Finally, in *District of Columbia v. Wesby*, 583 U.S. \_\_\_, \_\_\_, 138 S. Ct. 577, 584 (2018), the Court considered a case where partygoers brought a 42 U.S.C. § 1983 action against police officers for false arrest. The central issues in the case were whether the officers had probable cause to arrest the party participants and, if not, whether the officers were nonetheless entitled to qualified immunity. *Id.* at \_\_\_, 138 S. Ct. at 585. In considering the question of qualified immunity, the Court concluded that "a reasonable officer," looking at the totality of circumstances, could have concluded that there was a legal basis for the arrests. *Id.* at \_\_\_, 138 S. Ct. at 593.

Justice Ginsburg concurred in the judgment in part. *Id.* at \_\_\_, 138 S. Ct. at 593 (concurring in the judgment in part). She expressed concern that the Supreme Court's approach to search and seizure "sets the balance too heavily in favor of police unaccountability to the detriment of Fourth Amendment protection." *Id.* at \_\_\_, 138 S. Ct. at 594. She noted, among other things, that commentators have criticized the path charted in *Whren* and its progeny, which hold that "an arresting officer's state of mind . . . is irrelevant to the existence of probable cause." *Id.* (alteration in original) (quoting *Devenpeck*, 543 U.S. at 153, 125 S. Ct. at 593). Justice Ginsburg stated that she "would leave open, for reexamination in a future case, whether a police officer's reason for acting, in at least some circumstances,

should factor into the Fourth Amendment inquiry." *Id.* Yet Justice Ginsburg recognized that the position advocated by the plaintiffs in the case was not embraced by "settled law" and, as a result, the Court correctly decided the issue of qualified immunity. *Id.*

*Wilson, Sullivan, Strieff,* and *Wesby* do not necessarily indicate a majority of the current Supreme Court is in favor of departing from *Whren.* But the concurring and dissenting opinions show that among some current members of the Supreme Court, the consequences of *Whren* are cause for concern.

2. Whren *in state courts.* After *Whren,* many state courts conformed their interpretations of state constitutional search and seizure provisions to that federal decision. Most state courts have done so with little analysis, often by simply lockstepping state constitutional law with federal precedent even if contrary to prior state court holdings. *See, e.g., Gama,* 920 P.2d at 1012 (reversing course from prior precedent and noting the Nevada Constitution provides no greater protection than that afforded under the Federal Constitution); *State v. Vineyard,* 958 S.W.2d 730, 733–36 (Tenn. 1997) (holding in the context of pretextual traffic stops that the Tennessee Constitution is coextensive with the Fourth Amendment). Others, however, have taken a different path.

I first turn to cases out of Washington. Like Iowa, the Washington Supreme Court has insisted on the warrant-preference approach and has rejected the *Leon* approach under the state constitution. *State v. Afana,* 233 P.3d 879, 884–86 (Wash 2010) (en banc) (rejecting *Leon*); *State v. Ringer,* 674 P.2d 1240, 1247–49 (Wash. 1983) (en banc) (insisting on warrant preference), *overruled in part on other grounds by State v. Stroud,* 720 P.2d 436, 440–41 (Wash. 1986) (en banc), *overruled in part by State v.*

*Valdez*, 224 P.3d 751, 759 (Wash. 2009) (en banc). The Washington conceptual approach to search and seizure is thus similar to that in Iowa.

The Washington Supreme Court declined to follow *Whren* under the state constitution in *Ladson*, 979 P.2d at 836. The issue in that case was "whether pretextual traffic stops violate article I, section 7 of the Washington Constitution."[20] *Id.* In pre-*Whren* cases, the Washington Supreme Court had declared that police could not lawfully engage in pretextual arrests or searches. *State v. Michaels*, 374 P.2d 989, 992 (Wash. 1962) (en banc) ("An arrest may not be used as a pretext to search for evidence."), *abrogated in part on other grounds by Ringer*, 674 P.2d at 1248, *as recognized in State v. Snapp*, 275 P.3d 289, 296–97 (Wash. 2012) (en banc); *see also State v. Montague*, 438 P.2d 571, 574 (Wash. 1968) (rejecting the use of impoundment "as a device and pretext for making a general exploratory search of the car without a search warrant").

In *Ladson*, the Washington Supreme Court framed the issue of pretext as follows:

> [T]he problem with a pretextual traffic stop is that it is a search or seizure which cannot be constitutionally justified for its true reason (i.e., speculative criminal investigation), but only for some other reason (i.e., to enforce traffic code) which is at once lawfully sufficient but not the real reason. Pretext is therefore a triumph of form over substance; a triumph of expediency at the expense of reason.

979 P.2d at 838. The Washington Supreme Court rejected the teaching of *Whren* and instead held that pretextual stops violate article I, section 7 of the Washington Constitution. *Id.* at 842. In determining whether a stop is pretextual, the *Ladson* court held that the state must show, both subjectively and objectively, the traffic stop was not pretextual. *Id.* at 843.

---

[20]Article I, section 7 of the Washington Constitution provides, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." Wash. Const. art. I, § 7.

In the subsequent case of *State v. Arreola*, 290 P.3d 983, 986 (Wash. 2012) (en banc), the Washington Supreme Court held that a traffic stop with mixed motives was not pretextual as long as the motive to stop for the traffic infraction was an "actual, conscious, and independent cause" of the stop. Under *Arreola,* the question was whether the officer would have conducted the traffic stop regardless of the illegitimate reason or motivation. *Id.* at 991–92. According to *Arreola,* analysis of the pretext issue still requires consideration of both subjective intent and objective factors. *Id.* at 992. The presence of a legally inadequate motivation, however, does not affect the validity of the stop if the stop would have been made independently. *Id.*

A Delaware court also declined to follow *Whren* under its state constitution in *State v. Heath*, 929 A.2d 390, 402 (Del. Super. Ct. 2006). In *Heath,* the court considered the validity of a stop for a minor traffic violation that occurred in the course of a drug investigation. *Id.* at 394–96. The *Heath* court noted that "studies conducted on a stretch of [the interstate highway] between Baltimore and Delaware demonstrate that 93% of all drivers were observed committing some type of traffic violation." *Id.* at 398. In light of the pervasiveness of traffic violations, the *Heath* court reasoned that allowing an officer to search for evidence based on a mere hunch of an unrelated crime by executing a traffic stop amounted to "a general warrant to search and seize virtually all travelers on the roads of this State." *Id.* at 402.

As a result, the *Heath* court declined to follow *Whren* under article I, section 6 of the Delaware Constitution. *Id.* Instead, the Delaware court developed a three-step approach to determining whether a stop was lawful. First, the state has the burden of showing a reasonable basis to effectuate the stop based on a traffic violation. *Id.* at 402–03. If the state meets its

initial burden, the burden shifts to the defendant to show that the real reason for the stop was an unrelated purpose for which there was no probable cause or reasonable suspicion. *Id.* at 403. In order to meet the burden on this second step, the defendant needs to show that

> (1) he was stopped only for a traffic violation; (2) he was later arrested for and charged with a crime unrelated to the stop; (3) the crime or evidence of the crime was discovered as a result of the stop; (4) the traffic stop was merely a pretextual purpose, alleging that the officer had a hunch about, or suspected the defendant of, a non-traffic related offense *unsupported* by reasonable suspicion; and (5) the pretext can be inferred, at least, when the suppression hearing evidence is presented.

*Id.* A nonexclusive list of evidence that might be offered by the defendant to meet the burden on this second step includes

> (1) evidence of the arresting officer's non-compliance with written police regulations; (2) evidence of the abnormal nature of the traffic stop; (3) testimony of the arresting officer that his reason for the stop was pretextual; (4) evidence that the officer's typical employment duties do not include traffic stops; (5) evidence that the officer was driving an unmarked car or was not in uniform; and (6) evidence that the stop was unnecessary for the protection of traffic safety.

*Id.*

If the defendant meets his or her burden in this second step, a presumption of pretext arises. *Id.* In the third step, however, the state may demonstrate that a non-pretextual reason existed for stop. *Id.* Applying the three-step test, the *Heath* court concluded that the stop involved in that case was pretextual, and as a result, evidence of intoxicated driving was suppressed.[21] *Id.* at 404–06.

---

[21]In *Turner v. State*, 25 A.3d 774, 777 (Del. 2011), the Delaware Supreme Court declined to consider the constitutionality of a pretextual search under the Delaware Constitution as the claim was not properly preserved. The Supreme Court stated, without citation, that other superior courts had not followed *Heath*. *Id.* It also cited its "criteria" approach to independent state constitutional adjudication, which limits the court's ability to depart from federal precedent in its interpretation of the state constitution. *Id.* The

I next turn to New Mexico. Like Washington, New Mexico adheres to the warrant-preference approach to search and seizure under its state constitution and rejects *Leon. Campos v. State*, 870 P.2d 117, 121 (N.M. 1994) (stressing warrant preference); *State v. Gutierrez*, 863 P.2d 1052, 1053 (N.M. 1993) (rejecting *Leon*).

The New Mexico Court of Appeals has also declined to follow *Whren.* In *State v. Ochoa*, the New Mexico court considered the validity of a pretextual traffic stop under Article II, section 10 of the New Mexico Constitution. 206 P.3d 143, 146 (N.M. Ct. App.), *cert. granted*, 203 P.3d 103, 103 (N.M. 2008), *cert. quashed*, 225 P.3d 794, 794 (N.M. 2009); *see also Schuster v. State Dep't of Taxation & Revenue, Motor Vehicle Div.*, 283 P.3d 288, 297 (N.M. 2012) (discussing *Ochoa* with approval); *State v. Gonzales*, 257 P.3d 894, 897–98 (N.M. 2011) (same). The *Ochoa* court found the reasoning in *Whren* faulty. 206 P.3d at 148–51. Specifically, the court reasoned that because of the ubiquity of driving and the commonplace nature of traffic stops, probable cause and reasonable suspicion standards are not sufficient to limit police discretion in the enforcement of traffic standards. *Id.* at 150. The court also rejected the notion that the Equal Protection Clause of the Federal Constitution affords an adequate remedy, noting that prominent legal scholars had concluded that remedy faces nearly insurmountable barriers. *Id.* at 150–51. In any event, the court noted that reliance on the Equal Protection Clause would allow pretextual searches based on improper motives other than race. *Id.* at 151.

In order to determine the issue of pretext, the New Mexico court stated that "courts should consider the totality of the circumstances, judge

---

Delaware Supreme Court does not follow *Leon*, 468 U.S. at 913, 104 S. Ct. at 3415, under its state constitution. *Dorsey v. State*, 761 A.2d 807, 818–21 (Del. 2000).

the credibility of witnesses, weigh the evidence, make a decision, and exclude the evidence if the stop was unreasonable at its inception." *Id.* at 155.

3. *Iowa's response to* Whren. After *Whren*, we decided *Cline*, 617 N.W.2d 277. In *Cline*, we stated that in determining whether a stop was supported by probable cause, the officer's stated reasons did not bind the State. *Id.* at 280–81. Instead, relying in part on *Whren*, we stated that whether or not probable cause existed for a search was determined by an objective standard. *Id.*

The issue in *Cline,* however, was not whether the initial stop was pretextual and designed to permit a search for which there was no constitutionally sufficient basis. This issue of pretext was not raised by the parties in briefing and was not decided. Further, the briefing nowhere suggests that the Iowa Constitution should be interpreted in a fashion different from the federal counterpart on this issue. Thus, the question of whether we should depart from *Whren* in the context of pretextual searches was not before the court and not decided. Instead, we simply held that when applying a *Terry*-type test to determine the validity of the initial seizure, the analysis was objective in nature. *See id.*

Two years later, we decided *State v. Kreps*, 650 N.W.2d 636 (Iowa 2002). As in *Cline*, the issue was the validity of the initial investigative stop. *Id.* at 640. Also as in *Cline*, the parties did not raise the issue of whether to depart from federal standards in interpreting the Iowa Constitution. Indeed, in his brief, Kreps simply conceded that the standard for evaluating the lawfulness of the initial stop was an objective one. Appellee's Brief & Argument & Conditional Notice for Oral Argument at 6, *Kreps*, 650 N.W.2d 636 (No. 01-0571), 2001 WL 35712937, at *6 ("The constitutional reasonableness of a search or seizure is determined by an

objective standard."). Nowhere in *Kreps* does the defendant suggest that a different standard should be applied under article I, section 8 of the Iowa Constitution than is applied by the federal courts under the Fourth Amendment. The issue of a separate standard under the Iowa Constitution was not raised and was not briefed. An uncontested and summarily discussed issue is not entitled to stare decisis. *See Haskenhoff v. Homeland Energy Sols., LLC*, 897 N.W.2d 553, 615 (Iowa 2017) (Appel, J., concurring in part and dissenting in part) ("An uncontested statement of law is not entitled to stare decisis."); *see also United States v. Hemingway*, 734 F.3d 323, 335 (4th Cir. 2013) (holding that uncontested and summarily addressed issue in prior case was not controlling precedent).

In *State v. Griffin*, 691 N.W.2d 734, 735–36 (Iowa 2005), we did consider an arrest pursuant to a minor traffic incident. In *Griffin*, the defendant did not preserve the claim that the Iowa Constitution should be interpreted differently than its federal counterpart by failing to raise the issue in the district court. *Id.* To raise the claim on appeal, the defendant briefly asserted prior ineffective assistance of counsel. Appellant's Brief & Argument & Request for Oral Argument at 6, *Griffin*, 691 N.W.2d 734 (No. 03-1321), 2004 WL 3777646, at *6.

In a conclusory opinion, we noted that because of the nearly identical federal and state search and seizure provisions, "the construction of the federal constitution is persuasive in our interpretation of the state provision." *Griffin*, 691 N.W.2d at 737. We did not provide any discussion of potential alternative interpretations. We stated that we had not found a basis to distinguish the protections afforded by the Iowa Constitution from the federal caselaw. *Id.* The conclusory ruling in *Griffin* appears to

rely upon a presumption that we should generally follow federal law, *id.*, a presumption we specifically overturned in *Ochoa*, 792 N.W.2d at 267.

Notably in *Griffin*, however, we did not mention let alone overrule *Cooley*, 229 N.W.2d at 759. Computer-based research has no cautionary red flags on *Cooley*. Perhaps the *Griffin* court thought the arrest in *Griffin* was different than the search in *Cooley*. If *Griffin* intended to overrule *Cooley*, it certainly would have said so. Unless we are mind readers, we cannot regard the *Griffin* court as thoughtfully overruling a precedent in a different context about a case it did not mention.

In *State v. Predka*, 555 N.W.2d 202 (Iowa 1996), there is not one word about the search and seizure provisions of article I, section 8 of the Iowa Constitution. That is, perhaps, because the issue was not raised in the defendant's brief. *See* Defendant–Appellant's Brief & Argument, *Predka*, 555 N.W.2d 202 (No. 95-1045), 1996 WL 34360016. According to the *Predka* court, "The district court correctly concluded the stop was not in violation of Predka's Fourth Amendment rights." 555 N.W.2d at 206. A case where article I, section 8 of the Iowa Constitution has not been raised or discussed does not bind us through stare decisis from revisiting the validity of pretextual stops under the state constitution. *See Haskenhoff*, 897 N.W.2d at 614–15 (collecting cases).

In *State v. Nitcher*, 720 N.W.2d 547, 549–51 (Iowa 2006), we considered whether the police had probable cause coupled with exigent circumstances to support a search of a home that police suspected was involved in drug manufacturing. In considering the issue, we noted that the question of probable cause and exigent circumstances should be determined on an objective basis. *Id.* at 554. We noted that Nitcher had not asked us to distinguish the Iowa Constitution from the Federal

Constitution. *Id.* at 553. Therefore, the issue of whether we should depart from the federal approach was not presented by the parties.

Finally, in *Harrison*, 846 N.W.2d at 363, we considered a traffic stop where a license plate frame covered the county name. Iowa Code section 321.37(3) (2009) made it unlawful to place a frame over the registration plate which did not give a full view of all "numerals and letters." The question in *Harrison* was whether the obstruction of the county name amounted to an infraction under the statute. 846 N.W.2d at 363. No issue of pretext was presented in the case and there was no holding based upon it. See *id.* at 364 n.1 ("The parties did not raise on appeal the issue of whether a pretextual traffic stop is valid. We therefore do not reach that issue."). There is no holding in *Harrison* that is relevant for the resolution of this case.

In any event, if we insisted on blinkered application of stare decisis, cases like *Brown v. Board of Education*, 347 U.S. at 488, 74 S. Ct. at 688, and *Gideon v. Wainwright*, 372 U.S. 335, 337–38, 83 S. Ct. 792, 793 (1963), would have been decided differently. "[I]f precedent is to have any value it must be based on a convincing rationale." *Cline*, 617 N.W.2d at 285 (quoting *James*, 393 N.W.2d at 472); *see Vance*, 790 N.W.2d at 789. None of the Iowa cases that follow *Whren* even attempt to offer a convincing rationale but offer only naked conclusions. And a cut-and-paste job that simply declares another jurisdiction has followed a certain approach and inserts that approach into Iowa law is not a convincing rationale. *See Collins v. Day*, 644 N.E.2d 72, 75 (Ind. 1994) (explaining that past reliance on federal caselaw in construing an Indiana constitutional provision does not preclude formulation of an independent standard for analyzing state constitutional claims under the provision); Jack L. Landau, *Some Thoughts About State Constitutional Interpretation,* 115 Penn. St. L. Rev. 837, 871

(2011) ("A prior decision . . . that merely assumes without any analysis that a state individual rights provision has the same meaning that the federal courts have given its parallel provision in the federal Bill of Rights should have no particular binding effect.").

**VI. Application of Iowa Constitutional Principles to Pretextual Searches.**

**A. Problems with *Whren*.**

1. *Lack of understanding of historical context of Fourth Amendment and subsequent caselaw.* Remarkably, *Whren* contains no discussion at all about the history or function of the Fourth Amendment. There is not a word regarding the revolutionary generation's deeply held concern about general warrants and open-ended government authority to engage in search and seizure. One will find no citation to the "briny irreverence" of the colonist toward the arbitrary exercise of government power. Burger, 14 Am. U. L. Rev. at 4 (quoting Cahn at 24). The admonitions of Judge Pratt and Mercy Otis Warren about the exercise of general discretionary power to engage in unfettered search and seizure are ignored. *See Entick*, 95 Eng. Rep. at 818; 2 Wils. K.B. at 292; Finkelman, 16 S. Ill. U. L.J. at 392. The important constitutional role of the Fourth Amendment—to restrain wide-open discretion of government officials to stop any car on the open road—is not analyzed under the facts of the case.

Instead, *Whren* simply skipped the lessons of history and omitted any consideration of the structural role of the Fourth Amendment in limiting law enforcement discretion. *Whren* speed skated to its conclusion, namely, that the Court's prior caselaw foreclosed any conclusion that pretextual traffic stops might offend the Fourth Amendment. *See* 517 U.S. at 812–13, 116 S. Ct. at 1774. The opinion is on authority, not reason.

But *Whren*'s demand of obedience to the Court's authority was off the mark.

For instance, the *Whren* opinion relies heavily on the *Scott* case. *See id.* at 813, 116 S. Ct. at 1774. The *Scott* case, however, did not involve a question of pretext at all but only a question of whether law enforcement complied with a statutory directive to minimize intercepted communications. 436 U.S. at 130, 98 S. Ct. at 1719–20. And *Scott* did not involve pretextual actions but only subjective thoughts that had nothing to do with the holding of the case. *Id.* at 136–37, 98 S. Ct. at 1723. No binding ruling there on the question presented in *Whren.*

Another case relied upon in *Whren* was *Robinson. Whren*, 517 U.S. at 812–13, 116 S. Ct. at 1774. The *Whren* opinion characterized *Robinson* as holding that a "traffic-violation arrest . . . would not be rendered invalid by the fact that it was 'a mere pretext for a narcotics search.' " *Id.* (quoting *Robinson*, 414 U.S. at 221 n.1, 94 S. Ct. at 470 n.1). But the *Robinson* footnote cited in *Whren* did not present a holding at all but only a statement of the government's position in the matter. *Robinson,* 414 U.S. at 221 n.1, 94 S. Ct. at 470 n.1. Indeed, a careful reading of the footnote reveals that the pretextual argument was abandoned in the Supreme Court. *Id.* Further, as Professor Wayne R. LaFave points out, the custodial arrest in *Robinson* "was not a departure from established police department practice." 1 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 1.4(f), at 182 (5th ed. 2012) [hereinafter LaFave, *Search & Seizure*] (quoting *Robinson*, 414 U.S. at 221 n.1, 94 S. Ct. at 470 n.1). *Robinson* "leave[s] for another day questions which would arise on facts different from these." 414 U.S. at 221 n.1, 94 S. Ct. at 470 n.1.

The *Whren* Court also relied upon *Gustafson. Whren*, 517 U.S. at 813, 116 S. Ct. at 1774. In *Gustafson,* however, "the petitioner . . . fully

conceded the constitutional validity of his custodial arrest." 414 U.S. at 267, 94 S. Ct. at 492 (Stewart, J., concurring). The Supreme Court does not decide issues abandoned by the parties.

Another case relied upon was *Villamonte-Marquez*. *Whren*, 517 U.S. at 812, 116 S. Ct. at 1774. That case relied heavily on the need to protect our nation's borders. *See Villamonte-Marquez*, 462 U.S. at 588–89, 103 S. Ct. at 2579–80. Unlike our cars and homes, there is small expectation of privacy at border locations under United States Supreme Court precedent. *See id.* In any event, the case did not involve an allegation of pretext but instead involved the construction of a statute. *Id.* at 580–81, 103 S. Ct. at 2575.

In sum, the appeal to authority in *Whren* fails. That is not to say, of course, that the Supreme Court's caselaw required the question be resolved in Whren's favor. But what the case required was a thoughtful review of the purposes of the Fourth Amendment, a balanced review of the caselaw, and a careful application of legal principles to the facts at hand. That simply did not happen in *Whren*.

2. *The pervasiveness of automobile regulation makes unregulated government authority to conduct traffic stops the equivalent of a general warrant.* Ordinarily, the requirement of probable cause or reasonable suspicion serves as a check on arbitrary search and seizure. This particularized protection against arbitrariness, however, is absent in the context of automobile regulation. As has been recognized by many authorities, just about any motorist who police follow for any distance will commit some kind of minor traffic violation that could be used as a springboard for a pretextual stop.

As has been noted in the commentary, "If several, or in the case of traffic offenses, most, persons are committing the same offense and

practical realities preclude an officer from stopping them all, then probable cause does not meaningfully limit an officer's discretion."  Wesley MacNeil Oliver, *With an Evil Eye and an Unequal Hand: Pretextual Stops and Doctrinal Remedies to Racial Profiling*, 74 Tul. L. Rev. 1409, 1414 (2000) [hereinafter Oliver].  Professor LaFave is particularly critical:

> [G]iven the pervasiveness of such minor offenses and the ease with which law enforcement agents may uncover them in the conduct of virtually everyone, [the requirement of a traffic violation to conduct a stop] hardly matters, for . . . there exists "a power that places the liberty of every man in the hands of every petty officer," precisely the kind of arbitrary authority that gave rise to the Fourth Amendment.

LaFave, *Search and Seizure* § 1.4(e), at 173 (quoting John Adams, Abstract of the Argument, *in* 2 *Legal Papers of John Adams* 134, 141–42 (L. Kinvin Worth & Hiller B. Zobel eds.,1965)).

The cases demonstrate that LaFave is right.  The cases reveal pretextual stops for minor violations, such as driving sixty-eight miles per hour in a sixty-five miles per hour zone, *United States v. Navarro-Camacho*, 186 F.3d 701, 703, 705 (6th Cir. 1999), displaying a bent but readable license plate on the back of a boat trailer, *Kehoe*, 521 So. 2d at 1095, failing to signal while changing lanes, *Scopo*, 19 F.3d at 779–80, driving with an apparently defective windshield wiper when it was not raining, *State v. Daniel*, 665 So. 2d 1040, 1041, 1046 & n.7 (Fla. 1995), *overruled on other grounds by Holland v. State*, 696 So. 2d 757, 759 (Fla. 1997), displaying a license plate with the state name and motto partially obscured, *United States v. Contreras-Trevino*, 448 F.3d 821, 824–25 (5th Cir. 2006), driving with a turn signal activated and not turning after the first three opportunities to do so, *People v. Haywood*, 944 N.E.2d 846, 849–50 (Ill. App. Ct. 2011), and driving once over a fog line "by approximately eight inches for about five seconds," *Dods v. State*, 240 P.3d

1208, 1209 (Wyo. 2010). Indeed, there is caselaw suggesting that driving in complete compliance with traffic regulations is so unusual that officers consider it suspicious and a factor in a drug-courier profile. *Smith*, 799 F.2d at 707–08.

In Iowa, the traffic code is pervasive. Iowa Code chapter 321 (2016), entitled "Motor Vehicles and Law of the Road," consists of 245 pages of regulations, not including the table of contents. Traffic stops may be made for countless minor offenses that call for the exercise of discretion, such as driving with a license plate that is not "free from foreign materials," like dirt, *id.* § 321.38; careless driving, including causing a vehicle "to unnecessarily turn abruptly or sway," *id.* § 321.277A(4); driving at a speed "greater than []or less than is reasonable and proper," *id.* § 321.285(1), or at a speed that "impede[s] or block[s] the normal and reasonable movement of traffic," *id.* § 321.294; not driving a vehicle "as nearly as practical entirely within a single lane" on a multilane highway, *id.* § 321.306(1); and "follow[ing] another vehicle more closely than is reasonable and prudent," *id.* § 321.307. And aside from the regulations cited above, of course, police may make seizures for minor violations of the speed limit, for rolling stops, or for a myriad of minor equipment violations. *See, e.g., Harrison*, 846 N.W.2d at 368–69 (upholding stop for a license plate cover that obscured the county name even though the letters and numerals on the plate, which could be used to run a vehicle check, were unobstructed).

If it is true that every motorist is subject to a pretextual stop, the unfettered authority to engage in traffic stops is the equivalent of the hated general warrant that animates our search and seizure law. A general warrant authorized law enforcement to engage in wide-open, discretionary stops without particularized reasons for conducting the stop. *See, e.g.,* Oliver, 74 Tul. L. Rev. at 1411–12 ("The Fourth Amendment's historical

background clearly demonstrates a fear of the discretion of the official in the field, at that time embodied in general warrants that empowered an officer to search wherever he chose for evidence of a crime."). The Supreme Court in *Whren* simply did not recognize the pervasiveness of regulation nor the striking similarity of traffic stops to a general warrant in light of that pervasiveness. *See id.* at 1412.

The *Whren* Court seemed to think that probable cause that a traffic infraction had occurred was sufficient to cabin law enforcement discretion in the context of traffic stops. *See* 517 U.S. at 817–18, 116 S. Ct. at 1776–77. Often, a particularized showing can be a significant restraint. But in the context of pervasive traffic violations, it is no restraint at all. Reliance on probable cause that a traffic violation occurred, in essence, gives law enforcement officers carte blanche to engage in traffic stops based on their own whims, prejudices, or implicit biases.

Further, the Supreme Court in *Whren* did not recognize the role of search and seizure law, not only in ensuring government action is justified, but also in ensuring that government action is not *arbitrary*. The Court seemed oblivious to the history of search and seizure and the declarations of Judge Pratt in *Entick* and of Mercy Otis Warren during the ratification debate in America of the need to control arbitrary searches where large bodies of the population are subject to them. *See Entick*, 95 Eng. Rep. at 818; 2 Wils. K.B. at 292; Finkelman, 16 S. Ill. U. L.J. at 392. Judge Pratt and Mercy Otis Warren would find the approach in *Whren* quite disturbing.

3. *Lack of analysis on the methods of controlling pretextual stops.* The Supreme Court in *Whren* did not seriously analyze the potential methods of regulating pretextual stops. For instance, for twenty-five years after *Cooley*, 229 N.W.2d at 759, we employed a subjective approach to the problem of pretext. *Wiese*, 525 N.W.2d at 415; *Rosenstiel*, 473 N.W.2d at

61; *Bailey*, 452 N.W.2d at 182; *Lamp*, 322 N.W.2d at 51; *Aschenbrenner*, 289 N.W.2d at 619. In evaluating challenges to stops under *Cooley*, trial court judges did what they do every day, namely, found the facts based on the evidence and inferences that may be drawn from it. It is true, perhaps, that some prior Supreme Court precedent frowned on a subjective approach, but those precedents, then, may be flawed too. *See, e.g.*, *Scott*, 436 U.S. at 138, 98 S. Ct. at 1723; *Painten*, 389 U.S. at 565, 88 S. Ct. at 663. As Oliver Wendell Holmes once observed, "If justice requires the fact to be ascertained, the difficulty of doing so is no ground for refusing to try." O.W. Holmes, Jr., *The Common Law* 48 (Bos., Little, Brown & Co. 1881). *See generally* Dix, 76 Miss. L.J. at 477–81 (arguing that Fourth Amendment standards should contain a subjective component).

In reality, fact finders engage in subjective inquiries in many areas of our law. Motive is key in countless areas of law that require a determination of mens rea or bad faith. For example, motive is an important part of status-based discrimination and retaliation law under the Iowa Civil Rights Act, Iowa Code chapter 216. *See Haskenhoff*, 897 N.W.2d at 633–34 (majority opinion of Appel, J., which was joined by Chief Justice Cady, and Justices Wiggins and Hecht). In *State v. Kern*, 831 N.W.2d 149, 171–72 (Iowa 2013), we held that any special needs exception to the warrant requirement was not available because the purpose of the search was investigative in nature. And in *State v. Coffman*, 914 N.W.2d 240, 257 (Iowa 2018), we held that in order to invoke the community caretaking exception, the State must show that the officer both objectively and subjectively "intended to engage in community caretaking."

Federal law also considers subjective purpose in many contexts. Under *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S. Ct. 2674, 2676 (1978), police officers commit a constitutional violation if they knowingly

or "with reckless disregard for the truth" falsely support a warrant application. And under *Massiah v. United States*, 377 U.S. 201, 206, 84 S. Ct. 1199, 1203 (1964), courts inquire into whether the law enforcement officer "deliberately elicited" information from the accused. Courts inquire into "the purpose and flagrancy of the official misconduct," among other things, when "determining whether a confession is obtained by exploitation of an illegal arrest." *Brown v. Illinois*, 422 U.S. 590, 603–04, 95 S. Ct. 2254, 2261–62 (1975). Additionally, a roadside checkpoint is permitted under *City of Indianapolis v. Edmond*, 531 U.S. 32, 40–42, 121 S. Ct. 447, 453–54 (2000), only if the city's purpose is distinguishable from its general interest in crime control.

Further, the approach in *Whren* is inconsistent with the Supreme Court's inventory and administrative search cases. In the context of inventory and administrative search cases, government agents' exercise of discretion to conduct a search is not controlled by a requirement of particularity. *See Burger*, 482 U.S. at 702, 107 S. Ct. at 2643–44; *Bertine*, 479 U.S. at 371, 107 S. Ct. at 741. Because of the lack of control of discretion in inventory and administrative search cases by a particularity requirement, the Supreme Court has permitted inquiry into the purpose of the government action in order to prevent pretextual use of the inventory and administrative search doctrines. *See Burger*, 482 U.S. at 702–03, 107 S. Ct. at 2643–44; *Bertine*, 479 U.S. at 372–73, 107 S. Ct. at 741–42.

Just as the inventory and administrative searches are not controlled by a particularity requirement, the same is true in the context of a routine traffic stop. Because of the ubiquity of traffic violations, any requirement of particularity does not provide a meaningful control on the exercise of government discretion. Law enforcement can stop any driver on the road by tailing him or her for a few blocks. As a result, particularity provides

no check on unfettered discretion to perform a traffic stop. Thus, as in the inventory and administrative search cases, a further check is required, namely, some kind of inquiry into the purpose of the government action. When placed in the proper Fourth Amendment context—i.e., ensuring proper limitations on unfettered government discretion—*Whren* is inconsistent with *Bertine* and *Burger*.

Even if pure inquiry into subjective intent is disfavored, the alternative "would have" test that was proposed in *Whren* is largely an objective test. From a methodological standpoint, it is virtually identical to the test articulated in *Terry*, 392 U.S. at 21–24, 88 S. Ct. at 1879–81, for determining the lawfulness of an investigatory stop. A "would have" approach to pretextual stops would be no more unworkable than the *Terry* test, which has been with us for decades. The simple question is whether, under all the facts and circumstances, the stop would have occurred even without the pretextual motivation. The exercise would be strikingly similar to the application of the independent source exception to the exclusionary rule.

While the approach I advocate is said to be unworkable, the trend in the states prior to *Whren* was moving toward permitting challenges to pretextual searches. *See, e.g., Mings*, 884 S.W.2d at 602; *Kehoe*, 521 So. 2d at 1097; *Mendoza*, 599 N.E.2d at 1383; *Izzo*, 623 A.2d at 1280; *Thanner*, 611 A.2d at 1032; *Hoven*, 269 N.W.2d at 852–53; *Van Ackeren*, 495 N.W.2d at 642–45; *Alejandre*, 903 P.2d at 796; *James*, 630 N.Y.S.2d at 176–77; *Hawley*, 540 N.W.2d at 392–93; *Spencer*, 600 N.E.2d at 337; *Chapin*, 879 P.2d at 303–05. Our caselaw was part of that trend. For more than two decades after *Cooley*, 229 N.W.2d at 759, we clearly held to the view that pretextual searches were unlawful. *See Wiese*, 525 N.W.2d at 415; *Rosenstiel*, 473 N.W.2d at 61; *Bailey*, 452 N.W.2d at 182; *Lamp*,

322 N.W.2d at 51; *Aschenbrenner*, 289 N.W.2d at 619. The emerging trend in the states, of which we were a part, would not have occurred if judicial review of pretextual searches was unworkable.

In any event, the pragmatic policy considerations offered by followers of *Whren*, strikingly, do not include the constitutionally based policy of prohibiting the generalized exercise of discretion by police officers in conducting searches and seizure. Generalized authority to search is anathema to search and seizure law. The very purpose of search and seizure law is to cabin discretion of law enforcement. According to Chief Justice Burger, search and seizure law was based on "a sort of briny irreverence toward officials." Burger, 14 Am. U. L. Rev. at 4 (quoting Cahn at 24). Where is the "briny irreverence" in the opinions of the court in this case toward the exercise of government power to search and seize? To claim that cabining generalized discretion in the hands of law enforcement is inconvenient is to overrule the constitutional principles embraced in search and seizure law in the name of contemporary policy.

4. *Giving short shrift to the problem of racial profiling.* The impact on our population of racial profiling in our criminal justice system should not be ignored. As noted by the Ninth Circuit in *United States v. Montero-Camargo*,

> Stops based on race or ethnic appearance send the underlying message to all our citizens that those who are not white are judged by the color of their skin alone. Such stops also send a clear message that those who are not white enjoy a lesser degree of constitutional protection—that they are in effect assumed to be potential criminals first and individuals second.

208 F.3d 1122, 1135 (9th Cir. 2000) (en banc); *see also United States v. Weaver*, 966 F.2d 391, 397 (8th Cir. 1992) (Arnold, C.J., dissenting)

("When public officials begin to regard large groups of citizens as presumptively criminal, this country is in a perilous situation indeed.").

*Whren*'s impact with respect to racial profiling claims in the context of routine traffic stops under the Fourth Amendment is clear: there is no protection. As noted by two leading scholars, "*Whren v. United States* is notorious for its effective legitimation of racial profiling in the United States." Gabriel J. Chin & Charles J. Vernon, *Reasonable but Unconstitutional: Racial Profiling and the Radical Objectivity of* Whren v. United States, 83 Geo. Wash. L. Rev. 882, 884 (2015) [hereinafter Chin & Vernon] (footnote omitted).

5. *Inadequate analysis of potential equal protection claims.* The *Whren* opinion briefly addresses the concern about racial discrimination. According to *Whren,* the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment. 517 U.S. at 813, 116 S. Ct. at 1774.

The referral of defendants challenging pretextual traffic stops to the Equal Protection Clause is rich in irony. The Supreme Court in *Whren* rejected inquiry into the subjective state of mind of a police officer under the Fourth Amendment. *Id.* Yet it suggested that defendants alleging racial profiling might seek an equal protection remedy. *Id.* Under the applicable federal law, a criminal defendant seeking to establish an equal protection violation has the burden of showing racial animus. *Washington v. Davis,* 426 U.S. 229, 239–42, 96 S. Ct. 2040, 2047–49 (1976). So, in other words, law enforcement is freed from a Fourth Amendment inquiry into subjective intent because of the difficulties of proof, but criminal defendants are shackled with that very difficulty in seeking to prove an equal protection claim. Further, the requirement of invidious

discrimination in equal protection claims would likely prevent a claim of pretext based on implicit bias.

There are other problems. It is unclear that the exclusionary rule applies to equal protection violations. *See United States v. Armstrong*, 517 U.S. 456, 461 n.2, 116 S. Ct. 1480, 1484 n.2 (1996); Brooks Holland, *Safeguarding Equal Protection Rights: The Search for an Exclusionary Rule Under the Equal Protection Clause*, 37 Am. Crim. L. Rev. 1107, 1110 (2000) ("[N]either in *Whren* nor elsewhere has the Supreme Court clarified whether a defendant may seek the exclusion of evidence in a criminal proceeding as a remedy under the Equal Protection Clause.").

In addition, an individual defendant in a pretextual traffic stop simply does not ordinarily have the resources to conduct elaborate statistical studies to show the existence of racial profiling. Generally, motions to suppress are handled on relatively short notice and with limited discovery. The resolution of a suppression motion is not usually delayed while data is gathered and statistically analyzed, particularly where the defendant is in jail pending trial. Indigent defendants will not be able to afford an expert, and district courts may bray when faced with a costly application for approval of an expert in support of a motion to suppress. Further, some courts considering equal protection challenges to traffic stops have required statistical evidence of the specific locality where the stop occurred. *See, e.g.*, *Chavez v. Ill. State Police*, 251 F.3d 612, 643–45 (7th Cir. 2001) (holding statistical evidence was insufficient because it was statewide not local); *Lee v. City of South Charleston*, 668 F. Supp. 2d 763, 776 (S.D. W. Va. 2009) (noting evidence of disparate treatment by state police throughout state, county, and city but no evidence of disparate treatment by municipal officers employed by the particular city). Meeting such a requirement in the context of a motion to suppress would be

difficult. And even if a relevant pattern and practice of discriminatory conduct can be shown, this might not be sufficient to establish discrimination in a particular case, at least under federal law. *See McCleskey v. Kemp*, 481 U.S. 279, 297–99, 107 S. Ct. 1756, 1769–70 (1987).[22]

While an equal protection claim in a motion to suppress could be based on direct evidence of racial discrimination, such an approach will rarely occur because few police officers will overtly confess to racial bias. As noted by commentators, Bull Conner is gone. *See* Frank R. Baumgartner et al., *Suspect Citizens: What 20 Million Traffic Stops Tell Us About Policing and Race* 20 (2018). In short, an equal protection claim based upon a pretextual investigatory stop is not a very good candidate for resolution in the context of a motion to suppress.

In any event, the real problem may not only be a few bad apples in law enforcement or a pattern of intentional misconduct. As noted by a recent Kansas study, the problem of disproportionality in traffic stops is not caused by individual decisions in isolation but is, instead, a result of

---

[22]The discriminatory intent requirement has been subject to criticism. *See* Theodore Eisenberg & Sheri Lynn Johnson, *The Effects of Intent: Do We Know How Legal Standards Work?*, 76 Cornell L. Rev. 1151, 1152 (1991); R.A. Lenhardt, *Understanding the Mark: Race, Stigma, and Equality in Context*, 79 N.Y.U. L. Rev. 803, 808–09, 877–78 (2004); Girardeau A. Spann, *Disparate Impact*, 98 Geo. L.J. 1133, 1135–36 (2010).

In addition, the International Convention on the Elimination of All Forms of Racial Discrimination (ICERD) was ratified by the United States in 1994. *See* International Convention on the Elimination of All Forms of Racial Discrimination, *opened for signature* Dec. 21, 1965, 660 U.N.T.S. 195 (ratified by U.S. Oct. 21, 1994). The ICERD prohibits discrimination "where there is an unjustifiable disparate impact on a racial or ethnic group, regardless of whether there is any intent to discriminate against that group." Torruella, 20 B.U. Pub. Int. L.J. at 194. "[W]here official policies or practices are racially discriminatory," the state has an affirmative obligation "to prevent or end the situation." *Id.* The United States joined the ICERD with a declaration stating that the treaty was not self-executing, meaning that the treaty would not afford private causes of action. *See* Jamie Fellner, *Race, Drugs, and Law Enforcement in the United States*, 20 Stan. L. & Pol'y Rev. 257, 259 (2009).

institutional practice of pretextual investigatory stops, "a deliberate, specific invention that directly contributed to the explosion in arrests and imprisonment of racial minorities." Epp et al. at 10. The authors note that "a large body of research demonstrates that most people in the contemporary United States"—including police officers, lawyers, and, yes, judges too—"cannot help but assume that racial minorities are more likely to be dangerous or engaged in criminality." *Id.* at 40. "Policies favoring proactive [pretextual] investigatory stops . . . activate departments' and officers' implicit stereotypes of which neighborhoods and which individuals are suspicious." *Id.* at 50.

Finally, an equal protection approach may not have the same across-the-board application to all arbitrary pretextual searches. A pretextual search based on racial profiling might be subject to search and seizure attack, but an equally arbitrary pretextual search of a person with curly hair would not. Celebrated criminal justice cases—including those affording counsel to indigents in the *Scottsboro* case, requiring *Miranda* warnings to those who might otherwise face the third degree, and extending Fourth Amendment protections to the states to avoid the outrageous treatment of Dollree Mapp—were motivated, at least in part, to protect African-Americans from unfair overreach by law enforcement. Yet the principles announced in these cases apply to all and not just to some.

The view in *Whren* that the Fourth Amendment and the Equal Protection Clause are hermetically sealed off from one another is theoretically unsound. A wide range of modern scholars, including Charles Black, John Hart Ely, Laurence Tribe, Akhil Reed Amar, and Vicki Jackson, "have argued against constitutional interpretation that treats clauses of the document in isolation." Paul M. Schwartz & William Michael Treanor, Eldred *and* Lochner*: Copyright Term Extension and Intellectual*

*Property as Constitutional Property*, 112 Yale L.J. 2331, 2410–11, 2410 n.407 (2003) [hereinafter Schwartz & Treanor] (collecting authorities); *see also* Richard Albert, *Constitutional Handcuffs*, 42 Ariz. St. L.J. 663, 683 (2010) [hereinafter Albert] ("To regard a constitution as a mere compilation of individual provisions, each subject to a sliding scale of worth, is to devalue the constitutional text as a document whose constituent parts must be read together to give the larger whole its full meaning.").

It is also a historically inaccurate characterization of the Court's cases. Criminal procedure rulings under other constitutional provisions, including the Fourth, Fifth, and Sixth Amendments, have been very much informed by the notion of equal citizenship for minorities. *See, e.g.*, Michael J. Klarman, *The Racial Origins of Modern Criminal Procedure*, 99 Mich. L. Rev. 48, 48 (2000). The *Whren* Court must not have gotten the memo, but the story of American criminal procedure is a story about race. *E.g.*, I. Bennett Capers, *Rethinking the Fourth Amendment: Race, Citizenship, and the Equality Principle*, 46 Harv. C.R.-C.L. L. Rev. 1, 1 (2011).

Certainly, the theoretical availability of an equal protection claim should not preempt the possibility of a claim under search and seizure principles. There is no constitutional bar to simultaneous violations of multiple constitutional provisions. *See, e.g., Loving v. Virginia*, 388 U.S. 1, 12, 87 S. Ct. 1817, 1823–24 (1967) (finding violations of both Equal Protection and Due Process Clauses in striking down miscegenation statute).

The interplay between antidiscrimination principles and constitutional concepts of search and seizure were illustrated very early in Iowa's history. In 1863, Archie P. Webb, an African-American, was employed as a laborer in Polk County. Coffin at 201. The sheriff arrested

him for violating an 1851 statute that provided, among other things, that free blacks would be required to leave the state on three days' notice. *Id.* Webb filed a petition for habeas corpus, and the matter came before Judge John Gray. *Id.* Among other rulings, Judge Gray found that the seizure of Webb by the sheriff violated article I, section 8 of the Iowa Constitution. *See id.* at 211. After citing article I, section 8, Judge Gray powerfully reasoned, "Is a law reasonable that *arrests* and imprisons a man where the only *crime charged* is that he is a *freeman* and has settled in the State of Iowa?" *Id.* Judge Gray then asked, "If this law authorizes a reasonable seizure, then what *would* be an *unreasonable* seizure?" *Id.* The case of *Webb v. Griffith* is a classic demonstration of the interplay between search and seizure law and the principles of equality.

6. *Role of implicit bias.* The *Whren* Court did not consider that disproportionate traffic stops may arise not simply from overt bias but also from unconscious bias or stereotypes. The notion of implicit bias is not very new. Nearly a decade before *Whren,* Professor Charles Lawrence wrote a seminal law review article on the role of implicit bias in law enforcement and other settings. Charles R. Lawrence III, *The Id, the Ego, and Equal Protection: Reckoning with Unconscious Racism,* 39 Stan. L. Rev. 317, 322 (1987) [hereinafter Lawrence]. Professor Lawrence raised questions about the intent requirement in an equal protection claim under *Davis,* 426 U.S. 229, 96 S. Ct. 2040. Lawrence, 39 Stan. L. Rev. at 318. According to Lawrence, the injury to racial minorities arising from acts of discrimination is not affected by the motives of the decision-maker. *See id.* at 321.

There can be no doubt that the Supreme Court was generally aware of the problem of implicit bias when it decided *Whren.* In *Batson v. Kentucky,* Justice Marshall recognized the potential role of unconscious

racism in jury selection. 476 U.S. 79, 106, 106 S. Ct. 1712, 1728 (1986) (Marshall, J., concurring). Later, in *Georgia v. McCollum*, Justices O'Connor and Thomas each recognized that unconscious racism may affect jurors' view of a minority defendant. 505 U.S. 42, 61, 112 S. Ct. 2348, 2360 (1992) (Thomas, J., concurring in the judgment); *id.* at 68, 112 S. Ct. at 2364 (O'Connor, J., dissenting). Yet the Court did not address the impact of implicit bias in *Whren.*

7. *Role of government as teacher.* In *Olmstead v. United States*, Justice Brandeis famously wrote about the role of government as teacher. 277 U.S. 438, 485, 48 S. Ct. 564, 575 (1928) (Brandeis, J., dissenting), *overruled on other grounds by Katz v. United States*, 389 U.S. 347, 352–53, 88 S. Ct. 507, 512 (1967). According to Justice Brandeis, the long-term effectiveness of the criminal justice system demands that the laws be fairly enforced. *See id.* The Supreme Court recapitulated Justice Brandeis's point in *Mapp*, warning, "Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence." 367 U.S. at 659, 81 S. Ct. at 1694.

The use of pretextual investigative stops to avoid historic constitutional restraints is hardly the kind of lesson to be taught to those who interface with the criminal justice system. A defendant who engaged in pretextual reasoning would not win plaudits from a probation or parole officer, a prison official, or a sentencing judge. Condoning pretextual seizures by law enforcement sends a clear message: The law's restrictions apply to me but not to thee. *See* Jonathan Blanks, *Thin Blue Lies: How Pretextual Stops Undermine Police Legitimacy*, 66 Case W. Res. L. Rev. 931, 932 (2016); Tom R. Tyler & Cheryl J. Wakslak, *Profiling and Police Legitimacy: Procedural Justice, Attributions of Motive, and Acceptance of*

*Police Authority*, 42 Criminology 253, 273–74, 276 (2004) [hereinafter Tyler & Wakslak].

8. *Harms caused by arbitrary seizures.* The *Whren* Court did not consider the harms that arise from arbitrary seizures of citizens on the open road. *See* 517 U.S. at 818–19, 116 S. Ct. at 1777. In considering harms, the focus is not on benefiting the particular defendant who seeks to suppress evidence but is instead on the need to protect innocent citizens generally from pretextual investigative stops. *Brinegar*, 338 U.S. at 180–82, 69 S. Ct. at 1313–14. As noted by Professor David Harris, costs of pretextual investigative stops include "*the impact on all the people innocent of any wrongdoing who are stopped, questioned and perhaps searched, and treated in many ways like suspected criminals in the effort to arrest the guilty.*" David A. Harris, Essay, *Car Wars: The Fourth Amendment's Death on the Highway*, 66 Geo. Wash. L. Rev. 556, 580 (1998).

Pretextual investigative stops of automobiles are not harmless to innocent citizens. Search and seizure law protects not only privacy of information but includes the right to be secure in one's person, papers, and effects. A person's interest in security is obviously impacted by a stop by police on the open road. Such stops are not simply minor inconveniences. They may engender "fear and surprise," *Sitz*, 496 U.S. at 452, 110 S. Ct. at 2486, as well as an "unsettling show of authority" and "substantial anxiety" in law-abiding motorists, *Prouse*, 440 U.S. at 657, 99 S. Ct. at 1398. Further, a pretextual investigative stop may give rise to fears of an escalating confrontation that African-Americans explain to their teenaged children in "the talk."

When pretextual investigative stops are made on racial minorities, the message is sent that those who are not white are second-class citizens. In the "stop and frisk" case of *Floyd v. City of New York*, 959 F. Supp. 2d

540, 557 (S.D.N.Y. 2013), testimony suggested that the stops make people "feel unwelcome in some parts of the City." Discrimination may cause "deep and lasting harm" and sends a message of racial insubordination. Epp et al. at 135. This kind of racial stigmatization drove the result in *Brown v. Board of Education*, where the court noted that segregated schools "generate[] a feeling of inferiority" among students "as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone." 347 U.S. at 494, 74 S. Ct. at 691.

Pretextual investigative stops also make people less likely to trust police. Social psychology suggests that where people believe the system is discriminatory or unfair, they support it less and view it as less legitimate. *See* Tyler & Wakslak, 42 Criminology at 273–74, 276.

There is a suggestion in another opinion in this case of a long line of policy horribles if we were to decline to permit pretextual stops. One of the asserted problems with eliminating pretextual stops is that it would undermine public confidence in our legal system. But do pretextual stops promote public confidence in our legal system? Really? Do pretextual stops promote the perception that law enforcement offers act with integrity? Who thinks that? Do pretextual stops promote public confidence among those persons who bear the brunt of many of them, namely, African-Americans? When an African-American parent gives his or her teenage child "the talk" about driving in Iowa, does anyone think that parent could credibly explain that the general authority of police to stop based on implicit bias is part of the need for "public confidence" in law enforcement? Pretextual stops arising from racial profiling permitted by *Whren* "damage[] law enforcement and the criminal justice system as a whole by undermining public confidence and trust in the police, the courts, and criminal law, and thereby undermining law enforcement

efforts and ability to solve and reduce crime."  *See* 31 R.I. Gen. Laws Ann. § 31-21.2-2(f) (West, Westlaw through Chapter 26 of the 2019 Regular Session).

9. *Summary.*  According to Professor LaFave, "The totality of the Court's analysis in *Whren* is, to put it mildly, quite disappointing."[23] LaFave, *"Routine Traffic Stop,"* 102 Mich. L. Rev. at 1859.  As noted above, the shortcomings of *Whren* are manifold.  To the extent a state court simply adopts *Whren* hook, line, and sinker into its interpretation of its own state constitution, the flaws are implicitly imported into local law.

### B.  Post-*Whren* Developments.

1. *Implicit bias.*  Since *Whren* was decided, there has been an explosion of scholarly activity focusing on the question of implicit bias.  A

---

[23]LaFave is not alone in his criticism of *Whren*.  The scholarly reaction to *Whren*, on balance, has been quite negative.  *See, e.g.*, Chin & Vernon, 83 Geo. Wash. L. Rev. at 884 ("*Whren v. United States* is notorious for its effective legitimation of racial profiling in the United States." (Footnote omitted.)); David A. Harris, Essay, *"Driving While Black" and All Other Traffic Offenses: The Supreme Court and Pretextual Traffic Stops*, 87 J. Crim. L. & Criminology 544, 582 (1997) (criticizing the increased discretion in *Whren* and stating that "[w]e are all the losers for it"); Pamela S. Karlan, *Race, Rights, and Remedies in Criminal Adjudication*, 96 Mich. L. Rev. 2001, 2005 (1998) (stating the *Whren* petitioner's fears of racial profiling from arbitrary traffic stops have proved to be well founded); Lewis R. Katz, *"Lonesome Road": Driving Without the Fourth Amendment*, 36 Seattle U. L. Rev. 1413, 1414–15 (2013) ("The protections of the Fourth Amendment on the streets and highways of America have been drastically curtailed[, and its] value of preventing arbitrary police behavior has been marginalized."); Maclin, *Race and the Fourth Amendment*, 51 Vand. L. Rev. at 392 ("If the Supreme Court is serious about protecting the Fourth Amendment interests of minority motorists, it should reverse *Whren v. United States* forthwith."); David A. Moran, *The New Fourth Amendment Vehicle Doctrine: Stop and Search Any Car at Any Time*, 47 Vill. L. Rev. 815, 821 (2002) (noting under *Whren*, police have authority to stop almost any vehicle at any time); Oliver, 74 Tul. L. Rev. at 1480 (calling for limiting discretion of police in traffic stops); Thompson, 74 N.Y.U. L. Rev. at 1012 (concluding that "the Supreme Court has distorted Fourth Amendment jurisprudence" and erred in "declaring that the subject of racial motivation is irrelevant to Fourth Amendment analysis"); Jonathan Witmer-Rich, *Arbitrary Law Enforcement Is Unreasonable: *Whren*'s Failure to Hold Police Accountable for Traffic Enforcement Policies*, 66 Case W. Res. L. Rev. 1059, 1059 & n.3 (2016) (noting that critical reaction to *Whren* has been overwhelmingly negative); Daniel B. Yeager, *The Stubbornness of Pretexts*, 40 San Diego L. Rev. 611, 617–34 (2003) (criticizing *Whren* for failing to acknowledge what counts as pretext).

robust scholarly literature has emerged demonstrating that in addition to intentional acts of discrimination, many acts of discrimination may be unconscious. *E.g.*, L. Song Richardson, *Police Efficiency and the Fourth Amendment*, 87 Ind. L.J. 1143, 1146–51 (2012) [hereinafter Richardson]. The scholarly literature is summarized in *State v. Plain*, 898 N.W.2d 801, 830–36 (Iowa 2017) (Appel, J., concurring specially).

We discussed the problem of implicit bias in *Pippen v. State*, 854 N.W.2d 1, 6–7 (Iowa 2014). In *Pippen*, Justice Waterman, in a concurring opinion, noted, "Implicit-bias theory helps explain how statistical disparities can result without intentional discrimination . . . ." *Id.* at 33 (Waterman, J., concurring specially). In short, in situations where a decision-maker has substantial discretion, the risk of unconscious bias affecting decisions is present and potentially quite powerful. There is no reason to think law enforcement, any more than farmers, teachers, lawyers, or judges, are immune from implicit bias. *See* Megan Quattlebaum, *Let's Get Real: Behavioral Realism, Implicit Bias, and the Reasonable Police Officer*, 14 Stan. J. C.R. & C.L. 1, 3–5, 10–11 (2018) [hereinafter Quattlebaum]. Our increasing understanding of implicit bias heightens the urgency for dealing in an effective way with situations where law enforcement exercises broad, unfettered general authority to affect individual liberty. *See id.* at 32–33 ("[A] Supreme Court that seeks to minimize traffic stops and searches that are unreasonable because race is used as a basis of judgments about suspicion might revisit the significant discretion it has afforded police officers through the combined effects of its decisions in *Whren, Schneckloth,* and related cases.").

Recent implicit bias studies suggest that racial disproportionality in pretextual investigatory stops may be due to an institutional mindset that allows for unregulated selection of investigative stop targets based upon

split-second decisions where implicit bias is likely to flourish. *See, e.g.,* Epp et al. at 9–14; *see also Batson*, 476 U.S. at 106–07, 106 S. Ct. at 1728 (" '[S]eat-of-the-pants instincts' may often be just another term for racial prejudice. Even if all parties approach the Court's mandate with the best of conscious intentions, that mandate requires them to confront and overcome their own racism on all levels—a challenge I doubt all of them can meet. It is worth remembering that '. . . racial and other forms of discrimination still remain a fact of life, in the administration of justice as in our society as a whole.' " (quoting *Vasquez v. Hillery*, 474 U.S. 254, 264, 106 S. Ct. 617, 624 (1986))). Search and seizure law should be fashioned to limit the risk of improper influence arising from such institutional bias.

2. *Recognition of the problem of pretextual stops.* A second feature of the landscape that has changed since *Whren* is the recognition of the pervasiveness of racial profiling. There are some decades-old empirical studies that are not encouraging. For instance, in Colorado, a study showed that even though over 400 persons were stopped on the interstate for traffic violations, not a single traffic ticket was issued. David A. Harris, Essay, *"Driving While Black" and All Other Traffic Offenses: The Supreme Court and Pretextual Traffic Stops*, 87 J. Crim. L. & Criminology 544, 568–69 (1997). Similarly, during the 1980s in Volusia County, Florida, available records show that less than 1% of those stopped actually received tickets. *Id.* at 561–63. Of the 1100 recorded stops, 70% were African-American or Hispanic even though these racial groups comprised only about 5% of the drivers in the area. *Id.* Further, studies in Connecticut, Illinois, North Carolina, and Rhode Island showed marked racial disparity in traffic stops. Guy Padula, Utah v. Strieff*: Lemonade Stands and Dragnet Policing*, 120 W. Va. L. Rev. 469, 481 n.89 (2017) [hereinafter Padula]; *see also* Baumgartner et al., *Racial Disparities in Traffic Stop Outcomes*, 9 Duke

F. for L. & Soc. Change at 24–26 (discussing studies in sixteen states); Gross and Barnes, 101 Mich. L. Rev. at 660 (describing studies in Maryland); Beall, 36 Law & Ineq. at 149 & n.27 (summarizing studies in North Carolina and Detroit).

More recently, a study in a Cleveland neighborhood showed that 83% of all citations for seat belt violations were issued to African-Americans and 88% of all the driver's license offenses involved African-Americans. Dunn, 66 Case W. Res. L. Rev. at 982. Further study of Ohio cities has found a persistent pattern of racial profiling in traffic enforcement. *See id.* at 973–86. A federal court found the stop and frisk policy in New York City was racially discriminatory. *Floyd,* 959 F. Supp. 2d at 560–61.

By way of summary, scholars have cited testimonial accounts of victims, statistical evidence, laws and consent decrees, political speeches, and policy-maker decisions to show the persistent pattern of racial profiling in law enforcement. *E.g.,* Padula, 120 W. Va. L. Rev. at 474 & nn.39–43.[24]

**C. Discussion of Choices Under Article I, Section 8 of the Iowa Constitution.** There is an array of choices under the Iowa Constitution. First, we could, of course, follow the analysis in *Whren* and adopt what is known as the "could have" test. Under the "could have" test, pretextual

---

[24]The American Civil Liberties Union of Iowa, the NAACP, the League of United Latin Americans Citizens of Iowa, and 1000 Kids for Iowa have filed an amicus brief in this case presenting statistical information which they assert demonstrates racial disproportionality in arrests in Iowa. In response, the Iowa County Attorneys Association filed an amicus brief challenging the validity of the statistics. I am grateful for the efforts of amici to assist us in this case. Deciding this case, however, does not require resolving whether, in fact, racial profiling is present in Iowa generally or even in this particular case. Instead, what is important, for purposes of article I, section 8, is that if law enforcement had unlimited discretion to make traffic stops regardless of pretext, our search and seizure law would allow law enforcement to engage in racial profiling.

traffic stops where the officers have reasonable suspicion or probable cause of a traffic infraction are not subject to challenge under article I, section 8 regardless of the nature and power of the motive for the search. A defendant would have to look elsewhere—perhaps to concepts of equal protection—for constitutional protection, if any, from arbitrary search and seizure.

A second option is to simply embrace a subjective test for pretext and determine what the officer's purpose was for engaging in the stop. This is the test we applied in *Cooley*, 229 N.W.2d at 759, and its progeny.

A third option is some form of the "would have" test. The notion here would be that evidence obtained as a result of a pretextual traffic stop is subject to exclusion as unlawfully obtained under article I, section 8 unless the State can show that the stop would have occurred even without pretextual motivation.

There is, perhaps, a final twist. This court could adopt an approach that limits search and seizure review of pretextual stops to certain subject matter. For instance, one scholar has suggested that judicial search and seizure oversight of pretextual traffic stops might be limited to situations involving "authoritarian pretext." Cynthia Barmore, *Authoritarian Pretext and the Fourth Amendment*, 51 Harv. C.R.-C.L. L. Rev. 273, 276 (2016).

I begin by rejecting the "could have" approach of *Whren*, 517 U.S. at 811–16, 116 S. Ct. at 1773–76. The "could have" test is not a test for pretext at all but simply rejects all pretext claims. I am simply unwilling to allow such a wholesale abandonment of constitutional restrictions on arbitrary pretextual traffic stops. It is undeniable that one of the historic purposes of search and seizure law is to prevent the government from engaging in arbitrary conduct permitted by unfettered discretion. *Wilson*, 519 U.S. at 416, 117 S. Ct. at 887; *Stanford*, 379 U.S. at 481, 85 S. Ct. at

510; *Brinegar,* 338 U.S. at 180–81, 69 S. Ct. at 1313; *Wolf,* 338 U.S. at 27, 69 S. Ct. at 1361; *Boyd,* 116 U.S. at 625, 6 S. Ct. at 529; *McCoy v. State,* 491 P.2d 127, 138 (Alaska 1971); *Coleman,* 890 N.W.2d at 299–300; *Entick,* 95 Eng. Rep. at 818; 2 Wils. K.B. at 292; Cuddihy at 377–78; LaFave, *Search and Seizure* § 1.4(e), at 173; Amsterdam, 58 Minn. L. Rev. at 411, 417; Burger, 14 Am. U. L. Rev. at 4; Finkelman, 16 S. Ill. U. L.J. at 392; Maclin, *Race and the Fourth Amendment,* 51 Vand. L. Rev. at 333–38; Maclin, *The Complexity of the Fourth Amendment,* 77 B.U. L. Rev. at 946; Maclin, *The Central Meaning of the Fourth Amendment,* 35 Wm. & Mary L. Rev. at 248. And it is inescapable that given the pervasiveness of traffic regulation, unfettered discretion to stop motorists on the open road is the equivalent of the hated general warrant. *Botero-Ospina,* 71 F.3d at 796; *Heath,* 929 A.2d at 402; LaFave, *Search and Seizure* § 1.4(e), at 173; Oliver, 74 Tul. L. Rev. at 1411–12. Further, a wide-open, let 'er rip approach to warrantless pretextual traffic stops is inconsistent with the thrust of our search and seizure law, which seeks to limit the scope of warrantless searches and to tightly control searches that occur without a warrant. *See Ingram,* 914 N.W.2d at 804–05; *Coleman,* 890 N.W.2d at 299–300; *Gaskins,* 866 N.W.2d at 3, 12–14; *Pals,* 805 N.W.2d at 782–83.

Further, our increased knowledge of implicit bias and the accumulating evidence of the reality of racial profiling reinforces my determination to address the issue. *See Batson,* 476 U.S. at 106–07, 106 S. Ct. at 1728; *Plain,* 898 N.W.2d at 830–36; Epp et al. at 50; Lawrence, 39 Stan. L. Rev. at 322; Quattlebaum, 14 Stan. J. C.R. & C.L. at 3–5, 10–11, 32–33; Richardson, 87 Ind. L.J. at 1146–51. The "could have" approach amounts to a license to law enforcement to act in an unstructured fashion without regard to implicit bias that may be a powerful motivating factor in the exercise of police authority. The

accumulating evidence of the exercise of wide-open discretion through direct or implied use of racial profiling in traffic stops reinforces the need to fashion a body of law that discourages, if not eliminates, these factors in the discretionary exercise of the power to search and seize.

I also decline to rely on the back-up plan of equal protection. Bringing an equal protection claim under federal law would be difficult, if not impossible, in the context of pretextual traffic stops. *See McCleskey*, 481 U.S. at 297–99, 107 S. Ct. at 1769–70; *Davis*, 426 U.S. at 239–42, 96 S. Ct. at 2047–49; *Ochoa*, 206 P.3d at 150–51. There may be opportunities under the Iowa Constitution to bring an equal protection-type claim. *See Varnum*, 763 N.W.2d at 878 n.6 (discussing independent approach to equal protection under the Iowa Constitution); *Racing Ass'n of Central Iowa*, 675 N.W.2d at 4–7, 16 (applying rational basis test under the Iowa Constitution in a fashion different from the United States Supreme Court). But even if available, equal protection claims will not likely reach the broad scope of arbitrary police conduct associated with pretextual traffic stops. In any event, it is not unusual for constitutional claims to overlap. *See, e.g.*, *Loving*, 388 U.S. at 12, 87 S. Ct. at 1823–24. One constitutional right does not preempt another. *See* Albert, 42 Ariz. St. L.J. at 683; Schwartz & Treanor, 112 Yale L.J. at 2410–11, 2410 n.407.

The rights-denying "could have" approach is no doubt more efficient. It would be more efficient, of course, to hold all Fourth Amendment rights, or all constitutional rights generally, unenforceable. But "[c]onvenience and efficiency are not the primary objectives—or the hallmarks—of democratic government." *Immigration & Naturalization Serv. v. Chadha*, 462 U.S. 919, 944, 103 S. Ct. 2764, 2781 (1983). "[T]he mere fact that law enforcement may be made more efficient can never by itself justify disregard of" constitutional search and seizure requirements. *Mincey v.*

*Arizona*, 437 U.S. 385, 393, 98 S. Ct. 2408, 2414 (1978). Maximum simplicity is not a doctrine to override search and seizure protections. *See United States v. Chadwick*, 433 U.S. 1, 6–11, 97 S. Ct. 2476, 2481–83 (1977), *abrogated on other grounds by California v. Acevedo*, 500 U.S. 565, 579, 111 S. Ct. 1982, 1991 (1991). Indeed, "[t]he very purpose of constitutional provisions . . . is to prevent current practical considerations from eviscerating 'inalienable' constitutional rights." *Gaskins*, 866 N.W.2d at 18 (Appel, J., concurring specially) (quoting Iowa Const. art I, § 1).

I think, however, simply returning to the test in *Cooley*, 229 N.W.2d at 759, may not be the best approach. Good evidence of subjective purpose, of course, is not always available. In addition, there may be situations where there is mixed subjective motivation or even conflicting subjective motivation. As a general proposition, a stop motivated in part by an unlawful purpose but that would have been lawfully made in any event does not give rise to a violation of article I, section 8.

The best approach under article I, section 8 to pretextual traffic stops is to adopt a version of the "would have" test. I would do so today. I would also adopt a burden-shifting approach as the best way to handle the problem of pretext in our district courts.

Under the "would have" approach, once the State establishes it had probable cause to engage in a stop, the burden shifts to the defendant to produce evidence that the stop was pretextual. Objective and subjective evidence would be admissible.[25] *Heath*, 929 A.2d at 402–03; *Ochoa*, 206

---

[25]The line between objective and subjective evidence is not as clear as some have suggested. The showing required to justify *Terry*-type searches, for instance, is sometimes claimed to be objective, but the "what did you know and when did you know it" questions relevant under *Terry* obviously have subjective aspects. *See* Kit Kinports, *Criminal Procedure in Perspective*, 98 J. Crim. L. & Criminology 71, 85–86 (2007); *see also* R. George Wright, *Objective and Subjective Tests in the Law*, 16 U.N.H. L. Rev. 121, 121–25 (2017) (asserting that the distinction between objective and subjective tests is

P.3d at 155–56.  If the defendant makes a prima facie case that the stop was in fact pretextual, the burden of proof shifts to the State to show that the stop was not pretextual or that the stop would have occurred even without the pretextual motivation.  *Heath*, 929 A.2d at 402–03; *Ochoa*, 206 P.3d at 155–56.  Because the State in a pretext case is seeking to offer evidence obtained as a result of a warrantless seizure or search, the burden of proof is on the State to show admissibility of the evidence.

The test I would adopt is somewhat similar to that embraced in *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S. Ct. 568 (1977).  *Mt. Healthy* stands for the proposition that if a government employee is fired for two reasons, one constitutional and one not, the government may prevail by proving that it would have taken the same action even in the absence of any unconstitutional motive.  *Id.* at 285–87, 97 S. Ct. at 575–76.

Finally, I turn to the suggestion that our review of search and seizure pretexts should be limited by the nature of the pretext.  It would, perhaps, be possible to limit search and seizure pretext review to cases involving fundamental rights such as race, religion, or free speech.  But I find such an approach inadequate.  It gives only partial life to the constitutional principle that the power to search and seize should not be exercised in an arbitrary manner.  Pretextual investigative searches may be based not only on race but upon "appearances that some police officers do not like, such as young men with long hair, heavy jewelry, and flashy clothing."  *Scopo*, 19 F.3d at 786 (Newman, C.J., concurring).  The search and seizure provisions of article I, section 8 protect all citizens, even average Joes and Sallys, who do not fall within a suspect class and are not exercising

---

incoherent and ultimately futile in practice).  Under my approach, there is no need to separate evidence by artificial categorization.

fundamental rights.  The protections apply when persons are engaged in the mundane tasks of life, like trips to the grocery store, as well as trips to a political rally.  They apply to all members of all races and ethnic groups. I decline to withdraw protection from pretextual search and seizure based on the subject matter involved.

**D.  Application of the "Would Have" Test in This Case.**  Applying these principles to the facts of this case, I have little trouble concluding that the stop was pretextual.  The officer involved virtually said as much. According to Officer Brandt, he "wasn't even going to stop" the car for the traffic violations until he ran the plate and learned of the owner's gang affiliation.  After he learned of the gang affiliation, he then wanted to "poke around and see what's up."  He had a hunch based on the owner's gang affiliation, but that would not be a constitutionally sufficient basis for a traffic stop.  As a result, the evidence obtained as a result of the illegal stop, namely, evidence of Brown's intoxication, should have been suppressed.  Therefore, Brown's conviction should be reversed and the case remanded to the district court.

**VII.  Conclusion.**

For the above reasons, the district court should have granted the motion to suppress in this case.  I regret that this view does not command the support of the current majority of this court.  Accordingly, I respectfully dissent.

Wiggins, J., joins this dissent.